IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MERVAT MIKHAEIL

                Plaintiff,                    Case No.: 13-14107

                                                Hon. Nancy G. Edmunds

v

WALGREEN'S INC.

                Defendants.

---

| | |
|---|---|
| MARLA A. LINDERMAN (P55759) | ELIZABETH HARDY (P37426) |
| ATNIP & ASSOCIATES, PLLC | THOMAS J. DAVIS (D.C. 490033) |
| 400 Water Street, Suite 205 | KIENBAUM OPPERWALL, ET AL |
| Rochester, MI 48307 | 280 N. Old Woodward, Ste 400 |
| 248-674-4404 | Birmingham, MI 48009 |
| marla@atniplawyers.com | 248-645-48009 |

---

# PLAINTIFF'S RESPONSE
# TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# <u>QUESTIONS PRESENTED AND CONTROLLING AUTHORITY</u>

1. Should Defendant's motion be denied as to Plaintiff's discrimination claims?

   Plaintiff states:          Yes.
   Defendant states:       No.

   Controlling Authority: <u>Aho v. Dep't of Corr.</u>, 263 Mich. App. 281, 688 N.W.2d 104, 108 (Mich. Ct. App. 2004); <u>Pena</u> v <u>Ingham County Road Commission</u>, 255 Mich. App. 299; 660 N.W.2d 351 (2003); <u>Grow</u> v. <u>W.A. Thomas Co.</u>, 236 Mich. App. 696, 702-703 (1999); <u>Henry v Detroit</u>, 234 Mich App 405, 414 (1999); <u>Downey v. Charlevoix County Bd. of Rd. Comm'rs</u>, 227 Mich. App. 621, 626 (1998).

2. Should Defendant's motion be denied as to Plaintiff's FLSA claims?

   Plaintiff states:          Yes.
   Defendant states:       No.

   Controlling Authority:  29 USC 201 et seq.

3. Should Defendant's motion be denied as to Plaintiff's WPA or public policy claims?

   Plaintiff states:          Yes.
   Defendant states:       No.

   Controlling Authority: MCL 15,361; <u>Driver</u> v. <u>Hanley</u>, 226 Mich. App. 558, 566 (1997);<u>Dudewicz v Norris-Schmid, Inc</u>, 443 Mich 68, 78-79 (1993).

4. Should Defendant's motion be denied as to the federal False Claim Act retaliation claim?

   Plaintiff states:          Yes.
   Defendant states:       No.

Controlling Authority:  31 USC §3730(h); <u>United States ex rel. Marlar v. BWXT Y-12, L.L.C.,</u> 525 F.3d 439, 450 (6th Cir. Tenn. 2008); <u>United States ex rel. McKenzie v. Bellsouth Telcoms.,</u> 123 F.3d 935, 944 (6th Cir. 1997).

5. Should Defendant's motion be denied as to Michigan's False Claim retaliation claim?


Plaintiff states:          Yes.
Defendant states:        No.

Controlling Authority: MCL 400.601 et seq.  Deficit Reduction Act of 2005, 42 USC §1305.

## **INTRODUCTION**

Within weeks of Donna Spencer becoming her Pharmacy Manager, Plaintiff Mervat Mikhaeil realized there were serious problems that needed to be addressed. Ms. Spencer quickly let Plaintiff know that she did not like her being Egyptian and from Egypt.  And Ms. Spencer would make Plaintiff work for her without getting properly paid.  And even worse, Ms. Spencer was violating the law regarding prescription dispensing of Controlled II substances.

Plaintiff tried to follow Walgreen's policies. She reported the FLSA violations and the discrimination, harassment and retaliation violations. Even though Ms. Spencer admitted to making illegal comments, nothing happened. Even though Plaintiff was not paid correctly, nothing was fixed. Plaintiff tried to follow Walgreen's STARS policy and report her supervisor's irregularities, however, she was instructed by both supervisors, Donna Spencer and Amy Yadmark, to stop reporting Ms. Spencer into the STARS systems in Ms. Spencer's first month at the store.  Instead, Plaintiff was instructed to tell Ms. Spencer, and then Ms. Spencer would either tell her that she planned to self-report or that Plaintiff could report it.

Plaintiff made it known to Ms. Yadmark that she was investigating Ms. Spencer for prescription violations and Medicaid/Medicare billing fraud and was making claims under the FLSA and ELCRA. Plaintiff set up a meeting with Ms. Yadmark but Ms. Yadmark kept cancelling the meeting and pushing it off.

Plaintiff, recognizing that her claims were being ignored, sent a picture of an illegally filled prescription to Ms. Yadmark.  Rather than address Ms. Spencer's now admitted violation of the law, Ms. Yadmark tried to fire Plaintiff for sending the email but couldn't.  Plaintiff did meet with Ms. Yadmark on June 28, 2013, told her she was investigating the prescription violations, and tried to provide the evidence to Ms. Yadmark.  Ms. Yadmark refused to look at the evidence, saying that Ms. Spencer was doing everything perfectly.

Instead, Ms. Yadmark concocted a reason to terminate Plaintiff, a reason that Ms. Spencer and Ms. Yadmark had created and ordered Plaintiff to follow, as to the STARS system.  Ms. Yadmark knew she had told Plaintiff that she couldn't report Ms. Spencer anymore, told Plaintiff that Ms. Spencer was doing it "perfectly", admitted that she knew that Plaintiff was not following the written STARS policy for months, but then allegedly terminated Plaintiff for following her and Ms. Spencer's instructions.  Plaintiff alleges that this reason is pretext.

It should be noted that Plaintiff's concerns about the prescriptions are not de minimus violations. In June of 2013, Walgreens agreed to pay $80 million in penalties for the violations that Plaintiff was concerned about; this settlement included violations from four states including Michigan.  Exhibit A[1].

---

[1] Plaintiff sent a request for production asking for "Any and all documents relating or referring to Defendant's noncompliance with prescription laws and/or regulations from 2010 through the

# FACTS

## I.   THE PEOPLE INVOLVED

Plaintiff started working for Defendant Walgreens on approximately August 1, 2012 as a pharmacist. (Dkt No. 1). In December of 2012, she transferred to the Bloomfield location, Store No. 7094. Ex. B, Plaintiff's Dep. pp. 321-322. About mid-January 2013, Plaintiff started reporting to Donna Spencer, Pharmacist Manager. Id. at 324. Ms. Spencer's immediate supervisor was Amy Yadmark, Pharmacy Supervisor of 41 stores in Michigan. Exhibit C, Yadmark Dep. p. 13.

Jeremy Willis was the Loss Prevention Manager for the region and John Calhoun was also a Loss Prevention Manager. Id. at 81, 120. Loss Prevention Managers are supposed to investigate discrimination claims. Exhibit D, Willis Dep. pp. 14-19. Defendant admits it chose not to fully investigate Plaintiff's discrimination, harassment and retaliation claims and there is an email admitting that Mr. Willis dropped the ball. Ex. E. No one investigated Plaintiff's prescription drug violations and fraud claims. Plaintiff also made written complaints to Kevin Schmidt, a Vice President of Walgreens, before her termination. Exhibit F.

## II.   RACE, NATIONAL ORIGIN AND RETALIATION CLAIMS

Within a matter of weeks of Plaintiff working with Ms. Spencer, Ms. Spencer started making inappropriate comments about Plaintiff's Egyptian race

---

present." Defendant failed to provide any documents or even mention the $80 million dollar fine relating to the Federal Government's investigation of its noncompliance with prescription laws.

3

and national origin.   Ex. B, p. 322, 325. The comments were frequent and included:

    1.    "So, Mervat, I just want to tell you  something.  If you are living here in the United States of America, you have to deal with American people like an American, because you are already trying to do the  same like Egyptian.  This is not okay here.  Try to  forget everything about Egypt." <u>Id.</u> at 327. (by Spencer).

    2.    "Try to tell her don't use this voice like Egyptian people with --over the phone.  I cannot concentrate because of this high voice.  This is very loud.  I don't -- I don't like this way.  Try to tell her to stop it." <u>Id.</u> at 329. (by Spencer).

    3.    "I told you, several times, forget about your  attitude and Egypt.  Why you didn't wash those type of equipment before leaving?  Why you didn't -- you didn't do it?  Try to be clean, please.  You are not." <u>Id.</u> at 339. (by Spencer).

    4.    Making fun of her accent. <u>Id.</u> at 334 (by Spencer).

    5.    Being told she couldn't go to an event at her Egyptian Church honoring her family, on her day off, by Ms. Spencer and being told by Ms. Yadmark that she deserved the unlawful treatment by Ms. Spencer for not telling Ms. Spencer, 'No." <u>Id.</u> 550-551.

    6.    Assigning her menial tasks and treating her like a slave by Ms. Spencer. <u>Id.</u> 277, 349-353.

    7.    Inappropriate physical poking and shoving by Ms. Spencer. <u>Id.</u> at 329-331

Plaintiff reported these claims very quickly to Walgreens.  First to Amanda, the Store Manager of 7094 and also Ginger, the Assistant Store Manager in about March of 2012. <u>Id.</u> at 343-344. Then she reported the discrimination and retaliation to Mr. Willis on April 22, 2013, in tears; Mr. Willis "fully informed" Ms. Yadmark of the situation on April 23, 2013. Exhibit G. Plaintiff then contacted Mr. Willis

again on May 20, 2013 and sent an email on June 4, 2013 which started by saying she wanted to inform him of "some issues I go through everyday with my manager, Donna Spencer" and then proceeded to give him some examples of the discrimination, harassment, retaliation, she was experiencing but stated "there are way more situations like this that have occurred." Ex. G and H. Ms. Yadmark also admits that Plaintiff brought concerns about racial and national harassment, as well as prescription violations, to her attention several times in May of 2013 and Plaintiff was so upset she was crying. Ex. C, p. 81, 110-111. Mr. Willis and Ms. Yadmark chose to ignore the complaints and protect Ms. Spencer.

Defendant failed to investigate Plaintiff's claims for months. Ex. G, H, E, Ex. D p. 24-25, 73-75, 121-129. Instead Mr. Willis he relied on Ms. Yadmark's assurances that Ms. Spencer had admitted to one comment and would be apologizing; a claim now denied by Ms. Yadmark. Ex. D, pp. 75, 121, 125. Plaintiff brought these claims up again on June 28, 2013 to Ms. Yadmark and Mr. Calhoun, and again on July 11, 2013 to Mr. Willis and to Ms. Yadmark. Ex. B, p. 367-370, 388, 394-396. It wasn't until after Plaintiff's termination that Defendant kind of investigated Plaintiff's claims and even then, Defendant decided it was not important to get Plaintiff's statement.

III.   **FLSA Claims**

Plaintiff alleges two different types of FLSA violations. One is a failure to pay for overtime hours and the other is for not being paid minimum wage on hours she was promised to be paid for and received no compensation for at all. Ex. B, pp. 338, 346-349, 446, 451, 547. Defendant does not address the second alleged failure in its brief.

## IV.    PLAINTIFF'S PRESCRIPTION RELATED CLAIMS

### A.    Illegal Controlled 2 Substance Dispensing

Controlled 2 substances like oxycodin and adderall are highly regulated drugs. Plaintiff found drugs were missing and were being given out in violation of prescription regulations. For example, when insurance companies would not approve refilling these prescriptions because it was too soon, Ms. Spencer would give out a 4-5 day supply of these Controlled 2 substances in unmarked prescription bottles or just by hand and without charge.[2] Ex. B pp. 145-149, 197-210, 237-242. On at least one occasion, Plaintiff became aware that 10 Controlled 2 substance pills were missing and unaccounted for, within 10 days of a DEA audit. Id. at 145-149.

However, the law requires that these prescriptions have prescription labels and information and that the entire prescription be filled within 72 hours. See e.g. 21 CFR 1306.13. Ms. Spencer admits being unaware of these requirements until

---

[2] Please see the documents submitted under seal by Defendant.

this lawsuit, having violated these prescription regulations and being willing to continue to violate the law, even now that she is aware of the regulations. Ex. J, Spencer Dep. pp 36-59, 61-73, 101-106. Ms. Spencer would also change doctor prescriptions illegally when she could not get the insurance companies to approve the prescriptions as written.  For example, on one occasion, a doctor wrote a Controlled 2 prescription as TID (three times daily) and without permission from the doctor, Ms. Spencer changed the prescription to BID (twice daily); only a doctor can make this change. Ex. B, pp. 237-242.

When Plaintiff brought these illegal drug violations to Ms. Yadmark's attention, Ms. Yadmark made it clear that Walgreen's endorsed and approved the violations of the law and that Ms. Spencer was acting "perfectly" according to acceptable Walgreen's practices:

> [Ms. Yadmark] said, "I'm -- I'm so busy right now.  Everything is just fine. Your manager is excellent.  So anything you -- you thought that she  doing wrong is just perfect.  Try to follow her."

Ex. B, p. 385. However, the Federal Government disagreed with Walgreen's practices and Walgreen's had to pay $80 million dollars in fines, which included allegations of wrongdoing in Michigan.  Exhibit A.

## B.     Medicaid/Medicare Fraud in Billing

Plaintiff attempted to tell Defendant about her concerns about Medicaid and Medicare Fraud on several occasions, despite the fact that Ms. Yadmark would go

to great lengths to avoid hearing what Plaintiff was saying. Ex. B, pp. 220-236.

However, on June 28, 2013, Plaintiff specifically told Ms. Yadmark,

> "I told her that, "There is something wrong with – with  the -- the Medicaid or Medicare fraud, ma'am.  I can see that here." She said, "I don't think that's what you're thinking, because our -- our pharmacy manager was one day supervisor, and know everything about the law, and never can violate it, so I'm not -- I'm not going with you.  She is just perfect, and she is the exact, excellent one."

Id. at 503.  *After* Plaintiff made this specific complaint, in the same meeting, she was suspended and threatened with termination for an alleged HIPAA violation. However, Ms. Yadmark testified she had known about this alleged violation since Mid-June, had not contacted human resources about it[3] and had not suspended Plaintiff or moved to discipline Plaintiff.

After that meeting, Plaintiff was handed some paperwork and Mr. Calhoun told her she shouldn't sign it.  Id. at 438-440.  That paperwork did not say it was a final written warning and is not the paperwork that Defendant now claims was given to Plaintiff at that meeting or the July 11, 2013 meeting.  Id. at 469-470. Plaintiff never was given or told about any final written warning. Id.  Ms. Yadmark instead told Plaintiff that the proper discipline for the alleged HIPAA violation was

---

[3] Of interest, Ms. Yadmark testified that she told Plaintiff she was going to contact the privacy office in mid-June about the email, but did not contact them until after she suspended Plaintiff. Ex. C, p. 114. This was such a non-issue that Plaintiff was allowed to continue working until Friday, June 28, 2013. The only time it was mentioned, and became an issue, was after Plaintiff reported the ELCRA and Medicare/Medicaid fraud issues in the June 28, 2013 meeting.

just retraining, not suspension or termination, however Plaintiff was never paid for the time of her improper suspension despite being salaried. Ex. B. pp 517-519. Without Plaintiff's knowledge, and in contradiction to what Ms. Yadmark told her, a disciplinary form was later put in Plaintiff's personnel form alleging that she was being given a final warning, where no warning was ever given.

### C.    STARS System Pretext

Plaintiff was specifically instructed to not use the STARS system to report Ms. Spencer's mistakes by Ms. Spencer in January of 2013, and then again,by Ms. Yadmark, early in the year of 2013, several months before her termination. Ex, B, p. 473-474.  Plaintiff was ordered, to instead, bring the issue to Ms. Spencer's attention and let her self-report.  Id.

According to Ms. Spencer, she was aware that Plaintiff was not entering events into the STARS system and despite it being her responsibility to supervise Plaintiff, let it go on without comment.  Ex. J pp. 28-30. Moreover, Ms. Spencer said she told Ms. Yadmark about Plaintiff's failures with the STARS system, perhaps early in her working with Plaintiff, which begain in January of 2013, and that Ms. Yadmark did not instruct her to talk to Plaintiff about it or discipline Plaintiff about it or even say that she, Ms. Yadmark, would talk to Plaintiff.  Ex. J pp. 30-32. This was a non-issue for months.

Plaintiff also brought STARS policy violations to Mr. Willis's attention, where she could prove that Ms. Spencer was assigning error to Plaintiff where the paperwork clearly showed that Ms. Spencer made the error.  Exhibit B, p. 277. Walgreen's didn't care about Ms. Spencer's STARS System violations though.

Plaintiff denies that Ms. Yadmark spoke to her about STARS reports prior to July 11, 2013 and testified that instead Ms. Yadmark instructed her not to file STARS reports. Plaintiff was never given a verbal warning, a written warning about these alleged violations or any progressive discipline, and in contravention of Walgreen's progressive discipline policy went immediately to termination.

In addition, the testimony about the reporting requirements about STARS system was inconsistent.  Ms. Yadmark said STARS reports had to be completed within 24 hours, Ms. Spencer said within 72 hours and she wasn't sure it was a written policy, it does not appear that Plaintiff was ever told a time period that reporting had to be done.  Exhibit C p. 87, Ex. J, p. 30.

However, for the actual STARS report for which Plaintiff was terminated for, no violation of the STARS system actually occurred.  First, two of the three allegations were known before July 11, 2013 and Ms. Yadmark chose not to discipline or warn Plaintiff about these incidents[4]. Exhibit L. At this point, Plaintiff had been instructed not to report incidents unless approved by Ms. Spencer.  As to

---

[4] For one incident, Plaintiff also did not have enough information to file a STARS system report because she didn't have the patient's name or prescription number. Exhibit B.

the third allegation, the one actually discussed on July 11, 2013, Ms. Spencer testified that she self-reported the error timely and that only one person had to report it.  Ex. C., p. 88-89, 97-98, Ex. J, pp. 24-25, 101. Moreover, Plaintiff had been specifically instructed not to file this STARS report because she was needed elsewhere. So Plaintiff was terminated for unfounded and old accusations of STARS system violations.  Walgreens did not produce any evidence of any other employee terminated for a STARS system violation, despite the fact that according to Ms. Yadmark, Ms. Spencer violated the policy too since she reported within 72 hours, not 24 hrs, and Ms. Yadmark was not aware of anyone else that had been terminated for similar reasons as Plaintiff. Ex. C p. 149-150.

## V.    DISCIPLINE AND TERMINATION

The first time Defendant ever gave Plaintiff any job criticism was after she engaged in protected activity on June 28, 2013. After her protected activity, in that same meeting, and she was suspended.  Plaintiff denies that the STARS system was mentioned at all at this meeting and there is no mention in the (falsified) disciplinary record about the June 28, 2013 incident. Ex. L. On July 8, 2013, Ms. Yadmark called Plaintiff, wished her a happy birthday, told her she was not terminated because she didn't do anything wrong under the HIPAA, and would just be given training.  Ex. B, p. 281. Plaintiff never received any notice of discipline for the HIPAA incident until Discovery. Ex. L.

The second time Plaintiff's performance was discussed was on July 11, 2013, her first day back to work.  She was again suspended but Mr. Willis told her she would not be terminated for the STARS system allegation. Ex. B, p. 392-393. Plaintiff contacted Mr. Schmidt on July 18, 2013 for help regarding her complaints and to stop the retaliation. Ex.t F. On July 22, 2013, Plaintiff was terminated.

It should be noted that Ms. Spencer had trouble keeping her story straight, originally claiming the first time Plaintiff was suspended was on July 11, 2013 but then remembering the first suspension, after being reminded of it. Ex. C, pp. 82-83, 97-104.  Ms. Yadmark admitted that Plaintiff had not been disciplined before June 28, 2011. Id. at 106-107. Also, Ms. Spencer was never disciplined for serious prescription and false claim law violations or the racially inappropriate comment that she allegedly admitted to saying. Ex. A,D,E,K.

## ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD

The summary judgment standards are set forth in Patterson v. Hudson Area Schools, 551 F.3d 438, n. 6 (6th Cir. 2009). On summary judgment, courts are prohibited from discounting evidence put forth by the non-moving plaintiff, and must accept such evidence as true, and construe all evidence and inferences drawn from the evidence in the light most favorable to the non-moving plaintiff. Cutcher v. Kmart Corp., 364 Fed.Appx. 183 (6th Cir. 2010); See also Schaffer v. A.O.

Smith Harvestore Prod., 74 F.3d 722, 727 (6th Cir. 1996) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Of significance to this particular type of case, summary judgment should be granted only "sparingly" in employment discrimination case. King v. Hardesty, 517 F.3d 1049, 1057 (8th Cir. 2008). Because this is a discrimination case where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate. Carlton v. Mystic Transport Co., 202 F.3d 129, 134 (2nd Cir. 2000).

## II.   THE RELATIONSHIP BETWEEN PLAINTIFF'S FEDERAL FALSE CLAIMS ACT CLAIM, MICHIGAN MEDICAID FALSE CLAIMS ACT CLAIM, WHISTLEBLOWERS' PROTECTION ACT CLAIM AND PUBLIC POLICY CLAIM

The Whistleblower's Protection Act ("WPA"), MCL 15.361 et seq. was passed in 1981 and protects employees, who blow the whistle to government agencies, from retaliation from their employers.   MCL 15.361 et seq.   The Michigan Medicaid False Claims Act ("MFCA") provision was passed in 2005 and protects employees who initiate an investigation into whether Medicaid and Medicare fraud has occurred or is occurring. MCL 400.610c.

While Michigan's statute has not been the subject of extensive interpretation, its history makes it clear that it is supposed to be interpreted exactly as the Federal FSA Act is, and that failure to do so will literally cost Michiganders millions of dollars.  As a word of caution, Michigan is ***required*** to have this act by the federal government, if it wishes to obtain full recovery of Medicaid fraud

13

funds. The federal Deficit Reduction Act of 2005 allows a state to receive an additional 10 percent of recovered money from false claims if it has a law with similar civil liability provisions to the FCA. In 2008, the federal government found that Michigan's MFCA was too dissimilar to the federal law and Michigan lost **$2.17 million dollars**. Michigan's Legislature quickly amended the MFCA after this unfortunately ruling to ensure that Michiganders received the full benefit of funds recovered from false claims.  MCL 400.610c.  If this Court finds that the MFCA is to be interpreted differently than the FCA, it will be jeopardizing millions of Michigan's taxpayer dollars.

The Federal FCA's language as to employee retaliation is identical to the MFCA.  Federal law since 1997 has interpreted the same language adopted by Michigan in 2005 to protect employees who make internal claims of Medicaid fraud and employees investigating their employer based on suspicions of fraud.

The FCA and MFCA is broader and provides more protection than the WPA.  The WPA only protects an employee who reports or is about to report a violation to a governmental body; it does not apply if the employee had not yet reported or had not taken steps to report.  MCL 15.361 et seq; Driver v. Hanley, 226 Mich. App. 558, 566 (1997).  Conversely, by its very language, the MFCA protects an employee who initiates or assists in an investigation of Medicaid fraud,

without having to prove that the investigation has been reported or that they were about to report their investigation to a governmental entity. MCL 400.610c.

> An employer shall not discharge, demote, suspend, threaten, harass, or in any other manner, discriminate against an employee in the terms and conditions of employment because the employee engaged in lawful acts, including initiating, assisting in, or participating in the furtherance of an action under this act or because the employee cooperates with or assists in an investigation under this act.

Michigan has recognized that the WPA is not the exclusive remedy when other statutes provide a remedy for the same acts. Shuttleworth v Riverside Osteopathic Hosp., 191 Mich App 25, 28 (1991). Here, the WPA and the MFCA are harmonized statutes coexisting and cooperating to protect employees who investigate Medicaid and Medicare fraud.

> The statute provides examples of the types of activity that are protected, **including investigation**, initiation of a suit, and testimony, **but these examples are not exclusive and the legislative history indicates that "protected activity should . . . be interpreted broadly."** S. REP. NO. 34599th Cong., 2d Sess. 35 (1986), reprinted in, 1986 U.S.C.C.A.N. 5266, 5300. We conclude that the activity engaged in by McKenzie, including bringing the alleged fraud to the attention of her supervisors and showing them a newspaper article describing a qui tam action in Florida involving similar allegations of fraud, are protected activities within the meaning of the Act.

United States ex rel. McKenzie v. Bellsouth Telcoms., 123 F.3d 935, 944 (6th Cir. 1997) (emphasis added). Plaintiff has testified that she brought the allegations of fraud to the attention of Amy Yadmark. Ex. B, p. 503. This activity is protected under the FCA and MFCA. See Id.

Defendant argues on one hand that Plaintiff does not have a WPA claim because she did not engage in protected activity because she did not make a report or show that she was about to report to a governmental agency. On the other hand, Defendant claims that Plaintiff cannot have a public policy claim because the WPA preempts it. Defendant cannot have it both ways. The Michigan Court of Appeals has held, rejecting Defendant's contrary arguments, if the WPA does not apply, it provides no remedy and there is no preemption. Driver v Hanley (After Remand), 226 Mich App 558; 566 (1997). Moreover, the WPA only preempts a public policy claim arising from the same activity; here, Plaintiff alleges both internal protected activity when she complained to Ms. Yadmark and Ms. Spencer and also governmental protected activity, when she was gathering evidence to send to the DEA and DHHS, which are separate acts. Dudewicz v Norris-Schmid, Inc, 443 Mich 68, 78-79 (1993). For example, it is conceivable that a jury could conclude Defendant did not terminate Plaintiff for gathering evidence to send to the DEA and DHHS, but when she would not drop it and continued to compile evidence of Defendant's violation of the law and presented it internally, it was the last straw that led to her termination.

## III.  FALSE CLAIMS ACTS

The False Claims Act, 31 USC §3730 (h) protects Plaintiff from being discharged, threatened, harassed, or in any other manner discriminated against

because she investigated Medicaid and Medicare fraud. Plaintiff does allege in her Complaint that she was subjected to illegal retaliation under 31 USC §3730(h) and also Michigan's law.

Under both federal and state False Claims Acts, the WPA and public policy claims, Plaintiff must show that:

(1)     She engaged in a protected activity;

(2)     Her employer knew that she engaged in the protected activity; and

(3)     her employer discharged or otherwise discriminated against the employee as a result of the protected activity."

United States ex rel. Marlar v. BWXT Y-12, L.L.C., 525 F.3d 439, 450 (6th Cir. Tenn. 2008) (citing Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 566 n. 6 (6th Cir. Ohio 2003).

### A.     Plaintiff Engaged In Protected Activity

The definition of "protected activity" under both FCA is broad and clearly includes Plaintiff's activities. The Sixth Circuit has accepted a broad definition of "protected activity" in Marlar, supra and McKenzie I, infra:

> The statute provides examples of the types of activity that are protected, **including investigation**, initiation of a suit, and testimony, **but these examples are not exclusive and the legislative history indicates that "protected activity should . . . be interpreted broadly.**" S. REP. NO. 34599th Cong., 2d Sess. 35 (1986), reprinted in, 1986 U.S.C.C.A.N. 5266, 5300. We conclude that the activity engaged in by McKenzie, including bringing the alleged fraud to the attention of her supervisors and showing them a newspaper article

17

describing a qui tam action in Florida involving similar allegations of fraud, are protected activities within the meaning of the Act.

United States ex rel. McKenzie v. Bellsouth Telcoms., 123 F.3d 935, 944 (6th Cir.

Tenn. 1997) (emphasis added).  As the 6th Circuit said in Marlar, supra at 449-450:

> We held in McKenzie that a plaintiff must only allege activities "that would have given [the defendant] reason to believe that she was contemplating a qui tam action." Id. This test was drawn from Mikes v. Strauss, 889 F. Supp. 746, 753 (S.D.N.Y. 1995). Mikes found that a plaintiff is entitled to recovery under § 3730(h) when she alleges that she observed purportedly fraudulent activity, she confronted her employer about it, and her employer fired her because of it. 889 F. Supp. at 752-53.

The District Courts in this Circuit have further stated:

> To be considered protected activity, "it is sufficient that a plaintiff be investigating matters that 'reasonably could lead' to a viable False Claims Act case." United States ex. rel. Yesudian v. Howard Univ., 153 F.3d 731, 740, 332 U.S. App. D.C. 56 (D.C. Cir. 1998). A plaintiff's protected activity must, therefore, pertain to fraudulent claims. McKenzie v. BellSouth Telecomms., Inc., 219 F.3d 508, 514 (6th Cir. 2000). "[T]he protected conduct element of such a claim does not require the plaintiff to have developed a winning qui tam action before he is retaliated against." Yesudian, 153 F.3d at 739. "Under the whistleblower statute, 'an employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government.'" Wilkins v. St. Louis Housing Auth., 314 F.3d 927, 933 (8th Cir. 2002) (quoting Moore v. Cal. Inst. of Tech. Jet Propulsion Lab., 275 F.3d 838, 845 (9th Cir. 2002).

Thompson  v. Quorum Health Res., LLC, 2010 U.S. Dist. LEXIS 2668 (W.D. Ky.

Jan. 12, 2010). Here, Plaintiff specifically told her employer she believed Medicare

and Medicaid fraud had occurred and that she had gathered evidence to support her

claim.  Exhibit B, p. 503. This evidence could lead to a viable qui tam action. Ex, K, Therefore, the law fully supports that Plaintiff engaged in protected activity.

### a. Investigating A Claim is Specifically Mentioned in 31 USC §3730(h) and MCL 400.601c As Protected Activity

Plaintiff told Defendants that she was investigating and had gathered evidence that she believed would prove Medicare and Medicaid Fraud as Ms. Spencer was double charging Medicare and Medicaid for prescriptions.  Ex. B, p. 503.  Exhibit K provides background relating to the fraud.  This was protected activity under 31 USC §3730(h) and under MCL 400.610c.  See McKenzie (I), supra and Marlar, supra.

While in the end, the evidence Plaintiff has supports a finding of Medicare fraud and not Medicaid fraud, it is not a requirement that Plaintiff's investigation be fruitful to be protected activity. Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 416 (2005).  Therefore, Plaintiff is still protected under the Michigan Medicaid False Claims Act.

### b. Defendant Knew Plaintiff Engaged In Protected Activity

Plaintiff attempted to make her protected activity about suspected fraud known prior to June 28, 2013, however, Ms. Yadmark was unwilling to listen. Finally, on June 28, 2013, Plaintiff specifically told Ms. Yadmark that she suspected Medicaid and Medicare fraud and had been gathering documents to prove her suspicions. Ex. B, p. 503.  It should be noted that this June 28, 2013

meeting was not setup to discuss any HIPAA violation.  It had been set for early June 2013 to discuss Plaintiff's racial and national origin claims of harassment and retaliation and her concerns about prescription law violations and kept getting cancelled and rescheduled by Ms. Yadmark.  In the meantime, Plaintiff tried to give Ms. Yadmark some evidence of what was occurring because the violations were so severe.  Ms. Yadmark tried to use the alleged HIPAA violation to discredit Plaintiff's other claims and get rid of her but she was unsuccessful.

### c.   Defendant Discharged And Retaliated Against Plaintiff for her Protected Activity

The language of the FCA, and thus MCL 400.610c, has been analogized to the broad language of the retaliation provision of Title VII

> Behavior does not constitute retaliation under False Claims Act, for purposes of whistleblower protection, unless it would be sufficient to constitute adverse employment action under Title VII (42 USCS §§ 2000e et seq.); thus, action may be cognizable as discrimination under False Claims Act if it is reasonably likely to deter employees from engaging in activity protected thereunder.

Moore v Cal. Inst. of Tech. Jet Propulsion Lab. 275 F3d 838, (9th Cir 2002).  No other similarly situated employee was suspended and threatened with termination for an alleged HIPAA violation[5]. Here, only after Plaintiff engaged in protected activity was her job in jeopardy.  And when Ms. Yadmark realized she could not terminate Plaintiff for this non-HIPAA violation, she looked for another way to get

---

[5] No explanation is given to explain why sending an email to Plaintiff's supervisor, who was authorized to have the information, would be a HIPAA violation.

rid of Plaintiff.  Defendant simply did not want anyone internally investigating the same types of claims being investigated by the federal government. Ex. A. And by suspending and terminating Plaintiff, who was the victim and the protected employee, Defendant sent a strong retaliatory message to other employees to deter them from engaging in protected activity.

Plaintiff was terminated by Ms. Yadmark for following her instructions.  For months, Ms. Yadmark and Ms. Spencer knew that Plaintiff was not reporting STARS events because they ordered her to not report Ms. Spencer's plethora of errors and violations. Only when Plaintiff refused to stop engaging in protected activity did this known activity become a problem. And even then, to make it a problem, Defendant had to ignore its progressive discipline policy, falsify discipline and lie and say that Plaintiff had been given verbal warnings.

A genuine issue of material fact is present as a jury may wonder why no discipline or investigation was commenced against Ms. Spencer, who did violate the law, and the focus was on Plaintiff, who at best, violated an internal policy of Walgreen's. It's like a police officer ignoring the person who speeds through the intersection on a red light and causes an accident to instead ticket the person who didn't yield at the stop sign in the Target parking lot; it just doesn't happen.

## IV.   **Whistle-Blowing And Public Policy**

Plaintiff did not contact a governmental agency while employed at Walgreen's. However, she made it clear in writing that she believed the law was being broken and that if the issues were not resolved she would alert the proper authorities, before she was terminated. Exhibit B, p. 503, Exhibit F.  Her intent to go to the authorities was communicated to Mr. Willis before Plaintiff's termination, who was in communication with the decision maker Ms. Yadmark, also before Plaintiff's termination.  Exhibit E.  This evidence is enough to provide clear and convincing evidence that Plaintiff was planning to blow the whistle and therefore, Plaintiff's WPA claim should survive summary judgment.

In the alternative, if this Court does not think enough evidence has been present that Plaintiff intended to report to a government agency, like the DHHS or the DEA, before her termination, Plaintiff's public policy claims should be upheld. As is obvious from Exhibit A and K, there is clear public policy at issue here with Controlled 2 prescription drug impropriety and Medicaid/Medicare fraud.

And as explained in the FSA claims section, Defendant was aware of Plaintiff's protected activity and there is evidence that the reason for Plaintiff's termination is pretextual and false.

## V.     <u>FLSA</u>

While Defendant may argue that the FLSA does not cover every wage situation, it does not explain why Plaintiff's situation, where she was not paid all of

the wages owed to her for work she did, is not covered by the FLSA.  A review of Exhibit M shows that Defendant agreed to pay Plaintiff for certain hours of work and did not pay her the wages owed.  The standard of willfulness for the statute of damages is that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA. McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (U.S. 1988). Reckless disregard of the requirements of the Act means failure to make adequate inquiry into whether the conduct is in compliance with the Act. 5 CFR 551.104.

## VI.   DISCRIMINATION, HARASSMENT AND RETALIATION

As to harassment, Plaintiff must prove that she was:

1.   A member of a protected group;
2.   She was subjected to unwelcome comments based on her protected status;
3.   The comments created a hostile or offensive work environment; and
4.   Respondeat superior.

See e.g Quinto v Cross and Peters Company, 451 Mich. 358, 368-369 (1996); Pena v Ingham County Road Commission, 255 Mich. App. 299; 660 N.W.2d 351 (2003). The respondeat superior requirement is met under state law if the employer fails to "adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." See e.g. Grow v. W.A. Thomas Co., 236 Mich. App. 696, 702-703 (1999).

In the fact section, Plaintiff listed several specific incidents of hostile comments and actions based on her race and national origin, made on a regular basis by her supervisor. There is no question that Plaintiff was a member of protected groups as an Egyptian who was born on Egypt. Ms. Yadmark and Mr. Willis both testified that Plaintiff called them crying and frantic on separate occasions, telling them they were killing her, putting them on notice that her work environment was severely hostile. Ex. B, p. 494. And Defendant admits that it was aware of Plaintiff's complaints of a hostile work environment and "dropped the ball". Ex. E. Therefore, the respondeat superior requirement is met. Downey v. Charlevoix County Bd. of Rd. Comm'rs, 227 Mich. App. 621, 626 (1998); Malan v General Dynamics Land Systems, Inc, 212 Mich. App. 585, 587; (1995). Plaintiff has satisfied all of the requirements of a hostile work environment claim and therefore, this claim should survive summary judgment.

A prima facie case of retaliation under these statutes requires a plaintiff to prove: (1) she engaged in protected activity (2) that was known by the defendant, and (3) the defendant took an adverse employment action against her, and (4) her protected activity was causally connected to the employer's adverse action. Aho v. Dep't of Corr., 263 Mich. App. 281, 688 N.W.2d 104, 108 (Mich. Ct. App. 2004); Barrett v. Kirtland Cmty. Coll., 245 Mich. App. 306, (2001).

Here, in the very meeting where Plaintiff's claims of harassment were being discussed, she was suspended and threatened with termination. And then Plaintiff was terminated for highly doubtful reasons the first day she was brought back in for training, for actions already known to Defendant and approved.  Although the general rule is that temporal proximity is insufficient to raise an inference of causation, in cases where the temporal proximately is unusually suggestive, it can raise such an inference. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 524-25 (6th Cir. 2008).  While timing alone cannot create a causal connection normally, it is evidence of causation.  In Henry v Detroit, 234 Mich App 405, 414 (1999), the Court of Appeals found causation where the plaintiff had a clean employment record during a long employment, engaged in protected activity under the WPA, after which the plaintiff was informed his supervisors were upset with his protected activity and then four months later had to choose between demotion or retirement. Plaintiff had a clean employment record, engaged in protected activity and then was suspended and terminated in the same meetings, which is strong evidence of causation. See Henry, supra.

## CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that Defendant's Motion be denied in full.

Respectfully Submitted on December 15, 2014,


ATNIP & ASSOCIATES, PLLC


/s/ Marla A. Linderman
Marla A. Linderman (P55759)
400 Water St. Ste. 205
Rochester, MI  48307
(248) 674-4404
marla@atniplawyers.com
Attorneys for Plaintiff

<u>CERTIFICATE OF SERVICE</u>


I hereby certify that I electronically filed the foregoing document with the Clerk of
Court using the ECF system which will send notification of each filing to the
attorneys of record and I hereby certify that there are no non-ECF participants
appearing in this matter.


Dated: December 15, 2014                    /s/ Marla A. Linderman
                                            Marla A. Linderman