MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014

1—4

**Page 1**

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF MICHIGAN

3    SOUTHERN DIVISION

4    _____

5

6
MERVAT MIKHAEIL,        )

7               Plaintiff,  )    U.S. District Case No.:

8          vs.            )        2:13-CV-14107

9                         )    Honorable Nancy G. Edmunds
WALGREEN'S INC.,         )

10                        )  Magistrate Judge David R. Grand
          Defendant.  )

11

12    _____

13    THE VIDEOTAPED DEPOSITION OF MERVAT MIKHAEIL - VOLUME I

14    DEPONENT:     Mervat Mikhaeil

15

16    DATE:         Thursday, July 17, 2014

17

18    TIME:         9:44 a.m.

19    LOCATION:     Kienbaum Opperwall Hardy & Pelton, PLC
                    280 North Old Woodward Avenue, Suite 400
20                  Birmingham, Michigan  48009

21

22    REPORTER:     Kelli A. Murphy, CSR-7768, B.S.

23    VIDEOGRAPHER: Patrick Murphy.

24

25                    *   *   *

**Page 2**

1    APPEARANCES:

2

3         MARLA A. LINDERMAN, ESQ.  (P55759)
          Atnip & Associates PC
4         400 Water Street, Suite 205
          Rochester, Michigan  48307
5         248.674.4404
          marla@atnipattorneys.com
6
              Appearing on behalf of Plaintiff.
7

8         ELIZABETH HARDY, ESQ. (P37426)
          THOMAS J. DAVIS (D.C. 490033)
9         Kienbaum Opperwall Hardy & Pelton, PLC
          280 North Old Woodward Avenue, Suite 400
10        Birmingham, Michigan  48009
          248.645.0000
11        ehardy@kohp.com
          tdavis@kohp.com
12
13            Appearing on behalf of Defendant.

14

15
     ALSO PRESENT VIA VTC:   Stephanie Gaines, Esq.
16                           In-House Counsel for Walgreen's.

17

18                    *   *   *

19

20

21

22

23

24

25

**Page 3**

1         T A B L E   O F   C O N T E N T S

2

3    WITNESS

4    Mervat Mikhaeil

5

6    EXAMINATION

7    By Ms. Hardy................................Page 7

8

9

10

11

12

13                    *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1         E X H I B I T S

2

3    MIKHAEIL
     Deposition                                      Page
4    Exhibit          Description                    Marked
     ==============================================================
5
     Exhibit 1         Curriculum Vitae               87
6                     (WALGREEN 147 - 148)

7
     Exhibit 2      Application for Employment        89
8                     (WALGREEN 485 - 487)

9
     Exhibit 3         Copy of Prescription          176
10                        (WALGREEN 71)

11
     Exhibit 4         Copy of Prescription          176
12                        (WALGREEN 72)

13
     Exhibit 5          6/25/13 E-Mail               178
14                        (WALGREEN 70)

15
     Exhibit 6           E-Mail Chain                281
16                        (WALGREEN 80)

17

18

19

20

21                    *   *   *

22

23

24

25



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014

5–8

Page 5

1                       Birmingham, Michigan

2                     Thursday, July 17, 2014

3                     About 9:44 a.m.

4

5              *    *    *    *

6

7        THE VIDEOGRAPHER:  We are on the record.  This

8  is disc 1 of the video deposition of Mervat Mikhaeil,

9  being taken at the law offices of Kienbaum Opperwall

10  Hardy & Pelton, 2800 [sic] North Old Woodward Avenue in

11  Birmingham, Michigan.

12        Today is Thursday, July 17, 2014, and the time

13  is 9:44 a.m. This is in the matter of Mikhaeil versus

14  Walgreen's Inc., Case No. 2:13-CV-14107, pending in

15  US District Court for the Eastern District of Michigan,

16  Southern Division.

17        My name is Patrick Murphy.  I'm the legal

18  videographer.  Our court reporter today is Kelli Murphy.

19  We represent Esquire Solutions, and the attorneys will

20  now introduce themselves for the record.

21        MS. LINDERMAN:  Oh, you can go first.

22        MS. HARDY:  Elizabeth Hardy on behalf of the

23  defendant.

24        MR. DAVIS:  Tom Davis on behalf of the

25  defendant.

Page 6

1        MS. LINDERMAN:  Is she going to put her

2  appearance on?

3        MS. HARDY:  No.  She's not an attorney of

4  record.

5        MS. LINDERMAN:  Okay.  Well, still the party

6  person, but that's fine.

7        Marla Linderman, appearing on behalf of the

8  plaintiff.

9        M E R V A T  M I K H A E I L,

10  a Plaintiff herein, having been first duly sworn or

11  affirmed by the Notary Public, was examined and

12  testified as follows:

13        MS. HARDY:  Stephanie, can you at least place

14  your appearance on the record, although you're not

15  counsel of record?

16        MS. GAINES:  Sure.  Stephanie Gaines, in-house

17  counsel -- senior counsel at Walgreen's.

18        MS. HARDY:  Thank you.  All right.  Let's

19  proceed.

20        Good morning.  My name is Elizabeth Hardy, and

21  I represent Walgreen's in this matter, and I'm here

22  today to ask you some questions about the factual

23  support you have for the allegations that you've made in

24  this lawsuit.

25

Page 7

1                   EXAMINATION

2  BY MS. HARDY:

3  Q  Do you speak fluent English?

4  A  Yes.

5  Q  All right.  And you understand English; correct?

6  A  Yes.

7  Q  Okay.  If at any point in time you don't understand any

8    of my questions, or if I'm speaking too rapidly, please

9    let me know.  Will you do so?

10  A  I will do.

11  Q  Okay.  And if --

12        MS. LINDERMAN:  You need --

13        MS. HARDY:  -- at --

14        MS. LINDERMAN:  -- to speak up, 'cause I can

15    barely hear you --

16        THE WITNESS:  Okay.

17        MS. LINDERMAN:  -- myself.

18        THE WITNESS:  I'm sorry.  I have a sore

19    throat.  I'm sorry.

20  BY MS. HARDY:

21  Q  All right.  If, at any point in time, if I use a word

22    that you don't understand, or some combination of words

23    that you don't understand, please let me know.

24  A  Okay.  I will.

25  Q  You will do that --

Page 8

1  A  Um-hmm.

2  Q  -- correct?

3  A  Um-hmm.

4  Q  All right.  Yes.

5        Now, you need to make sure that you let me

6    finish a question before you answer, and then you have

7    to be careful to provide a verbal answer as opposed to a

8    nod of the head --

9  A  Okay.

10  Q  -- okay?

11  A  Okay.

12  Q  Now, witnesses frequently tend to nod their heads,

13    'cause that's how people communicate with one another,

14    but that makes it very difficult for the court reporter

15    to make a record.

16  A  Okay.

17  Q  So you've got to discipline yourself to verbally

18    respond.  If you fail to do so, I'm going to have to

19    interrupt you and let you know that you're nodding your

20    head.  I don't mean to be critical or rude, but we just

21    need to make sure that we get a clear record.

22  A  Okay.

23  Q  All right?

24  A  Okay.

25  Q  So it's also important that you let me finish my



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014

9–12

Page 9

1    question before you start to respond.  Even though you
2    may anticipate what I'm going to ask you, please let me
3    finish first.  Okay?
4    A    Okay.
5    Q    And the same goes for me.  If you're answering a
6    question, I need to let you finish.  Sometimes I'll
7    think you're done, when you're not.  And if I interrupt
8    you accidentally, you let me know.  Okay?
9    A    Okay.
10    Q    All right.  So it's the same -- same rules for both
11    sides here.
12    A    Yeah.
13    Q    Okay?
14    A    Okay.
15    Q    Now, have you ever had a deposition taken before?
16    A    No.  This is the first time.
17    Q    Okay.  So then these rules are particularly important,
18    and I may need to remind you, from time to time, about
19    the rules.
20    A    Okay.
21    Q    Okay?
22    A    Um-hmm.
23    Q    All right.  Now, if at some point in time you need a
24    break just to stretch your legs or to use the restroom,
25    please let me know.  I'll be happy to accommodate you.

Page 10

1    The only requirement is that if I have a question that's
2    pending, that you need to answer it before you leave the
3    room.
4    A    Okay.
5    Q    Okay?
6    A    Um-hmm.
7    Q    All right.  Fair enough?
8    A    Yes.
9    Q    All right.  Do you have any questions before we start?
10    A    No.
11    Q    All right.  Please state your current legal name for the
12    record.
13    A    My current -- for today?
14    Q    Yes.  Your -- your legal name as of today.
15    A    I'm sorry.  The legal?
16    Q    Your legal name.
17    A    Legal -- my legal name?
18        MS. LINDERMAN:  She just wants --
19        THE WITNESS:  Okay.
20        MS. LINDERMAN:  -- your name.
21        THE WITNESS:  My legal name is coming like
22    Mervat -- M-E-R-V -- "victory" --  A -- "apple" -- T --
23    "Thomas" -- Mikhaeil.  Mikhaeil or Mikhaeil.
24        M-I-K-H-A-E-I-L, Mikhaeil.
25

Page 11

1    BY MS. HARDY:
2    Q    Mikhaeil?
3    A    Yeah.
4    Q    Is that a married name?
5    A    For my husband?  No. My husband has a different name.  I
6    didn't change my -- my grandpa's name.
7    Q    All right.  Was your current name, Mervat Mikhaeil, your
8    name at birth?
9    A    Yes.
10    Q    Okay.  Have you ever been known by any other legal name?
11    A    No.
12    Q    All right.  What is your husband's name?
13    A    My husband's name is Moomen.
14    Q    Could you spell, please?
15    A    M-O-O-M-E-N.  The last name is Mirhom, M-I-R-H-O-M.
16    Q    Okay.  Do you have children?
17    A    Three.
18    Q    How many?  Three?
19    A    Three.
20    Q    All right.
21    A    One boy and two girls.
22    Q    What is their last name?
23    A    Last name is Farah, F-A-E-R-E-H [sic], Farah.
24        Can I spell it again?
25    Q    F-A-E-R --

Page 12

1    A    No.
2        F -- "Frank" -- A -- "apple" -- R -- "Robert" --
3    A -- "apple" -- H -- "Henry."
4    Q    And all three children have that same last name?
5    A    Yes.
6    Q    Where were you born?
7    A    Egypt.
8    Q    And when did you immigrate to the United States?
9    A    July 2007.
10    Q    Had you lived in the United States at any time prior to
11    July 2nd --
12    A    No.
13    Q    -- 2007?
14    A    Sorry.
15    Q    Okay.
16    A    No.
17    Q    That's an example of where you started --
18    A    I'm sorry.
19    Q    -- to interrupt me.
20        Okay.
21    A    I'm sorry.  No.
22    Q    Had you lived, at any point in time prior to July 2, 2007,
23    outside of Egypt?
24    A    No.  Just Egypt, and after that I came here.
25    Q    How old were you when you came to the United States?



MERVAT MIKHAEL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
13–16

Page 13

1   A   Thirty-seven.  Yeah, 37.

2   Q   Where did you learn to speak English?

3   A   I learned to -- to speak English when I was, like, four
4       years old, but I spoke like British -- British English.

5   Q   Um-hmm.

6   A   Yeah.

7   Q   Did you attend an English-speaking school as a child?

8   A   Yeah.

9   Q   So your -- your classes through your grade school and
10      high school time period were taught in English?

11  A   I will let you know that.  Just coming, like, extra
12      language while I was in elementary, high school, I --
13      elementary, middle, and high school, just coming like --
14      like an extra language with French, and after that when
15      I was in -- in the college, pharmacy school, I got like
16      five years in English.

17  Q   Did you receive -- strike that.

18          Were your classes taught in English?  Did the
19      instructors use English when they were instructing you
20      in the class, members of the class?

21  A   In pharmacy school?

22  Q   Let's start with elementary school.

23  A   Elementary school is coming like that, beginning how to
24      -- how to introduce myself, how to get something like
25      science, how to do some mathematical -- something like

Page 14

1       problems, how to do that.

2           And after this, I got it like how to
3       communicate with -- with British people when I go to
4       Britain.  That's what I already got.

5   Q   Did you go to an Egyptian school or a British school?

6   A   The -- the first one, it was in British school.  That --
7       this was elementary one to sixth grade, and after that
8       Egyptian one.

9   Q   Okay.  So let's take your elementary.  From the
10      beginning of your schooling, up through sixth grade, you
11      were in a British school?

12  A   Yes.

13  Q   And did the instructors speak English --

14  A   Yes.

15  Q   -- to -- to -- in -- when they were teaching the class?

16  A   Yeah.

17  Q   Okay.  And then when you went to seventh grade, which is
18      middle school, did -- were you in an Egyptian school or
19      a British school?

20  A   Egyptian.

21  Q   Okay.

22  A   From seventh until done with the college.

23  Q   Okay.  Until you're done with high school?

24  A   Not high school.  Until done with the pharmacy school.

25  Q   Through pharmacy school, okay.

Page 15

1           And that was an Egyptian school?

2   A   Yes.

3   Q   Okay.  And in the Egyptian school the instructors spoke
4       Arabic in the classroom or English?

5   A   Sometimes, yes, we can -- we can speak Arabic there in
6       the -- in the classes, itself, yeah, we can speak
7       Arabic.

8   Q   Now, what did the -- what language did the instructors
9       use in the course of -- of instructing the class?
10      English or --

11  A   English.

12  Q   -- Arabic?

13          English?

14  A   English.  But -- but sometimes we can mix between both
15      of them, you know.

16  Q   Um-hmm.

17  A   Sometimes that -- we used to do there.

18  Q   Okay.

19  A   Uh-huh.

20  Q   And then in addition to having English-speaking
21      instructors, you had English training when you lived in
22      Egypt; is that correct?  You went to classes that helped
23      you perfect your ability to speak --

24  A   Oh --

25  Q   -- the English language?

Page 16

1   A   I will tell you, no, I didn't get that at all.  But when
2       I came here in July 2007, after that I went back to
3       Egypt in -- in -- like in January 2008, and I was there
4       for, like, four months, and at this time I got something
5       like training for how to speak American.  That's what I
6       really got.

7   Q   American English as opposed to British English?

8   A   A little bit.  There is something like a little bit
9       different from here to there, so they are trying to
10      figure out to -- this -- "This you don't have to say,
11      because Americans understand something different.  You
12      can say that.  Don't say that."

13          That's what I already got.

14  Q   Okay.  How did you learn to speak British English?

15  A   British English, I already got it while I was there in
16      elementary.

17  Q   In elementary, okay.

18  A   Yeah.

19  Q   Do either of your parents speak British English?

20  A   My dad was speaking perfect British English and French
21      together.

22  Q   Okay.  Is your father Egyptian as well?

23  A   Um-hmm.

24  Q   Yes?

25  A   Yes.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014

17—20

Page 17

1 Q   And your mother Egyptian?

2 A   Yeah. We all.

3 Q   Okay. Are you a resident of the United States?

4 A   I'm a citizen.

5 Q   You're a citizen.

6         When did you obtain your citizenship?

7 A   I got it in October 2012.

8 Q   Is your husband a citizen as well?

9 A   Yes.

10 Q   When did you marry your husband?

11 A   1993. In July 1993.

12 Q   When did he become a citizen?

13 A   October 2012.

14 Q   Same time as you?

15 A   Yeah.

16 Q   Have you been married to anyone other than your current

17     husband?

18 A   No.

19 Q   What was your personal email in 2012 and 2013? What was

20     your email address?

21 A   My email address? 2012 and two-thousand what?

22 Q   '13.

23 A   2012 and 2013. By the end of that year of 2012,

24     something like maybe July 2012 till now, it is

25     M-E-R-V-A-T-M-I-K-H-A-E-I-L -- my name, Mervat Mikhaeil,

Page 18

1     one more --

2 Q   Um-hmm.

3 A   -- @Yahoo.com.

4 Q   So the only personal email address you've had, since

5     July 2012, is the one you just identified on the record?

6 A   Yeah. Mervat Mikhaeil, um-hmm.

7 Q   And have you had a cell phone since July 2012?

8 A   Maybe it was from -- I'm trying to get that right. I

9     think 2011. October 2011.

10 Q   Okay.

11 A   I got one.

12 Q   You got a cell phone.

13         And you still have that same cell phone today?

14 A   Maybe I change it, but the same number. You know, the

15     same phone number, yes.

16 Q   Same phone number. What's the phone number?

17 A   (XXX) XXX-XXXX.

18 Q   Okay.

19         MS. LINDERMAN: Just for the record, I'd ask

20     that that number be redacted before it's put into the

21     record, her deposition in.

22         MS. HARDY: That's fine. No problem.

23 BY MS. HARDY:

24 Q   What type of cell phone did you acquire in October 2011?

25 A   Sorry. What?

Page 19

1 Q   What type of cell phone? Was it an iPhone, or was it a

2     -- some -- some other kind of phone?

3 A   I cannot remember this kind. I cannot even -- something

4     4G, maybe. That's what I had before, something 4G. I

5     cannot remember what it was.

6 Q   Okay. Did you have the capacity with your cell phone,

7     that you've had since October 2011, to send and receive

8     emails from your phone?

9 A   No. Because it was something, like, very old one and

10     there's no access to Internet.

11 Q   Okay. Do you have access to Internet on your cell phone

12     now?

13 A   Yes.

14 Q   When did you first acquire access to the Internet on

15     your cell phone?

16 A   I got the access on -- by the end of 2012, but when --

17     maybe October, maybe December. I'm sorry. I cannot

18     remember when.

19 Q   Okay. And what cell phone did you have, at that point

20     in time, that provided you with access to the Internet?

21 A   Can you say it again?

22 Q   Yes.

23         What type of cell phone did you acquire at the

24     end of 2012 that allowed you to have access to the

25     Internet?

Page 20

1 A   Samsung S3.

2 Q   Is that the phone you have in front of you?

3 A   Yes.

4 Q   Okay. And the phone you have in front of you you've had

5     since the end of 2012?

6 A   Yes.

7 Q   Yes?

8 A   Um-hmm.

9         MS. LINDERMAN: You have to say "yes" or "no."

10         THE WITNESS: Yes.

11 BY MS. HARDY:

12 Q   Okay. And can you send emails from your Samsung phone

13     that you've had since the end of 2012?

14 A   What? Can I do what?

15 Q   Can you send emails?

16 A   Yeah, I can.

17 Q   All right. So you can send and receive emails from the

18     phone that you have in front of you which is the phone

19     you acquired at the end of 2012?

20 A   Once I get it, I can take it, yes.

21 Q   The answer is "yes"?

22 A   Yes.

23 Q   When did you become licensed as a pharmacist in the

24     United States?

25 A   March 15, 2011.



Page 21

1 Q You completed your pharmacy training in Egypt?

2 A I -- that's when I was here for my Egyptian license, but

3 when I came here, supposed to do something called

4 qualification to just get the license from USA.

5 Q Um-hmm.

6 A I'm supposed to pass, like, four exams, and I did. And

7 just did -- everything established on March 15, 2011.

8 Q I'd like you to explain what the qualification process

9 was that you went through in the United States so that

10 you could become licensed as a pharmacist.

11 MS. LINDERMAN: Asked and answered. She just

12 told you that.

13 BY MS. HARDY:

14 Q She said she took four exams, but I don't know whether

15 there was any coursework you had to take, or whether it

16 was just a matter of taking exams.

17 A Um-hmm. Okay. The four exams is supposed -- first of

18 all, you have to do something called "qualification."

19 It is something to -- to see how much did you get from

20 Egypt -- from Egypt or from your mother --

21 Q Country?

22 A -- country. And the -- if you are qualified enough, it

23 is something -- at my time it was two times in the --

24 the test coming -- or the exam coming, like, two times a

25 year. One of them coming in December, and the other one

Page 22

1 in May or April. I'm not sure.

2 But anyway, I -- when you do that, you can go

3 to another step, which coming like TOEFL, which means --

4 TOEFL means how to speak English well, fluent -- fluent

5 English. And when you pass this coming with a very high

6 score, when you do that you can go to the next step,

7 which coming like -- you have to do, like, 1,000 hours

8 with the -- the boards you're related to.

9 And Michigan comes, like, 1,000 hours. If you

10 are going to get it from Florida, 2,000 hours or

11 something. If you are going -- you know. So once you

12 got 1,000 hours, you can go to the next step, do exam

13 with NAPLEX. NAPLEX means that you already see this

14 kind of medication -- see this kind of medication, and

15 everything adjusted okay, and you know how to -- to --

16 You know what? It's coming, like, instruct

17 your patient, or you're trying to tell him how to get

18 your -- your medication well, in the morning, in the

19 evening, or something like this.

20 And after this, you have to pass the law, the

21 law for that board, or for -- with that -- that -- that

22 state you already are related to. If you got the law

23 with your -- your state, they are going to give you.

24 Q Are you licensed as a pharmacist in any state other than

25 Michigan?

Page 23

1 A No.

2 Q Have you attempted to become licensed in any state other

3 than Michigan?

4 A When we planning something to go to Florida, I got a

5 license as a pharmacy intern in Florida.

6 Q Did you live in Florida for a period --

7 A No --

8 Q -- of time?

9 A -- I didn't. No, I didn't go there before, so...

10 Q When you immigrated to the United States, did you come

11 directly to Michigan?

12 A Yeah.

13 Q And have you lived in Michigan at all times since you

14 have been in the United States?

15 A Yeah. I went out of the state just to do my exams.

16 Q Okay. When did you start the qualification process to

17 obtain a pharmacy license in Michigan?

18 A It was something like -- I already make, like,

19 application with the board, itself, and it -- it was in

20 June 2008. Yes, June 2008. And I got the permission to

21 go through it in October 2008.

22 Q And then you completed it on March 15, 2011?

23 A Yes, exactly.

24 Q Okay. All right. Let's switch gears for a moment.

25 Are you taking any medication, today, that

Page 24

1 could, in any way, interfere with your ability to

2 understand questions and to respond truthfully to

3 questions?

4 A I got some antibiotic today.

5 Q I'm sorry. What did you take?

6 A I got some antibiotic, Amoxicillin, 'cause I have a sore

7 throat.

8 Q Oh, all right. Some antibiotics?

9 A Yes, um-hmm.

10 Q Anything else?

11 A Tylenol Extra.

12 Q I'm sorry. Can you spell that?

13 A Tylenol.

14 Q Tylenol. Tylenol Extra.

15 A Um-hmm.

16 Q I'm sorry.

17 Anything else?

18 A That's it.

19 Q All right. So the only medications that you have taken

20 today are the antibiotics -- the Amoxicillin -- and

21 Tylenol Extra?

22 A Exactly.

23 Q All right. Do you take any other medications on a

24 regular basis?

25 A I'm supposed to be on -- on something like Feosol Complete



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
25–28

Page 25

1    or iron, every day, because I am anemic.
2  Q   Um-hmm.
3  A   So I'm supposed to get, every day, three tablets from --
4     from iron.
5  Q   Is that a prescription, or is that an over the counter?
6  A   No.  This is coming like prescription, but in a way I --
7     I couldn't use it -- I couldn't use it as much, because
8     it hurts me.
9  Q   Do you take any prescription medications on a regular
10     basis, other than the iron prescription?
11  A   No, never.
12  Q   Do you suffer, today, from any physical ailments or
13     mental health issues that require treatment?
14  A   I have a sore throat.  That's what I have.  And I feel
15     something with my ear, and it -- I -- my ear hurts me a
16     little.
17  Q   All right.  You don't have any other physical ailments
18     that require treatment --
19  A   No.
20  Q   -- at this time?
21  A   No.
22  Q   All right.  Do you have any mental health issues that
23     require treatment?
24  A   No.
25  Q   Have you ever sought treatment for emotional problems or

Page 26

1     mental health problems?
2  A   No.
3  Q   Have you ever suffered from any kind of mental health or
4     emotional problems that you felt required treatment even
5     though you did not seek treatment?
6  A   No.
7  Q   Have you ever taken any medication for any kind of
8     emotional or mental health problem?
9  A   No.
10  Q   And when I ask about treatment, I'm including not just
11     medical doctors, but therapists, social workers,
12     psychologists, or any kind of counselor who might assist
13     you with emotional issues or mental health issues.
14        MS. LINDERMAN:  Objection to form and
15     foundation.
16  BY MS. HARDY:
17  Q   So just to make sure it's clear, you haven't sought
18     treatment for --
19  A   No.
20  Q   -- emotional problems or mental health problems --
21  A   No.
22  Q   -- with anyone that falls in that category of a
23     counselor of any sort?
24  A   No, never.
25  Q   Okay.  Do you have a family physician?

Page 27

1  A   Yes.  My -- my family one, his name is Dr. Al-Matchy.
2  Q   Could you spell his last name?
3  A   A-L - M-A-T-C-H-Y.
4  Q   Where is his office located?
5  A   Exactly, I don't know, but he is between 15 and 16 Mile
6     and Dequindre Road.
7  Q   What's the name of his practice?
8  A   I don't know.  I'm sorry.
9  Q   Is he a medical doctor?
10  A   Yes.  Medical MD.
11  Q   Okay.  Is he -- what -- what is his specialty, if any?
12  A   I think he's GP.
13  Q   Okay.  And for what -- let's say in the past five years
14     -- what's the range of medical issues that you have
15     treated with him -- for which you've treated with him?
16  A   It was for what?  The last time it was for my throat,
17     sore throat.  And what else?  Something like -- like
18     stuff -- like gyno stuff, like gynecology.
19  Q   Yes.  Okay.
20  A   Okay.  And that's it.
21  Q   That's it?
22  A   Um-hmm.
23  Q   Okay.  So nothing serious and nothing ongoing?
24  A   No, up to now.
25  Q   So that's lucky.

Page 28

1  A   Um-hmm.
2  Q   Okay.  Have you seen the document requests that
3     Walgreen's served on you and your counsel in this case?
4     Has your attorney showed that to you?
5  A   Showed me what?
6  Q   The -- the request for documents that Walgreen's has
7     served on you and your counsel.  The documents that
8     Walgreen is asking you to provide to it.  Have you seen
9     that request?
10  A   No.
11  Q   Have you been asked to search for documents?
12  A   You are asking?
13  Q   No.
14        Have you been asked by your attorney to search
15     for documents that are responsive --
16  A   She asking me?
17  Q   -- to Walgreen's --
18  A   She --
19  Q   -- request?
20  A   She asking me for that?
21  Q   I'm -- my -- it's a question.  Has she asked you to look
22     for documents?
23  A   Yes.
24  Q   When -- when did she ask you?
25  A   The request, itself?  The document, itself?  The



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
29–32

Page 29

1    document? What? I'm sorry. I didn't get that.
2  Q  All right.
3  A  Which one are you looking for?
4  Q  Just -- I'm not --
5        MS. LINDERMAN: She's asking --
6        MS. HARDY: I'm not asking about anything, in
7    particular.
8  BY MS. HARDY:
9  Q  Has your attorney asked you to search your personal
10    belongings for documents that relate to this lawsuit?
11  A  Yes. I have my document. I already gave it to -- to my
12    attorney --
13  Q  Oh, okay.
14  A  -- from the -- the first time, yes.
15  Q  All right. So you have -- have you made a thorough
16    search of your home, your car, and any other place that
17    documents might be stored that are relevant to, or
18    relate to, the claims you're making in this lawsuit?
19  A  I'm sorry. I didn't get that. The -- the plan, how
20    did the -- how did the --
21        MS. HARDY: She'll read the question back to
22    you.
23        THE WITNESS: Um-hmm.
24        (Whereupon the question was read
25        back by the court reporter.)

Page 30

1  BY MS. HARDY:
2  Q  Do you understand?
3  A  So you are asking if I got this document and tried to
4    get that -- that -- that -- that -- that -- that
5    document through the Internet, or --
6  Q  No, no, no.
7  A  -- what --
8  Q  No, stop.
9  A  Um-hmm.
10  Q  It's much more simple.
11  A  Um-hmm.
12  Q  Okay.
13  A  Um-hmm.
14  Q  All right.
15  A  Um-hmm.
16  Q  Have you looked in your home, in your car, and any other
17    place where you might have hard copies of documents that
18    relate to your allegations in this lawsuit?
19  A  Yes.
20        MS. LINDERMAN: I'm going to object to form
21    and foundation, just because obviously there's some confusion.
22        THE WITNESS: Yes.
23  BY MS. HARDY:
24  Q  Have you made that search?
25  A  Made search?

Page 31

1  Q  Yeah. The search for documents.
2  A  What -- you -- you mean I make search to get this
3    document? That's what you are talking --
4  Q  Not --
5  A  -- about?
6  Q  Not -- not a particular document. Any -- any -- I'm
7    asking, do you have any documents -- did you keep any
8    documents, after you left Walgreen, that relate to the
9    allegations you're making --
10  A  Yes.
11  Q  -- in your lawsuit?
12  A  Yeah. I already got some documents related to this
13    case --
14  Q  Um-hmm.
15  A  -- once I found something wrong --
16  Q  All right.
17  A  -- with the law.
18  Q  All right. So have you searched every place where
19    documents might be stored that support the claims in
20    your lawsuit?
21  A  No. I didn't search -- I'm sorry for that, but I didn't
22    search. I didn't try, even, to get any kind of document
23    after -- once I -- I left Walgreen's. I didn't get any
24    other documents. Just I -- I have those which I already
25    have now, but for the last four -- from, like, 28 days

Page 32

1    or four weeks --
2        I just want to know the answer for one of my
3    questions. Is that okay or not? Is this -- this goes
4    with the law or not? This happened because the original
5    -- what is the law? Or they didn't know anything about
6    it?
7        So I tried to search with this kind of --
8    something like -- like it is -- it is available for all
9    pharmacists in -- in that state, and it is something
10    related to our board, which we are related to, and I
11    tried to meet 100 percent. That, I am honest.
12        I already have something violated. Something
13    they -- they already violated this kind of law. So I
14    just tried to know as a pharmacist -- as a pharmacist
15    for even -- as -- as a -- even before with Walgreen's, I
16    just wanted -- this coming, like, one idea on my -- in
17    my mind. Is -- is there something wrong happened? Yes
18    or no? Exactly.
19        I -- I am emotional or not, this is something
20    affects -- it affects me or not? So I tried to know
21    from that stage, this program, and the -- the Internet,
22    just available for all pharmacists.
23  Q  Okay.
24  A  I went through it.
25  Q  All right. You're -- you're getting a little --



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014

33—36

Page 33

1      MS. LINDERMAN: Yes.
2      MS. HARDY: -- far afield from where my
3  question is.
4      MS. LINDERMAN: And from her answer, I -- I
5  guess I do have to object to form and foundation, 'cause
6  I don't think she understood.
7      MS. HARDY: I -- I -- I will go back.
8  BY MS. HARDY:
9  Q   But before I go back to my original question --
10 A   Okay.
11 Q   -- I want to know when -- when did you start doing the
12     Internet research to determine whether or not something
13     had been done at Walgreen's that was wrong or against
14     the law?
15 A   Was from four weeks.
16 Q   Four weeks from when? Four weeks prior --
17 A   From now.
18 Q   From now?
19 A   Uh-huh.
20 Q   All right. So then that would have been sometime in
21     June 2014?
22 A   I'm not sure from the time, but I already got the -- the
23     answer for my question.
24 Q   All right. But you started the research, that you just
25     referred to, this -- this summer in 2014; correct?

Page 34

1      MS. LINDERMAN: Objection to form and
2  foundation.
3  BY MS. HARDY:
4  Q   You said three to four weeks ago. This is -- this is,
5      right now, July 18 [sic], 2014, so based upon your
6      testimony, it would have been sometime in -- in June or
7      early July 2014 that you started the research?
8  A   You know what? Even I'm not sure from the time, but I
9      think I got the answer. I'm sorry. Maybe I -- I'm not
10     this kind of -- of precise with the date, but I think I
11     got the answer.
12 Q   All right. Well, I want to know the general time frame,
13     even not -- even if you don't know the precise date when
14     you started the research. It was sometime this -- this
15     summer and this year?
16 A   This summer or this year? Yes. Um-hmm.
17 Q   All right. Now, let me go back and ask my question,
18     again, 'cause I agree with your counsel, I don't think
19     you understood.
20 A   Okay. Um-hmm.
21 Q   When -- when you left Walgreen's, did you have any hard
22     copies of documents that you -- you feel support the
23     claims you're making in this lawsuit?
24 A   Yes. I -- but -- but anyway, it wasn't something like
25     -- like a hard copy. It was something like -- like

Page 35

1  what? Like when I found one of them, I already told
2  somebody just to take care of it, because it -- "Hey
3  guys, because this is coming like an evaluation" --
4  Q   Okay. You're -- you're --
5  A   Yes.
6  Q   -- you're -- you're --
7      MS. LINDERMAN: Yeah.
8  BY MS. HARDY:
9  Q   -- now getting far afield again.
10 A   I'm sorry. Okay.
11 Q   I just want to know about documents that you have --
12 A   Yes.
13 Q   -- in your possession --
14 A   Yes.
15     MS. LINDERMAN: Just wait.
16 BY MS. HARDY:
17 Q   -- that you --
18 A   Yes.
19 Q   -- claim support what you're alleging in this lawsuit.
20 A   Yes.
21 Q   So let's just talk about documents.
22 A   Okay.
23 Q   What documents do you have, in your possession, that you
24     claim support what you're asserting in this lawsuit?
25 A   I --

Page 36

1      MS. LINDERMAN: Objection. Form and
2  foundation. You're talking about possession. I just
3  want to put this on the record, what she's given to me,
4  now I possess.
5      MS. HARDY: Well, things that she -- she had
6  in her possession at the time she left Walmart [sic].
7      MS. LINDERMAN: Objection to form and
8  foundation, but please go ahead.
9      THE WITNESS: Okay. I wanted to tell you
10 about that. Once I got all this stuff, and I found that
11 something, like, happened with me, and this coming like
12 -- like I tried to -- tell somebody, or to the
13 supervisor --
14 BY MS. HARDY:
15 Q   You're not talking about -- I just want to know about
16     documents.
17 A   Okay.
18 Q   This is a document right here (counsel indicating). A
19     piece of paper.
20 A   Okay.
21 Q   Let's just talk about pieces of paper --
22 A   Um-hmm.
23 Q   -- that relate to your employment at Walgreen, and the
24     allegations you're making in this lawsuit.
25 A   Now, I didn't --



Page 37

1        MS. LINDERMAN:  I do think she's trying to
2   answer the question.  I think there's something missing.
3        MS. HARDY:  All right.
4        THE WITNESS:  At this moment, I don't have
5   this kind which you already have.  I'm not sure.  I'm
6   not -- I don't have anything right now.  What I already
7   have right now, nothing from all those kind -- I already
8   forward all papers to my lawyer.  Just I -- I don't --
9   all -- all documents, which I already have it --
10       MS. HARDY:  Um-hmm.
11       THE WITNESS:  -- and --
12  BY MS. HARDY:
13  Q   You've given all -- you've already given them all to
14      your lawyer?
15  A   All of them, it was from that time, I already got
16      termination, and I decided to see what is going on
17      there.  So once I -- I got the termination, I tried to
18      see Marla, and -- my lawyer, and --
19       MS. LINDERMAN:  Be careful.  Don't go into
20  attorney-client privilege.
21       Can we go off the record for a second?
22       MS. HARDY:  Sure.
23       THE VIDEOGRAPHER:  I'm sorry.  Are we going
24  off the record?
25       MS. HARDY:  Yes.

Page 38

1        THE VIDEOGRAPHER:  Okay.  We're off the record
2   at 10:22.
3        (Whereupon a break was taken
4         from 10:22 a.m. to 10:25 a.m.)
5        THE VIDEOGRAPHER:  Back on the record at
6   10:25.  Go ahead.
7   BY MS. HARDY:
8   Q   When did you first consult legal counsel about your
9       employment problems at Walgreen's?
10  A   When did I what?
11  Q   First consult legal counsel about your employment
12      problems at Walgreen's.
13       MS. LINDERMAN:  Well, I'm going to object to
14  the "about" part of the question.  I think if you want
15  to just ask her when she talked about -- with legal
16  counsel.
17       MS. HARDY:  But it has to be about this case,
18  because it's not -- otherwise, it's not --
19       THE WITNESS:  Even --
20       MS. HARDY:  -- germane.
21       THE WITNESS:  Even I cannot -- I cannot -- you
22  know, it was for a long time, ma'am.  I'm sorry.  But
23  even I -- I don't -- I don't know what is the -- the
24  time it happened, but if you want to ask about every
25  event coming, one by one, it is coming --

Page 39

1        MS. HARDY:  No, no, no, no.
2        THE WITNESS:  It was --
3        MS. HARDY:  My question is -- really simple.
4   BY MS. HARDY:
5   Q   When -- when did --
6   A   I'm sorry.
7   Q   -- you first call a lawyer and say, "I need some advice
8       about what I think is happening at my place of
9       employment that I've got a problem with"?
10  A   It --
11  Q   When did you seek legal advice?
12  A   I will let you know that.  I already got a lot of advice
13      from, like, April 22nd.
14  Q   April 22nd?
15  A   I got -- I got a lot of advice just to go to do that.
16      They are trying -- sorry -- to trick you for something.
17  Q   All right.  So April 22, 2013 is when you first started
18      getting advice from a lawyer?
19  A   Not from the lawyer.  I got advice from my -- my -- my
20      friends around me.
21  Q   Okay.
22  A   They asked me just to go right away to find a lawyer.
23      There is something happened, and even you don't know how
24      much, it is serious.  And it affects everybody there.
25      If you don't want to -- to be attached with them, just

Page 40

1   leave them or ask for a transfer.  That's what I already
2   did.  On April 22nd, I asked them for transfer from --
3   from this store.
4   Q   To another Walgreen store?
5   A   To another one.
6   Q   Okay.  When did you first contact a lawyer to ask for
7       advice?
8   A   Okay.  I had, like, a meeting with my supervisor.  It
9       was -- ma'am, can I finish, please?
10  Q   Yes.
11  A   Okay.  On June 28th, she said, "There is something very
12      big.  I want to discuss that with you."
13       And she asked me to go there to that -- to
14      that office, and I went there.  And when I went there,
15      she gave me -- she even didn't listen.
16  Q   But you're getting --
17  A   Can -- can -- can --
18  Q   I know.  But see, I don't need the whole story --
19  A   I wasn't --
20  Q   -- about why.
21  A   -- giving --
22  Q   I'm just --
23  A   I wasn't --
24  Q   -- asking when.
25  A   I will let you know that, when.  Because, at this point,



Page 41

1    I found that there was people in front of me supposed to
2    sign it.  And when I tried to read it, she said, "You
3    know what, Mervat?  This kind of explanation for
4    yourself, you can explain yourself at this -- at this
5    moment, and sign it.  Just not to be threatened to be
6    terminated."
7         I told her, "It's okay."
8         Okay.
9    Q   And see you're getting --
10   A   Ma'am --
11   Q   -- into much more than my question, which is just when.
12   A   It was --
13   Q   When did you first contact --
14   A   It was --
15   Q   -- a lawyer?
16   A   -- 6/28 -- between 6/28 and July 11th.  I -- I --
17        MS. LINDERMAN:  Not every time.  Just the
18   first time.
19        THE WITNESS:  The first time, I already tried
20   to get that -- the right -- the right advice.  It was on
21   July 12th.
22   BY MS. HARDY:
23   Q   When did you first contact a lawyer about your --
24   A   July --
25   Q   -- employment issues?

Page 42

1    A   July 12th.
2    Q   July 12th?
3    A   Yes.
4    Q   Why did you mention that you contacted someone on 6/28?
5        Was that someone other than a lawyer?
6    A   No, 6/28, I -- I want -- I just want to -- I was
7        threatened to be terminated.
8    Q   Okay.  And we'll get to that later.  You'll have a
9        chance to tell that story.  I just am focused on
10       something that's --
11   A   The first --
12   Q   -- different right now.
13   A   The first that they -- they -- I tried to -- to reach
14       somebody to tell me what's going on, it was on
15       July 11th, but my lawyer gave me the number I tried to
16       call.
17   Q   Um-hmm.
18   A   It was busy, and I couldn't reach her.  I could reach
19       her on July 12th, the next day.
20   Q   All right.  And who did you contact on July 12th?
21   A   Marla Linderman.
22   Q   And has she been the only attorney with whom you've
23       received advice -- or from whom you've received advice
24       concerning your employment at Walgreen?
25        MS. LINDERMAN:  Or my firm.

Page 43

1        MS. HARDY:  Right, or her firm.
2        THE WITNESS:  So you want to ask about another
3    -- another lawyer?
4    BY MS. HARDY:
5    Q   Are there any other lawyers, other than Marla Linderman
6        or people associated with her firm, that have been
7        counseling you about your employment problems at
8        Walgreen?
9    A   There was another lawyer coming, like, pharmacist lawyer
10       -- a pharmacist lawyer, at the same time, and he knows a
11       lot about the law for the pharmacy.
12   Q   Who was that person?
13   A   I am -- you know, I cannot remember his name.  Sorry.
14   Q   And when did you consult with him?
15   A   Something like October.
16   Q   Of 2013?
17   A   Yes.
18   Q   So, now, let's go back to the documents.
19        What documents do you have in your possession,
20       or are in your lawyer's possession, that relate to the
21       type of claims that you're making in this lawsuit?
22   A   Um --
23   Q   Just define the universe of documents.
24   A   The documents which I already have it, it is like
25       documents from the doctor.  He already -- something like

Page 44

1        prescription.
2    Q   Prescriptions for patients of Walgreen's?
3    A   Patients of Walgreen's, but without the name, without
4        the address, without date of birth, without a telephone
5        number.
6    Q   All right.  And those are documents that you obtained
7        from Walgreen?
8    A   Yes.
9    Q   Okay.  And how did you obtain copies from Walgreen's?
10   A   They were in front of me and somebody called me -- that
11       patient himself or herself, one of them -- she called me
12       and she said that, "There's something wrong with you,
13       and is supposed to sue you."
14        And I said, "Sorry, ma'am.  I -- I don't know
15       who I'm talking, even, to."
16        And she said, "This is blah-blah-blah-blah."
17   Q   I don't need all that background.  I just need to know
18       how you got copies --
19   A   One of them --
20   Q   -- of those documents?
21   A   -- was in front of me.
22   Q   Did you take the original?
23   A   I just got, like, a copy.
24   Q   And where did you make the copy?
25   A   When?



Page 45

1  Q   Where?  How?

2  A   How did I get it?

3  Q   Yes.

4  A   Copied it.  I printed it.

5  Q   Well, did you take a photo of it on your cell phone and

6      then print it off of that?

7  A   You know what?  Even I cannot remember.  I want to tell

8      the truth, so I don't know if I -- how I got it, with my

9      phone or I got a copy.  It is in front of me, and I can

10     get it like print.  So even I don't know which is easier

11     for me to get it by my phone, or, like, a copy.  I -- I

12     cannot remember.

13 Q   All right.  So did you --

14 A   Plus, it was from, like, more than one year it was.

15 Q   Okay.

16 A   It was for more than 14 months, so even I cannot -- I

17     cannot remember when was that that it happened.

18 Q   All right.  So sometimes you used your phone and

19     sometimes you used a copy machine and you can't recall

20     which --

21        MS. LINDERMAN:  Objection --

22        MS. HARDY:  -- for the documents you're

23     speaking about now?

24        MS. LINDERMAN:  Objection.  Form and

25     foundation.

Page 46

1         THE WITNESS:  I'm not sure --

2         MS. HARDY:  All right.

3         THE WITNESS:  -- you know...

4  BY MS. HARDY:

5  Q   Did -- did you use your phone, at times, to make copies

6      of documents, pharmacy documents?

7  A   Yes.  I used my phone once, um-hmm.

8  Q   Okay.  And at other times, did you take documents home

9      and copy them?

10 A   No.  I didn't get any documents to home, because even

11     you don't have to.

12 Q   What do you mean "you don't have to"?

13 A   You don't have to get a document to your home to get a

14     copy.

15 Q   Well, what -- if -- if you weren't copying them by

16     taking a photo with your phone, where else or how else

17     would you get a copy of the pharmacy documents?

18 A   You -- when you get a prescription by yourself, as a

19     pharmacist, the prescription is -- is coming, like, by

20     your left side, and that -- that -- at that time, you

21     wanted to -- to post it in the system with your right

22     side.

23        So if you ask the system to give me a copy

24     from this one, just to forward to my supervisor or to

25     forward to the doctor just to give me the right decision

Page 47

1      for an instruction, or just to make like -- like a --

2      the -- the -- how to do this prescription, because

3      sometimes it's coming, like, compounding, and you wanted

4      it -- the right way to do it, sometimes you have to ask

5      some -- some friends in Walgreen's, and they ask you to

6      forward this prescription to their store just to get --

7      to give you that instruction.

8  Q   Okay.

9  A   Uh-huh.

10 Q   So let me make sure I understand.

11        When you're -- you have a patient in front of

12     you who needs a prescription filled, and you have a

13     question, you have that prescription up on the screen;

14     correct?

15 A   Yes.

16 Q   All right.  And you could push a button and print a copy

17     of that?

18 A   Yes.

19 Q   Okay.  Did you do that at times?

20 A   Ma'am, believe me, I -- I cannot even remember if I

21     already print it from the phone, or print it -- print it

22     through the phone, or print it from my -- my -- that

23     screen, itself.  I cannot -- I cannot even remember how

24     did I do that.

25 Q   All right.  Let's take the second scenario that you

Page 48

1      mentioned.  If you have the prescription up on the

2      screen, and you decide to forward it to somebody within

3      the Walgreen system --

4  A   Yes.

5  Q   -- so that you can get input from them on what to do or

6      how to handle it, how -- how do you go about forwarding

7      it?  What do you do?

8  A   It's --

9         MS. LINDERMAN:  Objection to form and

10     foundation.

11        You can answer.

12        THE WITNESS:  Okay.  If you have the

13     prescription, itself, in front of you, and you want to

14     get the right -- the right way to do it, you can get the

15     copy from -- from the screen, and forward it to that --

16     the number of that store.  If you have the fax number,

17     just put the fax number and fax it over to them.  They

18     are going to get it.

19        This happened a lot of times, and even I got

20     the -- this -- this way from -- from Amy, from Vickie

21     something.  She is the -- the -- the she is the

22     technician supervisor.

23        MS. HARDY:  Um-hmm.

24        THE WITNESS:  I think her name was Vickie.

25     That's what I can remember.  I'm sorry.  I cannot



MERVAT MIKHAEL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
49–52

Page 49

1  remember a lot about this now.  And they told me from
2  the beginning I was there, I got like theoretical
3  practice.  So when they sent me to that store -- and I
4  was by myself.  There was no help, no technician,
5  nothing at all.  That store manager doesn't know
6  anything about the pharmacy.  No help there.  And I
7  tried to get some help, because this coming like
8  practice.  This coming like an area of life you have to
9  gather.  This is theoretical about how to do it by
10 yourself.
11      MS. HARDY:  Okay.  You're --
12      THE WITNESS:  It's very difficult.
13      MS. HARDY:  You're getting too far afield.
14      THE WITNESS:  Okay.
15      MS. HARDY:  Let me ask my question again, and
16 just respond --
17      THE WITNESS:  I want --
18      MS. HARDY:  -- to my question.
19      THE WITNESS:  -- to finish my -- my point,
20 please.
21      MS. HARDY:  Well -- but it's not responsive to
22 the --
23      THE WITNESS:  Please --
24      MS. HARDY:  -- question.
25      THE WITNESS:  Can I finish my point, please?

Page 50

1      MS. LINDERMAN:  You're not -- when she asks a
2  question, you do have to answer her question.  You will
3  have --
4      THE WITNESS:  I want to --
5      MS. LINDERMAN:  -- time -- the things you want
6  to say, she wants to know, but you have to let her
7  go and --
8      THE WITNESS:  I already got the written
9  instruction from two persons in Walgreen's --
10     MS. HARDY:  Okay.
11     THE WITNESS:  -- how to forward those -- those --
12 BY MS. HARDY:
13 Q   Okay.  That's all I want to know is how you forward a
14     prescription from the pharmacy to somebody else in the
15     Walgreen system.
16 A   Through a fax.
17 Q   Is there a pharmacy email that you use?
18 A   Not email.  It is coming, like, a fax.
19 Q   But --
20 A   They didn't -- they didn't even give me an email.
21 Q   Like a fax?
22 A   Yes.
23 Q   Oh, okay.  All right.  So you got the prescription up on
24     the screen, and you use a fax function to forward it,
25     for instance, to --

Page 51

1  A   Exactly.
2  Q   -- the store manager or to the supervisor?
3  A   Not -- not to one of them.  Just to send it to -- to one
4      of your friends that still work in another store.
5  Q   That work --
6  A   I --
7  Q   -- in -- that work in -- a pharmacy in another store?
8  A   Work with Walgreen's in another store.
9  Q   Right, okay.
10 A   And so if you have this kind of prescription, you can
11     just fax it over to them, so they know how to deal with
12     that.  They are going to call me after -- after minutes
13     and --
14 Q   Um-hmm.
15 A   -- just to let me know how to go through it.
16 Q   All right.  So if you had a prescription on the system
17     in the pharmacy, and you wanted to send it, for
18     instance, to your supervisor, the store manager, or
19     another pharmacy in the Walgreen system, you could use
20     that fax function to -- to convey the documents?
21 A   Exactly.
22 Q   Do you have any documents that are either in your
23     possession, or now in your lawyer's possession, that
24     describe the events that occurred in the workplace that
25     you have placed at issue in this litigation?

Page 52

1      MS. LINDERMAN:  Objection.  Form and
2  foundation.
3  BY MS. HARDY:
4  Q   Let -- and let me explain further.
5      Did you, for instance, create any notes in
6  handwriting, or on the computer, to describe things that
7  occurred that you had a problem with?
8  A   Like -- like I just got, like, some -- some notes --
9      notes from what I already have?  Like experience while I
10     was there working?  Like they work and I found something
11     wrong with them, and I can just put like a note for
12     myself?
13 Q   Sure, yes.
14 A   Yes.  I can do that, yes.  Whenever I found something
15     like -- like a big issue there, and I found that -- that
16     I couldn't -- I couldn't reach how to resolve this
17     issue, I said, "We can -- we can resolve it later.  Can
18     you call me, ma'am?" or for the customer in front of me,
19     "Can you call me tomorrow just to resolve this issue?"
20         Most of them are welcome with that.  And once
21     I got that -- the solution -- most of them coming from
22     supervisor, coming from -- the solution of this issue
23     coming from supervisor or coming from --
24 Q   Okay.  Let -- let me just --
25 A   -- pharmacy manager.



Page 53

1  Q   Okay. 'Cause I need more description of what you're
2      talking --
3  A   Okay.
4  Q   -- about.
5         All right. So while you were working at
6      Walgreen's, you wrote notes to yourself to describe or
7      memorialize things that were happening in the workplace
8      that you had a problem with?
9  A   Yes, exactly.
10        And there is one in front of you, and you can
11     -- you can do that perfect job with him, I just put like
12     a note for myself, and ask -- ask that phone number for
13     my customer, and ask him, "Can you call me today at
14     noon? Can you call me at night, at this time? I'm
15     going to call you back. Give me your phone number."
16        And whenever I got any issue, just once I
17     resolved it, called back my -- my -- my customer just to
18     tell him that, "Everything's just fine," or "I couldn't
19     do anything. Can you come in to get your prescription
20     back?"
21 Q   Did you keep any notes about problems you had with
22     Donna Spencer?
23 A   Notes what happened with Donna Spencer?
24 Q   Did you keep any notes about the problems you had with
25     Donna --

Page 54

1  A   I -- I --
2  Q   -- Spencer --
3  A   -- don't --
4  Q   -- or complaints you had with her?
5  A   I don't -- the complaint between me and Donna Spencer,
6      it was -- she already jotted down and gave it to me.
7  Q   No. Did you keep any --
8  A   Yes.
9  Q   -- notes?
10 A   She gave it to me hand by hand.
11 Q   No, no. I'm talking about notes you create.
12        Did you create any notes about things that
13     Donna Spencer did that you have a complaint about? Did
14     or said.
15 A   No, no. I don't have anything. She already -- I
16     created by myself? No.
17 Q   All right. Did you create any notes about anything that
18     was said or done by anyone at Walmart [sic] that you
19     have a complaint about? I'm not talking about
20     customers. I'm talking about --
21 A   What about Walmart?
22 Q   -- employees of Walmart.
23        MS. LINDERMAN: Object to form and --
24        MS. HARDY: Or, I'm --
25        MS. LINDERMAN: -- foundation.

Page 55

1         MS. HARDY: -- sorry.
2         MS. LINDERMAN: Yeah, I was going to --
3         MS. HARDY: Walgreen's.
4         MS. LINDERMAN: They all have walls.
5         MS. HARDY: It's very different. All right.
6      Let me strike that.
7  BY MS. HARDY:
8  Q   Did you create any kind of notes about complaints you
9      have about things that employees of Walgreen's said or
10     did?
11        MS. LINDERMAN: Objection to form and
12     foundation.
13        THE WITNESS: No. I did -- what -- you know
14     what? When something happened like this, I -- I just
15     forward, like, email to -- to my supervisor. That's it.
16 BY MS. HARDY:
17 Q   Okay. All right. Did you keep copies of all emails of
18     that nature?
19 A   You know, I have, like, more than something like 34
20     emails between me and my supervisor.
21 Q   Okay. And do you have -- do you -- do you have
22     electronic copies of all of those still?
23 A   Yes.
24        Can I finish my point, please?
25 Q   Sure.

Page 56

1  A   Okay. From the -- the beginning, I was -- I was
2      emailing my supervisor like -- like, from my personal
3      email. Okay.
4  Q   Um-hmm.
5  A   And I just did that like -- like 20 times or something.
6      More than 20 times. Something around 30 times. And --
7      and after like -- like by the beginning of March -- or
8      not March, maybe after March, that -- that Donna -- not
9      Donna -- Amanda, the store manager, she asked me,
10     "Mervat, do you open your email with Walgreen's?"
11        I told her, "You know what, Amanda, even I
12     don't know that I have emails with Walgreen's. No one
13     even told me how to open it."
14        She said --
15 Q   Okay. You're getting far afield now.
16 A   Okay.
17 Q   Okay.
18 A   Sorry.
19 Q   That's not responsive.
20        I simply want to know whether or not you have
21     any kind of notes, either handwritten or recorded on the
22     computer, that document or memorialize the complaints
23     you have about what people did at Walgreen's.
24 A   What --
25        MS. LINDERMAN: Objection to form and



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
57—60

Page 57

1    foundation.
2         THE WITNESS:  Can I answer?
3         MS. LINDERMAN:  Yes, you can answer, unless I
4    tell you not to.
5         THE WITNESS:  Okay.  Something like I already
6    create with Walgreen's?  No, I don't have it.  That --
7    that document, which I already have it and she give it
8    to me, and she by -- by -- by order, "Just keep it with
9    you in your purse."
10        And because my purse is not in the pharmacy,
11   itself, and I give -- always I kept it in that -- in
12   that -- in that lunchroom, she told me, "Just put it in
13   your -- in your pocket, and after that put it in your
14   purse, after you're done with your day."
15        And this -- what -- I already got it hand by
16   hand.
17   BY MS. HARDY:
18   Q    What are you referring to?
19   A    About what I am talking about?
20   Q    Yes.  What documents are you referring to that you put
21   in your purse?
22   A    Okay.  About -- about my schedule.
23   Q    Anything other than documents about your schedule?
24   A    The plan she put every week.
25   Q    The --

Page 58

1    A    Plan for the pharmacy.
2    Q    The schedule?
3    A    Not the schedule.  Plan.
4    Q    What kind of plan?
5    A    You have to do this, and I have to do that.  The
6    technician has to do this.
7    Q    All right.  What other documents from Walgreen did --
8    were in your purse?
9    A    Nothing.
10   Q    Do you have electronic copies of all emails that you
11   sent to employees at Walgreen's?
12   A    Yes.
13   Q    Okay.  What --
14   A    Except --
15   Q    -- computer are --
16   A    Except one.
17   Q    -- they stored on?
18   A    Except one.
19   Q    What computer are the documents that you do have stored
20   on?
21   A    My --
22        MS. LINDERMAN:  Objection.  Form and
23   foundation.
24   BY MS. HARDY:
25   Q    Or are they not -- are they stored on a disc or some --

Page 59

1    in some other fashion?
2         MS. LINDERMAN:  If there -- if she's Yahoo,
3    then they're stored as documents.  That's my objection.
4         MS. HARDY:  Okay.
5    BY MS. HARDY:
6    Q    Well, there -- are all the documents that you have
7    access to, electronically, documents that you'd have to
8    obtain through your Yahoo account?
9    A    Yes.
10   Q    All right.  And you have everything that you sent on
11   your Yahoo account to various people within the
12   Walgreen's system, but for one document?
13   A    No.  I didn't get that point at all.
14   Q    All right.  You said there was one document you didn't
15   have.  Which document is that?
16   A    This one was, like, something like email I already did
17   and emailed two people at the same time.  One of them
18   was my supervisor, and the other one -- he was
19   Mr. Jeremy Willis, I think.  That's what I can remember.
20   I'm sorry.  I cannot really remember the name, but
21   something like Jeremy Willis.
22   Q    Okay.
23   A    And I --
24   Q    Jeremy Willis?
25   A    That's what I -- yeah.

Page 60

1         And I already forward this email for both of
2    them.  I already did this before from my personal email.
3    I already did that, like, two or three days before for
4    both of them, and I said that I care about Walgreen's,
5    number 1.  And all over the state, coming to see the
6    documents, there is something wrong.  And I -- I didn't
7    get any answer.  So when I found, myself, that I am in a
8    very big risk just to let them know that that document,
9    as example, that document there is very, very serious
10   and we cannot do anything with that.
11        I just give them that -- that -- like -- like
12   attachment to them.  Please, look at those and tell me
13   with which one is supposed to go with you, or with the
14   law?  And if the law just for you, I want a paper of the
15   law for you guys.
16   Q    Okay.  All right.  What documents do you have, or does
17   your lawyer have, other than documents that came off of
18   your Yahoo account?
19        MS. LINDERMAN:  I'm going to object to form
20   and foundation.
21        THE WITNESS:  All -- all paper?  I cannot
22   remember all documents if she already have it right now.
23   I -- I don't know.
24   BY MS. HARDY:
25   Q    What category of documents?



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
61–64

1  A  Category of documents coming, like, one of them, it is
2  the -- like the -- the hard copies she already booked in
3  advance, like something like Control 2 in advance, like
4  nine days before that time we already processed these
5  prescriptions. And other stuff -- and it was with his
6  -- with her handwritten, I gave four tablets. I gave
7  five tablets, and this is my initial, and this is the
8  date of which I already did. Perfect. I didn't see
9  that. Perfect.
10       I didn't see anything like this, because --
11  because, even, she is a supervisor before, and I don't
12  know if it is okay or not. So I processed this
13  prescription at the time it was supposed to be done, and
14  the -- the -- the customer called me in the morning and
15  he said, "This is blah-blah-blah, and I want my
16  prescription today. Can you process?"
17       I processed this prescription with the right
18  quantity with everything just fine, and both -- all --
19  all kind of right stuff with this prescription, and
20  labeled it and put it there. But when I tried to put
21  the label over this -- over -- over that -- that
22  medication on the hard copy, I found something very
23  weird that this patient, he already got four tablets for
24  no charge.
25       This is my -- my -- my initial, and this is my

1  -- my -- the time I write it up. And this coming like
2  -- so as a pharmacist, now, what I have to do? I
3  already put the right -- the right quantity was written
4  in the -- with the hard copy. Which one is supposed to
5  go? Just to get, like, four tablets? This kind of
6  Control 2, we cannot postulate. So what I have to do is
7  deal with that?
8       I just left it, finally, and called the
9  customer, and I asked him, "Sir, there's something wrong
10  with your prescription, and I'm going just to leave it
11  until my manager, when she come in, and -- around this
12  -- time. Can you call me, at this time, please, after I
13  get everything okay?"
14       He said, "Are you a new pharmacist there?"
15  I told him, "No."
16       He said, "I think I already have seen you
17  before."
18       "Yes, sir."
19       "By the way, I just want to tell you that your
20  manager is -- is something like first cousin, or
21  something like that, and I am coming just to see her in
22  afternoon."
23  Q  You know, you're very, very far afield --
24  A  Okay.
25  Q  -- with the question I asked.

1  A  Okay.
2  Q  Okay.
3  A  Sorry.
4  Q  You will get a chance to explain all of these issues
5  that --
6       MS. LINDERMAN: She's trying to tell you the
7  documents she gave me.
8       MS. HARDY: I know, but that -- that's a
9  really long explanation --
10       THE WITNESS: I'm sorry.
11       MS. LINDERMAN: -- about --
12       THE WITNESS: I'm so --
13       MS. HARDY: -- the documents.
14       THE WITNESS: I'm sorry.
15  BY MS. HARDY:
16  Q  So what's the document that -- that -- that you --
17  A  I just --
18  Q  -- gave your lawyer --
19  A  I just --
20  Q  -- related to that incident? What -- just describe the
21  document.
22  A  The document coming like -- like a copy, photocopy, from
23  that prescription with that -- that -- that -- the
24  handwritten, she --
25  Q  Um-hmm.

1  A  -- already put it there, and with -- with that -- it's
2  something like -- that's it. That's what I --
3  Q  All right.
4  A  -- can remember.
5  Q  All right. So how did you get a copy of that document?
6  A  I cannot remember. Believe me. I cannot remember. I
7  -- for the one I already sent to -- to Willis, and to my
8  supervisor, it -- it was something like -- like a
9  picture. I just got it with my phone.
10  Q  Um-hmm.
11  A  I just put it and get a copy. But after this, how did I
12  get it? I don't know. I'm sorry.
13  Q  How did you send it to your lawyer?
14  A  I -- I have seen her, like, on July 15th or something,
15  and I told her about the document there, and she told
16  me --
17       MS. LINDERMAN: That's where --
18       MS. HARDY: Let me --
19       MS. LINDERMAN: -- you stop.
20  BY MS. HARDY:
21  Q  Did -- did you -- did you give her a copy on July 15, 2013,
22  of the pharmacy document?
23       MS. LINDERMAN: Do you remember which day?
24       THE WITNESS: Maybe -- July 15th, maybe, like
25  days after. I'm not sure with that.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
65—68

Page 65

1 BY MS. HARDY:
2 Q  Did you give her a hard copy or an electronic --
3 A  I give --
4 Q  -- copy?
5 A  I give her -- I give her that -- that document which I
6    already have.  All documents.
7 Q  Did you give her a hard copy piece of paper, or an
8    electronic copy of the document?
9 A  Piece of paper, yes.
10 Q  Okay.
11 A  Piece of paper.
12 Q  And you don't recall how you got that piece of paper
13    from the system?
14    MS. LINDERMAN:  I'm going to object to form
15    and foundation since there's more than one document.
16 BY MS. HARDY:
17 Q  Or pieces of paper?
18 A  I don't have the -- the answer --
19 Q  All right.
20 A  -- for that.  I'm sorry.
21 Q  All right.  Have you ever made a voice recording of
22    anybody at Walgreen?
23 A  A voice recording?
24 Q  Yes.
25 A  No.  They leave it, like, a lot of voice messages, but I

Page 66

1    never called --
2 Q  Let's put aside voice messages that are left that you
3    have copies of.  We'll go to that next.
4    But have you ever recorded --
5 A  No.
6 Q  -- anybody at Walgreen's?
7 A  No.
8    You know what?  Just to be 100 percent on
9    this, one of the pharmacists, she was working with
10    Walgreen's, she told me to try to record that -- that
11    insult -- all insults that you got every day.  You have
12    to keep that with you.
13    But you know what?  I don't know how to do
14    that even.  And you know what?  I can't get something --
15    I can't get something without your permission to give it
16    to me.  If you get me a piece of paper, and you said --
17 Q  If the --
18 A  -- keep it --
19 Q  If the answer's "no," that's --
20 A  No.
21 Q  -- all I need to hear.
22 A  No.
23 Q  Okay.
24 A  I don't have it.  I -- I don't know how to use it like
25    this.

Page 67

1 Q  Okay.  All right.  Do you have copies of voicemail
2    recordings that were left in the pharmacy?
3 A  After left from the pharmacy?
4 Q  That were left in the pharmacy.
5    MS. LINDERMAN:  Objection to form and
6    foundation.
7    I don't understand your question.
8    THE WITNESS:  I'm sorry.  I didn't get that.
9 BY MS. HARDY:
10 Q  All right.  You state in response to document request
11    number 1 that:
12    Plaintiff has a couple of phone messages.
13    What phone messages do you have?
14 A  I have one of them, she already left it to me on -- on
15    May 29th or 28th.  I'm sorry.
16 Q  Who -- who left it on May 29th?
17 A  My manager.  My pharmacy manager.
18 Q  Donna Spencer?
19 A  Yes.
20 Q  And what is the content of that message?  What did she
21    say?
22 A  As usual she's trying to -- to mess up my schedule, and
23    she left it, like, a message around ten o'clock or
24    something, and she asked me to be there around
25    twelve o'clock.

Page 68

1    "I'm so sorry for that.  I'm supposed to tell
2    you a little -- a little bit before, but I just got -- I
3    just -- I just remembered that right now.  They're
4    coming -- coming today before twelve -- I -- because I
5    have to leave the pharmacy.  I have another appointment
6    with the -- to get my alcohol -- alcohol class, because
7    this was expired.  Call me once you hear this message."
8    I hear the message, like, 12 minutes before
9    12, because I -- it was closed.  My -- my -- my -- my
10    phone, it was -- it was shut down.  And -- and when I
11    opened it, I found something like message.  I got it.  I
12    called her, "I'm so sorry, ma'am.  I got -- I just -- I
13    got your message.  Can you -- can you just wait for me
14    like -- like minutes before going there?"
15 Q  Okay.  So you've described the May 29th message from
16    Donna Spencer --
17 A  Yes.
18 Q  -- that you have a copy of?
19 A  Yes.
20 Q  And where -- where do you have a copy of that message?
21 A  Sorry?
22 Q  Where is that message?  Is it on your home --
23 A  Here in the phone.
24 Q  It's on -- it's on your iPhone?
25 A  Yeah.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014

69–72

Page 69

1  Q   That's an iPhone?  Or, no, Samsung --
2           MS. LINDERMAN:  Samsung.
3           MS. HARDY:  -- right?
4           MS. LINDERMAN:  Android.
5  BY MS. HARDY:
6  Q   So it's on your Android Samsung phone?
7  A   Hmm?
8  Q   The voice recording.
9  A   Um-hmm.
10 Q   It's stored on there currently; correct?
11 A   Um-hmm.
12 Q   Yes?
13 A   Yes.
14 Q   Okay.  Do you have any other voice messages that are
15       stored on your cell phone --
16 A   There is some --
17 Q   -- or any other recording device?
18 A   There is another one from Amy Spencer [sic].  It was on
19       July 12th.  I'm -- I'm sorry.  I don't know what is that
20       contact there.
21 Q   Was it -- do you know what it was about?
22           MS. LINDERMAN:  She said "Amy Spencer," which
23       means she's confused.
24           THE WITNESS:  Amy -- Amy Yadmark.  Sorry.
25       Amy Yadmark.

Page 70

1  BY MS. HARDY:
2  Q   Do you know what the -- the -- the general subject
3       matter was of her message?
4  A   She suspended me, like, a day before.  And she told me,
5       "I'm going to call you one day after," and she said
6       something -- I'm sorry.  I cannot remember.  Even I
7       didn't hear it for a long time.  But it is still there,
8       and -- and what again?
9           And there is another two -- two voice
10      messages.  One of them came from Susan Debrowlsky and
11      she's trying to reach me.  There was another one on
12      August 3rd or something.  It was from our store manager.
13      He respect me a lot.  I already worked with him.
14          And he didn't hear about my termination.  He
15      asked me to go to help him, as usual, because every time
16      he's asking for help, I -- I go there.
17 Q   You're referring to Todd Lyle?
18 A   Sorry?
19 Q   Todd.  Or Ted, I'm sorry.  Ted Fletcher?
20 A   No.  This -- this store manager, he was on other floor.
21      I'm sorry.  I cannot remember that number -- that store
22      number, but he was on other floor.
23 Q   So it wasn't the manager at the store where you worked
24      in -- at the end of your employment?  It wasn't that
25      store manager?

Page 71

1  A   Mr. Fletcher is my store manager.  But this one who left
2       the voice message, whenever he needs help, he couldn't
3       find it with any other one.  He just called me and I'm
4       trying my best to be there.
5  Q   Do you have any other phone messages?
6  A   No.
7  Q   So you only have four phone messages?  One from
8       Donna Spencer.  One from Amy Yadmark.  One from Susan.
9  A   Two from Susan.
10 Q   Two from Susan, okay.
11          And then one from a store manager in
12      Waterford?
13 A   Yes.  I can't remember his name.
14 Q   And you don't have any other voice recordings of any
15      kind?
16 A   No.
17 Q   Do you have photos of any other Walmart documents --
18 A   Walgreen's.
19 Q   Or Walgreen's.  I'm sorry.
20          Do you have photos of any other Walgreen
21      documents on your cell phone, other than the ones of the
22      prescriptions that you've previously testified about?
23          MS. LINDERMAN:  Objection to form and
24      foundation.
25          THE WITNESS:  I wanted to -- to tell about the

Page 72

1       one.  I'm -- I'm going to repeat it now.  I told you I
2       have all emails from between me and Amy.  Just one, I
3       don't have it.  Why you don't have it?  Because the time
4       I already sent it to them, it is coming very serious
5       one, and they called me, like, after, and they ask my --
6       my supervisor asked me to delete it right away.  And I
7       told her, "One, I sent it to you, ma'am, and, two, I
8       sent it to Mr. Willis.  I already deleted.  So, even, I
9       don't know how to get it again.
10 BY MS. HARDY:
11 Q   I'm not asking about emails right now.  I'm asking about
12      photos that you took with your cell phone.
13 A   Because of -- there's no email, so there's no photos.
14      The only thing, which I already have it, it was
15      something like a copy from the prescription, which I
16      already forwarded to my -- my managers.
17 Q   Um-hmm.
18 A   And after that, I deleted just to get some attention.  I
19      -- I tried, like, several times to email all of them.
20      Please, one minute from you guys.  One minute from me --
21      from you.  But because they are so busy, and still busy,
22      I couldn't get any attention without the document.
23 Q   When do you claim you deleted the photos of the pharmacy
24      records off of your cell phone?
25          MS. LINDERMAN:  I'm going to object to form



MERVAT MIKHAEL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
73–76

Page 73

1   and foundation.
2       You keep saying "photos," and she keeps saying
3   photo, so we need to -- that's a problem.
4   BY MS. HARDY:
5   Q   How many photos did you take of pharmacy records?
6   A   I am not sure how -- if I got, like, a photo with my
7   cell phone?  That's what you want?  From where did you
8   get the hard copies?
9       MS. LINDERMAN:  No.  How --
10      MS. HARDY:  No.
11      MS. LINDERMAN:  How many?
12      MS. HARDY:  How many --
13      MS. LINDERMAN:  She said --
14      MS. HARDY:  -- photos --
15      MS. LINDERMAN:  -- "How many?"
16      MS. HARDY:  -- did you take?
17      THE WITNESS:  I -- I cannot remember.
18  BY MS. HARDY:
19  Q   Okay.  When did you -- have you deleted all the
20  photos --
21  A   All the --
22  Q   -- the pharmacy records off of --
23  A   Once --
24  Q   -- your --
25  A   Once --

Page 74

1   Q   -- cell phone?
2   A   Yes.  I just --
3   Q   Just -- just answer the question.
4   A   This --
5   Q   Yes?
6       MS. LINDERMAN:  Yes or no?
7       MS. HARDY:  Yes or --
8       THE WITNESS:  No.
9       MR. HARDY:  -- no?
10      THE WITNESS:  No.  I don't have any.
11      MS. LINDERMAN:  So the answer is "yes"?
12      MS. HARDY:  My -- see, you -- you've got to
13  stop and let me finish my question --
14      THE WITNESS:  Okay.
15      MS. HARDY:  -- because you're not even hearing
16  the question before you start to respond.
17      THE WITNESS:  Okay.
18      MS. HARDY:  And your lawyer just made a good
19  point.  I asked you if you deleted them all, and the
20  answer is "yes," and instead you're answering "no,"
21  because you're not paying attention.
22      THE WITNESS:  I don't have any copies.  Yes, I
23  don't -- I deleted all of them.
24  BY MS. HARDY:
25  Q   All right.  When did you delete the photos of the

Page 75

1   pharmacy records off of your cell phone?
2       MS. LINDERMAN:  Objection to form and
3   foundation.
4       THE WITNESS:  Oh, my gosh.  I don't know.  The
5   one which I already -- 100 percent, that I already
6   deleted, once I just sent it and I got the confirmation
7   that it was sent, it was on 6/23 or 6/24.  That's what
8   I'm 100 percent that I already sent it.  Once I got the
9   confirmation that they already -- they got that -- that
10  prescription, or they got my document, I deleted at
11  once.  That's what I can confirm about it.
12  BY MS. HARDY:
13  Q   How did you get confirmation they got your document?
14  A   It is saying, like, "sent."  Sent.  If you email
15  somebody, they come back to you "sent."
16  Q   You get a message back on your phone saying "sent"?
17  A   Something like this.  I'm not sure what -- what can --
18  but something like "sent," or I'm not sure what is the
19  -- the -- the right thing.  I got it through -- through
20  this.  But I got that they already got it.
21  Q   All right.  Why would you take a photo of a prescription
22  with your cell phone, rather than just send it to a
23  Walgreen supervisor through the fax function?
24      MS. LINDERMAN:  Objection.  Form and
25  foundation.

Page 76

1       THE WITNESS:  First of all, because I don't
2   have the fax number.
3   BY MS. HARDY:
4   Q   You didn't --
5   A   I don't -- I don't --
6   Q   On June 23rd or 24th you did not have the fax number?
7   A   I don't have the fax number from -- for any of -- for
8   Mr. Willis.  What I already have for both of them, and
9   they sent a lot of emails, and I sent back to them
10  emails.  It's coming, like, through my personal email.
11  That's it.  That's what I -- and their -- their email
12  through the -- Walgreen, I think, yes.
13  Q   Why didn't you obtain the fax number so that you could
14  send them the prescription that was at issue through the
15  fax system within Walgreen, as opposed to taking a photo
16  of a prescription with your personal cell phone?
17      MS. LINDERMAN:  Objection.  Form and
18  foundation.  You can answer.
19      THE WITNESS:  Okay.  That -- that's what I
20  told you before.  That's --
21  BY MS. HARDY:
22  Q   Why didn't you obtain the fax number --
23  A   I didn't --
24      MS. LINDERMAN:  She was trying to answer, I
25  think.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
77–80

Page 77

1 BY MS. HARDY:
2 Q -- so that you could fax the document through the
3     Walgreen's system, rather than take a photo with your
4     personal cell phone?
5 A Exactly.
6         MS. LINDERMAN: Hold on. Objection. Form and
7     foundation.
8         THE WITNESS: Okay. The fax number is easy
9     just to get it right away, but there's something, like,
10     I already emailed them, like, two days before. I tried
11     to get attention just to come -- somebody to email me,
12     or even tell me how to send it, or even come by yourself
13     just to see if it is serious or not, and I didn't get
14     any kind of attention.
15 BY MS. HARDY:
16 Q You're not answering my question, which is:
17         Why didn't you get the fax number for Amy, so
18     that you could --
19 A That --
20 Q -- use a proper way of getting the document to her,
21     rather than using your cell phone to take photos of
22     pharmacy records?
23         MS. LINDERMAN: Objection. Form and
24     foundation. You can answer.
25         THE WITNESS: First of all, I didn't want to

Page 78

1     get, like, a print from that -- that -- that, or I don't
2     know what I have to do. It's supposed to get, like, a
3     print from the system, itself, to get a copy from the
4     prescription, or you can get the hard copy, itself, and
5     make, like, photocopy, and after that you fax it over to
6     them. Yes, you can do that.
7         But there's something -- the first point that
8     -- at this day, Mr. Fletcher was there the whole day,
9     because it was a crazy, crazy day.
10 BY MS. HARDY:
11 Q You're not answering my question --
12 A Ma'am --
13 Q -- which is:
14         Why didn't you get the fax number so that you
15     could send the document in question through a fax,
16     rather than make a photo with your personal cell phone --
17         MS. LINDERMAN: I object --
18         MS. HARDY: -- of pharmacy records?
19         MS. LINDERMAN: Objection to form and
20     foundation.
21         I think she is trying to answer your question.
22     She's trying to explain the days and circumstances.
23         THE WITNESS: First of all, I didn't want
24     Mr. Fletcher to see it. I didn't want the technician to
25     see this kind of -- of -- of prescription. Because the

Page 79

1     technician has something like some issues with that --
2     that -- with her, and I don't want to encourage her to
3     -- to do something like this.
4         I don't want her to -- she told me, from the
5     beginning, she told me that there's a lot of this stuff.
6     Even she didn't see it before with any other
7     pharmacists. There's a lot of this stuff, even I can't
8     imagine. I just stopped her, and --
9 BY MS. HARDY:
10 Q Who are -- who are you talking about right now?
11 A Technician.
12 Q Who? What's her name?
13 A Her name is Janet.
14         (Clarification by reporter.)
15         MS. LINDERMAN: Janet.
16 BY MS. HARDY:
17 Q Janet?
18 A Yes.
19 Q And -- and -- and what position did she hold?
20 A Technician.
21 Q In -- in the pharmacy?
22 A Yes.
23 Q So what does sending a fax to Amy or to Ted Fletcher
24     have to do with Janet?
25 A I don't -- I didn't want somebody just to see this

Page 80

1     stuff. First of all, to get the fax number for that --
2     for my supervisor, or for Mr. Willis, you're supposed to
3     -- to get it -- call that district just to get the fax
4     number. I don't -- you know, she was there the whole
5     time, and she was working hand by hand. She was by me.
6     And Mr. Fletcher was by me, also. Both of them, they
7     work there, and I don't -- any one of them -- just to
8     see that those going to Ms. -- Ms. Amy, or Mr. Willis.
9         I don't -- that's what I -- I couldn't do it
10     in front of them. But anyway, I tried to tell that
11     there's something wrong.
12         "I already emailed you before and told you
13     that there is some issues. If these two prescriptions,
14     not issues, can you tell me? Can you show me? Can you
15     tell me if it goes with the law or not?"
16 Q See, you're getting way far afield. I -- I just wanted
17     to know why you didn't get the --
18 A That's --
19 Q -- fax number.
20 A This is --
21 Q And --
22 A -- my answer.
23 Q All right. And -- and you've completed your answer?
24 A Yes.
25 Q All right. Why didn't you just make a hard copy in the



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
81–84

1    pharmacy and hand it to Amy, or hand it to Mr. Fletcher?
2  A  Fletcher? I don't want Mr. Fletcher to get it.
3  Q  Well, Mr. Fletcher was the store manager; correct?
4  A  Yes. But this is a pharmacy issue.
5  Q  All right. So who did you want to have copies of -- of
6    the prescriptions that you thought were problematic?
7  A  Supervisor and loss prevention supervisor.
8  Q  All right. So you wanted Amy Yadmark to have a copy?
9  A  Yes.
10 Q  And you wanted who else? Which person with loss
11    prevention?
12 A  Loss prevention supervisor, Mr. Jeremy.
13 Q  Mr. Willis?
14 A  Yes.
15 Q  Okay. So why didn't you just make copies of the
16    documents and then hand them to Amy or to Jeremy?
17 A  I didn't see him a lot.
18 Q  Well --
19 A  I couldn't -- I couldn't reach any one of them. The
20    only way to reach any one of them, is just to email
21    them, and maybe after that they are going to email me
22    back.
23 Q  Why didn't you tell them in an email, "I've made a copy
24    of the documents, in question, and I want you to look at
25    them" --

1  A  Maybe I --
2        MS. LINDERMAN: Objection to --
3        THE WITNESS: -- mentioned --
4        MS. LINDERMAN: -- form.
5        MS. HARDY: -- rather than send a copy over
6    the Internet to them and make copies with your personal
7    cell phone --
8        MS. LINDERMAN: Objection --
9        MS. HARDY: -- of confidential pharmacy
10    records?
11        MS. LINDERMAN: Objection to form and
12    foundation.
13        THE WITNESS: Maybe before that -- two days
14    before sending them those, I already mentioned I tried
15    to tell them that, "We already have those. Please, give
16    me attention."
17 BY MS. HARDY:
18 Q  Okay. Do you understand that it is a serious violation
19    of Walgreen policy to make copies of pharmacy records
20    with a personal cell phone?
21        MS. LINDERMAN: Objection to form and
22    foundation.
23        THE WITNESS: Okay. That's what I already
24    got, like, an answer from Mr. [sic] Amy, when she --
25    when she -- Ms. Amy, when she found something like this,

1    and she called me, "Mervat, did you delete this
2    prescription from your phone, yet?"
3        And she asked me, "Did you -- did you -- this
4    is nothing in -- with your phone?"
5        "No."
6        And she told me, "This is something, like, a
7    HIPAA violation. You can come into my district
8    tomorrow. Would you like this?"
9        And at this -- at this meeting, she told me
10    that there is a -- "I'm sorry to tell you that maybe you
11    -- we are going to -- to terminate you. According to
12    the policy with Walgreen's, you're supposed not to be
13    here anymore, and" --
14        But she said that, "We -- let me -- for a
15    while -- just ask my lawyer to -- to see what can we do
16    with you."
17        And I told you -- her, "It's okay for that.
18    What I have to do with my schedule? Supposed to go with
19    it? I'm not?"
20        And she told me that, "Yes, you can go with
21    your -- your -- your schedule. Just work as usual,
22    until I'm going to call you to tell you what's coming
23    up."
24        And on July 8th, she called me around
25    two o'clock and she was --

1        MS. HARDY: You know, I don't really want to
2    get into all of this right now, because I'm going to
3    cover this later, and I don't want to repeat testimony,
4    and --
5        THE WITNESS: I just wanted to tell you about
6    that -- that -- that serious question that this is a
7    very serious policy. You already --
8  BY MS. HARDY:
9  Q  And -- and you know that that's a serious policy?
10        MS. LINDERMAN: Well --
11        THE WITNESS: Yes.
12        MS. LINDERMAN: -- objection to form and
13    foundation.
14        MS. HARDY: Okay.
15        THE WITNESS: But can I say -- can I finish,
16    please?
17        MS. HARDY: No. Because if you get into it
18    now, your lawyer is going to object when I ask you about
19    it later, and I'm not ready to go through that line of
20    questioning, 'cause I'm going to have a lot of follow-up
21    questions, and --
22        THE WITNESS: I wanted --
23        MS. HARDY: -- it's --
24        THE WITNESS: -- to --
25        MS. HARDY: -- it's outside of the sequence of



Page 85

1   -- of what I intend --
2        MS. LINDERMAN: Well --
3        MS. HARDY: -- to cover.
4        MS. LINDERMAN: -- just --
5        THE WITNESS: Okay.
6        MS. LINDERMAN: -- let her go on.
7        THE WITNESS: Okay.
8        MS. LINDERMAN: This is her ballgame. That's
9   how it works. And I have to support her there, so when
10  I -- it's my ballgame, she just can't come back to me
11  and say [descriptive sound]. What's fair is fair.
12  BY MS. HARDY:
13  Q   Have you ever been a plaintiff or a defendant in -- in a
14  lawsuit prior to this lawsuit?
15  A   Not here. Not in Egypt.
16  Q   Anywhere else?
17  A   (Witness shakes head.)
18       MS. LINDERMAN: You have to answer.
19  BY MS. HARDY:
20  Q   So the answer's "no"?
21  A   No.
22  Q   All right. You've never sued anybody, and you've never
23  been sued prior to this lawsuit?
24  A   Yeah. I swear.
25  Q   Have you ever filed a complaint of discrimination with a

Page 86

1   federal or state agency, other than the complaint you
2   filed in connection with your employment at Walgreen's?
3   A   No.
4   Q   Have you attended any college or university in the
5   United States for credit or even to audit a class?
6   A   I think classes which I already attended --
7   Q   Um-hmm.
8   A   -- something like took a -- a certificate for -- as a
9   compounding pharmacy to get -- to be, like, immunizing
10  pharmacy, to be something with PCR, something like a
11  regional --
12  Q   All right. What -- what institution did you attend to
13  further your training in pharmacy?
14  A   The Michigan Board of Pharmacy.
15  Q   The Michigan Board of Pharmacy?
16  A   Uh-huh.
17  Q   They offer classes?
18  A   Yeah. They offer classes for -- just to get it to give
19  you, like, a certificate to be an immunizing
20  pharmacist --
21  Q   Um-hmm.
22  A   -- or, like, a PCR.
23       But the compounding -- compounding mean --
24  because I already work, for a long time, for nursing
25  homes, or -- so supposed to get the -- like a

Page 87

1   certificate to do a lot of the stuff like -- like
2   intravenous, induce --
3   Q   Um-hmm.
4   A   -- so I already wrote for six months.
5   Q   All right. Other than classes with the Michigan Board
6   of Pharmacy --
7   A   Yeah.
8   Q   -- have you attended any institution of higher
9   education? A college or university --
10  A   No.
11  Q   -- for any kind of course work?
12  A   No.
13       MS. HARDY: Okay. Let the record reflect I'm
14  marking, as Deposition Exhibit No. 1, a document that
15  appears to be a resume of Ms. Mikhaeil.
16       (Marked for identification:
17        Deposition Exhibit No. 1.)
18       MS. HARDY: It is a two-page document for the
19  record. Here's a copy for the witness and for counsel.
20       MS. LINDERMAN: Thank you.
21  BY MS. HARDY:
22  Q   Is this your resume?
23  A   Yes.
24  Q   Is this the resume that you submitted to Walgreen in
25  connection with your application for employment?

Page 88

1   A   You know what? Even I don't know if it is updated or
2   not, but I think, yeah.
3   Q   Look at the date in the upper right-hand corner. It
4   indicates 6/20/2012.
5   A   Um --
6   Q   Look in the upper right-hand corner. No, in the upper --
7   A   Okay.
8   Q   -- upper right-hand corner, page 1.
9   A   Okay. That's what I'm trying to find out about that.
10  Yes, yes, um-hmm.
11  Q   All right. Are you -- can you confirm that Exhibit
12  No. 1 is the resume that you submitted to Walgreen at
13  the time you applied for employment?
14  A   I think it is just the paragraph there, because I can
15  see it in this one. Maybe I update that -- a new one,
16  and send it to them, or something like -- yes, yes.
17  This is the one. Yes. I found it. Sorry.
18  Q   Did you prepare Exhibit No. 1?
19  A   What was the question, again, please?
20  Q   Did you prepare the resume which has been marked as
21  Exhibit No. 1?
22  A   Yes.
23  Q   Are all of the -- is all of the information contained in
24  Exhibit No. 1 truthful and accurate?
25  A   Yes.



Page 89

1 Q   Are you still a licensed pharmacist?
2 A   Yes.
3         MS. LINDERMAN:  You know what?  Can you say
4     that again, 'cause I could barely hear it, and I want to
5     make sure that it's going to show up?  Just repeat your
6     answer.
7         THE WITNESS:  Yes.
8         MS. HARDY:  Why don't we take a break for a
9     moment?  A restroom break.
10        MS. LINDERMAN:  Okay.
11        THE VIDEOGRAPHER:  Okay.  This completes disc 1.
12    We're off the record at 11:24 a.m.
13        (Whereupon a break was taken
14          from 11:24 a.m. to 11:42 a.m.)
15        THE VIDEOGRAPHER:  We are back on the record
16    at 11:42 a.m.  This is disc 2 of the deposition of
17    Mervat Mikhaeil.  Please proceed.
18        MS. HARDY:  Let the record reflect I've
19    marked, as Deposition Exhibit No. 2, what appears to be
20    the Walgreen's application for employment of the
21    plaintiff.
22        (Marked for identification:
23         Deposition Exhibit No. 2.)
24 BY MS. HARDY:
25 Q   Can you, please, identify this document for the record?

Page 90

1         MS. HARDY:  I'm providing a copy to the
2     plaintiff and to counsel.
3         MS. LINDERMAN:  This is Exhibit B, you said?
4         MS. HARDY:  Yes, two.
5         MS. LINDERMAN:  Okay.  Exhibit 2.
6 BY MS. HARDY:
7 Q   Is this your application for employment with Walgreen?
8         MS. LINDERMAN:  Objection to form and
9     foundation.
10        THE WITNESS:  This is an application, yes.
11    This is one.
12 BY MS. HARDY:
13 Q   Is it your application?  Look at the third page.  It
14    purports to have your electronic signature.
15        MS. LINDERMAN:  I'll just object, 'cause if it
16    was done electronically, she may never have seen it in
17    this form.  That's my objection.
18        THE WITNESS:  Yes.  (Witness reading from
19    document.)
20        Yes, it seems just fine from what I can see.
21 BY MS. HARDY:
22 Q   I'm sorry.  You're -- you're whispering.  I can't hear
23    you.
24 A   Yes, it seems okay, but...
25        Yeah, um-hmm.  Yes, um-hmm.

Page 91

1 Q   All right.
2 A   This is mine.
3 Q   So Exhibit No. 2 is the application for employment with
4     Walgreen's that you filled out; correct?
5 A   Yes.
6 Q   All right.  And all of the check marks are check marks
7     that you provided in filling out this application;
8     correct?
9 A   That's what I can see right now, but --
10 Q   Well --
11 A   -- yes --
12 Q   -- what can't --
13 A   -- because --
14 Q   -- you see right now?  Is there anything you --
15 A   You know --
16 Q   -- can't read?
17 A   -- even I can't read every single point, but I think,
18    yes --
19        MS. LINDERMAN:  It's --
20        THE WITNESS:  -- this is the one.
21        MS. LINDERMAN:  It is really small.  It is
22    really small.
23 BY MS. HARDY:
24 Q   Well, what -- what can't you read, because I'll read it
25    to you?  If there's anything on Exhibit No. 2 that you

Page 92

1     can't read, because your eyesight's not good enough, let
2     me know what area you're referring to, and I'll read it
3     to you.
4         MS. LINDERMAN:  I just -- I don't think it's
5     an eyesight issue.  I think that it's really small, so
6     we can't probably --
7         MS. HARDY:  But what would the issue be, if it
8     wasn't an eyesight issue?
9         MS. LINDERMAN:  Well, 'cause 8.0 font or
10    lower --
11        MS. HARDY:  I know, but it's an eye -- an eye
12    -- an eyesight issue.  I'm not being critical, but she's
13    -- is she saying she can't read it, because the font's
14    too small?
15        MS. LINDERMAN:  Right.  But I think our eyes
16    only do so much.
17        MS. HARDY:  Well, I -- I actually can read it,
18    believe it or not, so -- despite my aging eyes, so...
19 BY MS. HARDY:
20 Q   Is there anything on Exhibit No. 2 that you can't read
21    because the print is too small?
22 A   I think everything is just fine, and that's what I can
23    see, and everything's okay, but...
24 Q   Well, what can't you see?  Is there anything you can't
25    see?  If so, point to it, and I will read it to you.



MERVAT MIKHAEL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
93–96

Page 93

1  A   I didn't read every single thing, but...

2        Okay.  Yes.  Um-hmm.  Every single thing.

3  Q   Everything is okay?

4  A   Um-hmm.

5  Q   Everything is accurate; correct?  It's all information

6      you provided and it's all accurate; is that your

7      testimony?

8  A   Something is not accurate here.  That's -- my address, I

9      already changed my address.

10 Q   But at the time you applied at Walgreen's, was that your

11     address?

12 A   This is not my address.  It -- at the time, I already

13     applied it was there, but now it is not there.  I -- I

14     already moved from this address.  And I can't find

15     something here.  It does --

16 Q   Well, let's -- let's -- slow down, please.

17        Did you live at 45516 Utica Green West in

18     Shelby Township at the time you filled out Exhibit No. 2,

19     which is your application for employment with Walgreen?

20 A   Yes.

21 Q   All right.  Is there anything on Exhibit No. 2 that was

22     not accurate at the time you provided the information in

23     response to the application?

24 A   Maybe by mistake.  I just look at "no," but it's

25     supposed to be "yes."

Page 94

1  Q   What -- what are you referring to?

2  A   Second -- second paper there, I can find that for the

3      Highland Pharmacy, my supervisor name -- his name is

4      Mehta, and this is the address.  And there was a

5      question there, "May we contact this employer?"

6        I said, "no," but it's supposed to be "yes."

7  Q   Okay.  Is there any other response, that you provided on

8      Exhibit No. 2, not accurate?

9  A   That's it.  That's what I can see right now, yeah.

10 Q   And did you authorize this to be signed per your

11     electronic signature?

12 A   Yes.

13 Q   Okay.  Now, let's cover your prior employment that

14     preceded working at Walgreen.  You worked for

15     CVS Pharmacy?

16 A   Yes.

17 Q   All right.  Store 8080?

18 A   Um-hmm.

19 Q   From June 2010 to December 2010?

20 A   Yes.

21 Q   All right.  And what position did you hold there?

22 A   Technician.

23 Q   Was it in the pharmacy?

24 A   This was in the pharmacy, yes.

25 Q   Okay.

Page 95

1  A   Um-hmm.

2  Q   And your supervisor during that time period was -- was

3      it Everet Ecronizer?

4  A   Everet Ecronizer, yes.

5  Q   Okay.

6  A   Yes.

7  Q   And to spell it for the record, it's E-V-E-R-E-T for

8      "Everet," and the last name E-C-R-O-N-I-Z-E-R.

9  A   Yes.

10 Q   What position did Everet hold?

11 A   Supervisor.

12 Q   Well, was he a pharmacist?

13 A   Yes.

14 Q   Was he the head pharmacist?

15 A   No.  This is coming, like, the supervisor for all -- the

16     whole district.

17 Q   Um-hmm.

18 A   Uh-huh.

19 Q   Were you -- did he work on-site with you --

20 A   Um --

21 Q   -- at that same location you worked at?

22 A   Maybe once or something, yes.

23 Q   All right.  Who worked in the same location as you?  The

24     same pharmacy day to day?

25 A   I can't remember the name.  I'm sorry.

Page 96

1  Q   Can you remember anybody?

2  A   What I already have there, her name is Rosetta (ph) --

3      Rosetta.  She is one of my friends in the church.  She

4      was technician.  But the managers -- because different

5      names or something.  I can't get the name.  I'm sorry.

6      But for Everet Ecronizer -- Everet Ecronizer, there is

7      something like a lot of emails between me and him --

8  Q   Um-hmm.

9  A   -- 'cause he knows that I'm a pharmacist and I'm doing

10     my -- my exams, so...

11 Q   All right.  At -- at the time you worked for

12     CVS Pharmacy, you did not --

13 A   Yes.

14 Q   -- have your license; is that correct?

15 A   As a technician -- I worked as a technician, so I didn't

16     get my license, yet.

17 Q   Okay.  So the answer is "yes," you -- you did not have

18     your license?

19 A   No.

20 Q   Okay.  All right.  What were your job duties as a

21     technician?

22 A   Counting, getting the prescription from the -- those

23     customers, to go to help with the drive-through,

24     cashier -- you know, and put some data there, help at

25     the pharmacy --



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
97—100

Page 97

1  Q   Okay.  Be like --
2  A   -- as a pharmacy --
3  Q   -- an assistant to the pharmacist?
4  A   Yes.  Technician, assistant.
5  Q   All right.  Did you have any type of performance
6      problem, to your knowledge, while you were a technician
7      for CVS Pharmacy?
8  A   Something like -- like problems there?
9  Q   Did anyone who worked at CVS say to you in writing, or
10     verbally, that they were concerned about how you were
11     performing your job or conducting yourself in the
12     workplace?
13 A   No.  I didn't get that, because even, at this time, I was
14     doing my exams.  So just I worked for, like, three hours
15     every week.  You know what I mean?
16 Q   Um-hmm.
17 A   So it is no big deal, even, just to -- to say something.
18 Q   Well, irrespective of how many hours a week you worked,
19     did anyone ever have any criticisms of how you were
20     conducting yourself in the workplace?
21 A   No.  I didn't get any -- criticize something, you know.
22     I didn't get anything.
23 Q   Was your departure from CVS completely voluntary on your
24     part?
25 A   Yes.  Because that's what I tried to email Mr. -- I

Page 98

1      think his name was Everet Ecronizer, or something --
2  Q   Um-hmm.
3  A   -- and I already emailed him that, "Can I make, like,
4      resignation?"
5          Because I had to focus on my studying to get
6      my -- my -- my --
7  Q   Um-hmm.
8  A   -- license, and he said that it -- it is okay.  And I --
9      he told -- I asked if I -- I can come back.  He told me,
10     "Yes, you can just try to reach somebody there in the
11     pharmacy just coming back even."
12 Q   All right.  Did you apply for a job with CVS as a
13     pharmacist once you obtained your license?
14 A   You know, I can't remember that I already applied with
15     them or not, but -- because I already got my job with
16     RPh on the Go and I like Target more, maybe.  I'm not
17     sure if I already did that or not.  I'm sorry.
18 Q   Did you ever have any problems getting along with anyone
19     while you worked at CVS?
20 A   Very little stuff, you know.  The technician just wanted
21     to get my -- my hours.  "You got more."
22         "I -- it's okay.  Even -- you can take it,
23     'cause even I don't want more hours.  I want to focus on
24     my studying."
25         When -- something like this.

Page 99

1  Q   That's the only kind of problem you had?
2  A   Yes.  Something like this.
3  Q   Okay.
4  A   Supposed to do this or that, that's it.  "Mervat, can
5      you go to do this?  Mervat, can you go to do that?"
6          That's it.
7  Q   All right.  And so they wanted you to work more hours
8      and you did not want to do that because of your studies?
9  A   Yes.
10 Q   Okay.  Did you have any other conflict or disagreement
11     or problems with any employees at CVS other than that
12     issue?
13 A   This is -- this thing happened with CVS.  It is coming
14     like a --
15 Q   It's really a "yes" or "no."  Did -- did -- did you have
16     any other --
17 A   No.
18 Q   -- kinds of problems?
19 A   No, no, no.
20 Q   Okay.  Thank you.
21         You worked from January 2010 to June 2010 for
22     Highland Pharmacy; is that correct?
23 A   Can you repeat that, again, please?
24 Q   Yes.
25         From January 2010 to June 2010 --

Page 100

1  A   Yes.
2  Q   -- you --
3  A   Yes.
4  Q   -- worked for --
5  A   Highland.
6  Q   -- Highland Pharmacy?
7  A   Yes.
8  Q   All right.  And what was your supervisor's name?
9  A   Mehta, M-E-H-T-A.
10 Q   Is that a first or last name?
11 A   I don't know, because this is what -- all of -- all of
12     us just called him.
13 Q   What was your job at Highland Pharmacy?
14 A   Highland Pharmacy, when I went there I -- I already
15     passed a lot of exams, so supposed to start on counting
16     my hours, so...
17         My hours as a pharmacy intern.  So I went
18     there just to get my hours.
19 Q   And you were paid $15 an hour?
20 A   Ma'am, I can't remember that.  I'm sorry.
21 Q   You -- you worked at Highland Pharmacy the same time you
22     worked at CVS Pharmacy?
23 A   No.  Once I am done with this, I -- I enrolled with
24     them.
25 Q   Once you were done with Highland, you went to CVS;



MERVAT MIKHAEL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
101–104

Page 101

1    correct?
2  A  Um-hmm.
3  Q  All right. And at CVS --
4         MS. LINDERMAN: You have --
5         MS. HARDY: -- you --
6         MS. LINDERMAN: -- to answer. You didn't
7    answer.
8  BY MS. HARDY:
9  Q  Is that correct?
10 A  Yes.
11 Q  All right. Then at Highland -- at CVS Pharmacy, you
12   were only paid $8.00 an hour?
13 A  $8.00 as a technician, yes.
14 Q  Okay. Why did you leave Highland Pharmacy to go to
15   CVS Pharmacy for less pay?
16 A  I just want to be with a big chain. That was my -- my
17   -- my dream, you know. This -- this pharmacy just
18   coming, like, a private pharmacy first, and not -- so I
19   just wanted to be with somebody, like, chain.
20 Q  Was your departure from Highland Pharmacy completely
21   voluntary on your part?
22 A  Yes.
23 Q  Did you have any kind of problems -- performance or
24   getting along with people -- when you worked at
25   Highland Pharmacy?

Page 102

1  A  It was a peaceful period.
2  Q  Okay. Where did you go after CVS Pharmacy?
3  A  After CVS Pharmacy? I think I worked, for a while, with
4    Franklin Discount Pharmacy.
5  Q  Okay.
6  A  And while I was there, I -- I got a job with RPh on the Go,
7    also, so...
8  Q  Which was a Target pharmacy?
9  A  Yes. Target Pharmacy --
10 Q  Okay.
11 A  -- RPh on the Go.
12       And --
13 Q  Okay. Why don't you disclose Target Pharmacy and
14   Franklin Discount Pharmacy on your employment
15   application with Walmart?
16     Walgreen's?
17 Q  Or Walgreen's.
18 A  Okay.
19       MS. LINDERMAN: Objection to form and
20   foundation.
21       THE WITNESS: I've got -- okay.
22 BY MS. HARDY:
23 Q  Let me ask the question over again.
24       Why did you not disclose, on your Walgreen
25   application, your employment with Target Pharmacy and

Page 103

1  Franklin Discount Pharmacy which both precede being
2  hired by Walgreen's?
3         MS. LINDERMAN: Same objection. Form and
4  foundation.
5         THE WITNESS: I will let you know about that.
6  The application came -- that -- that -- this coming --
7  the offer letter, it -- it came on like -- like minutes
8  before getting my job. You know what I mean? I will
9  let you know.
10       The offer letter from Ms. Amy, that's what --
11 you can see it even with my -- the email between me and
12 her. That offer letter came, and I was, at this time,
13 coming from -- from my work, my regular work. I found
14 that -- that -- that -- the offer letter came, and I did
15 it -- and I told her, even over the phone -- you know
16 what? Maybe it -- I just bought something there.
17       She told me, "Don't worry about this. That's
18 okay. Just -- we need something like -- like
19 application just to let -- to let -- to let you in the
20 system. You already have -- have something before, like
21 application with us, but it is expired. Can you just
22 put that in -- in the system, just to pick you up?
23 That's it."
24       And I told her, "Maybe I'm not so precise just
25 to do this and that."

Page 104

1         She told me, "Don't worry. It's okay. It is
2  our team work."
3         And she send it to me. "Good news, Mervat. I
4  already found your application, and this is -- this
5  email I already found -- found it yesterday."
6  BY MS. HARDY:
7  Q  All right. So what you're explaining is, is that you
8    filled out the application back in May 2011, and then
9    you didn't fill out another application in 2012?
10 A  Yes.
11 Q  You just used your old one?
12 A  Not -- I'm not sure which one she already got.
13 Q  Okay. Did you submit your resume to -- which is
14   Exhibit No. 1 -- to Walgreen at the time you applied for
15   employment in 2012?
16 A  Can you repeat that, please? Sorry. I --
17 Q  Did you submit your resume, which is in front of you --
18   Exhibit No. 1 -- to Walgreen at the time you applied for
19   employment in 2012?
20 A  I submitted to Ms. Amy Yadmark.
21 Q  Okay. All right. Let's look at Exhibit No. 1. Okay.
22   You were a part-time pharmacist at Franklin Discount
23   Pharmacy; correct?
24 A  Okay. Yeah.
25 Q  That's after you received your license; correct?



Page 105

1  A  Yes.
2  Q  All right.  And who was your supervisor?
3  A  In Franklin?  He was Mr. Eshraf, E-S-H-R-A-F.
4  Q  Was he your supervisor the entire time?
5  A  Eshraf, E-S-H -- E-S -- Eshraf.
6  Q  No, but I -- no.
7        I asked you:
8        Was he your supervisor the entire time?
9  A  Yeah.
10 Q  Okay.
11 A  He is the owner.
12 Q  He's the owner?
13 A  Yes.
14 Q  All right.  Was he a pharmacist as well?
15 A  Yes.
16 Q  Was Franklin Discount Pharmacy strictly a pharmacy?
17 A  It's a private one.
18 Q  Yes.  But it -- it wasn't a store like a Walgreen or a
19    CVS, which sells many different products?  It was just a
20    pharmacy?
21        MS. LINDERMAN:  Objection to form and
22    foundation.
23        THE WITNESS:  It was just a pharmacy.
24        MS. HARDY:  Okay.
25        THE WITNESS:  Medication.

Page 106

1  BY MS. HARDY:
2  Q  All right.  How long were you employed at -- at
3    Franklin Discount Pharmacy?
4  A  I'm not sure.  I'm not sure how long it will take.
5  Q  Your resume --
6  A  Okay.
7  Q  -- indicates March 2012.
8  A  This is the time I already left it and went to
9    Walgreen's.
10 Q  All right.  So up until the time of August 2012?
11 A  Maybe six months or something.
12 Q  Did you have any performance problems of any kind when
13    you were at Franklin Discount Pharmacy?
14 A  No.
15 Q  Did you have any problems getting along with people?
16 A  No.
17 Q  Did anyone mistreat you in any way?
18 A  No.
19 Q  Was that your first job as a pharmacist?
20        MS. LINDERMAN:  Objection to form and
21    foundation.  In the United States?
22        MS. HARDY:  (Counsel nods head.)
23        THE WITNESS:  Yes, it was.
24 BY MS. HARDY:
25 Q  Did you work as a pharmacist in Egypt?

Page 107

1  A  I worked as a pharmacist in Egypt for 15 years.
2  Q  Fifteen years?
3  A  Yes.
4  Q  Okay.  Were there differences in terms of the rules and
5    regulations that pharmacists must comply with between
6    Egypt and the United States?
7        MS. LINDERMAN:  Objection to form and
8    foundation.
9  BY MS. HARDY:
10 Q  I know that's a broad question, but was there something
11    that was -- that stands out, in your mind, that was
12    different about what Egypt required in terms of its
13    regulations versus the United States?
14 A  With the law, no.  The same.  The same law here.
15 Q  Um-hmm.
16 A  The same law here.  It's -- here and there, the same
17    law.
18 Q  Okay.
19 A  But how to proceed a prescription, a little -- a little
20    -- you know, maybe the technical work -- you know what I
21    mean?
22 Q  Um-hmm.
23 A  It --
24 Q  Just the technical issues?
25 A  That's it.

Page 108

1  Q  Such as --
2  A  You know --
3  Q  Give me an example of a -- a technical difference
4    between filling a prescription in Egypt versus the
5    United States.
6  A  In Egypt, when you -- once you get the prescription from
7    doctor, this is his.  Even you don't -- you don't have
8    to -- to verify it.  100 percent -- this prescription,
9    100 percent, is from him or from her, but whatever.
10        So there is no kind of verification.  There is
11    nothing like I have to verify it.  Maybe the
12    instruction, itself, may be a little confusing for you,
13    so even you don't know how to -- to instruct your patient.
14 Q  Um-hmm.
15 A  You can call just to make, like, communication with the
16    doctor, make like relation with the doctor, make
17    something right.  You -- make everything just
18    100 percent right.
19        Another one is coming, like, you don't have to
20    put a label.  Never.  Whatever the patient needs --
21 Q  Um-hmm.
22 A  -- you can give it to him.
23 Q  Um-hmm.
24 A  He needs just a tablet, the tablets coming in strips, so
25    you can give him one strip.



MERVAT MIKHAEL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
109–112

Page 109

1 Q  Um-hmm.

2 A  And both -- your instruction, I mean, is not something

3    like electronic or something, like, computer stuff.

4 Q  Um-hmm.

5 A  How to get your money back once you are done, he's going

6    to pay you.  So there is nothing like insurance will

7    cover up through one a month, and they are going to

8    reimburse you.  Nothing like that can happen --

9 Q  Um-hmm.

10 A  -- no.  Once I give you, you give me.  That's it.

11 Q  Okay.  All right.  So let's go back to Franklin Discount

12    Pharmacy.  Did you leave Franklin Discount Pharmacy of

13    your own volition?  Was it voluntary?

14 A  Yes, voluntary.

15 Q  No one suggested that you should look for another job?

16 A  I will let you know about that.  My -- my -- Dr. Eshraf

17    is my friend, and you -- I just asked him to give me

18    something like -- like his advice.

19       "Is this okay to go with a big pharmacy

20    like -- like a big chain like this?"

21       And he told me, "I was a supervisor, Mervat,

22    in CVS, and I can't encourage you.  I can't encourage

23    you to go with any chain.  But anyway, we can't -- we

24    cannot decide.  That is harmful for us without getting

25    the experience.  Go just to get your experience."

Page 110

1 Q  Um-hmm.  Okay.  Was the owner of the Franklin Discount

2    Pharmacy Egyptian?

3 A  Yes.

4 Q  You worked at the Target Pharmacy the same time you

5    worked at Franklin Discount Pharmacy?

6 A  I -- I worked for like -- maybe there is another one, so

7    that's what I'm trying to see that -- and I told that,

8    also, with [sic] Amy.  I told her, "I have to update

9    that -- that -- that -- this one.  I have to update that

10    resume, and just to send it to you" --

11 Q  You're not responding to the question.  I'm just asking

12    whether or not you --

13 A  Yes.

14 Q  -- worked at the Target Pharmacy the --

15 A  At the --

16 Q  -- same time --

17 A  -- same time?

18 Q  -- you worked at Franklin Discount Pharmacy.

19 A  Yes.

20       MS. LINDERMAN:  Can I just make an instruction

21    here?  When you ask her to repeat a question, even if

22    you're halfway through her question and you start

23    understanding what she's asking, you still need to let

24    her finish before you answer; 'cause, otherwise, our

25    transcript is going to be muddled.  Okay?

Page 111

1       THE WITNESS:  Okay.

2 BY MS. HARDY:

3 Q  Who was your supervisor at Target Pharmacy where you

4    were a relief pharmacist?

5 A  At the Target?  For Target?

6 Q  Yes.

7 A  That supervisor coming, every time, it's like -- like

8    not just one person.  You know what I mean?  If I'm

9    going to cover in -- in Shelby Township, this is --

10    there is one pharmacist.  The supervisor is there.  When

11    I want to go to -- to cover another area, there is

12    another one coming to me, or calling me, or that stuff,

13    yeah.

14 Q  So you had numerous different supervisors depending upon

15    what store you were in?

16 A  Yes.

17 Q  Did you have any performance problems of any kind while

18    you were at Target?

19 A  Honestly, most of them when I go there, they said,

20    "Don't leave Target.  Target is a good company.  Maybe

21    it's an old system, but be with us."

22 Q  All right.  Did you have any performance problems of any

23    kind when --

24 A  No.

25 Q  -- you were at Target?

Page 112

1       Did -- did you depart Target of your own

2    volition?  Was it voluntary on your part?

3 A  I left them like -- yeah.

4 Q  All right.

5 A  And --

6 Q  How many hours did you work at Target as a --

7 A  It depends.

8 Q  -- pharmacist?

9 A  It depends.  Some weeks coming, like, 25 hours.

10    Sometimes it's coming, like, 10 hours.  Sometimes it's

11    more than that.  I'm not sure how -- how -- how many

12    hours there.

13 Q  All right.  How many hours did you work at Franklin

14    Discount Pharmacy?

15 A  That -- that -- that raised after -- after Target.  If I

16    got just 10 hours, so I work as a -- as a pharmacist for

17    25 hours with -- there.  If I got like 20 hours here, I

18    can get, like, 20 hours even there.

19 Q  All right.  So your -- between the two jobs, it was a

20    full-time pharmacy?

21 A  That's what I -- I wanted to -- to mention before.  This

22    is one part time, and here is part time, and there was

23    third part time, and I already mentioned that to Amy

24    before even I did this one.

25 Q  Who was the third part time?



Page 113

1   A   The other one, it was for a pharmacy.  Its name is
2       Farmington Pharmacy.
3   Q   Was it an independent pharmacy or part of a chain?
4   A   Farmington coming like independent, private --
5   Q   Um-hmm.
6   A   -- yes.
7   Q   And it's called "Farmington Pharmacy"?
8   A   Yes.
9   Q   Where is it located?
10  A   Livonia.
11  Q   Livonia?
12  A   Eight Mile Road -- Farmington Road and Eight Mile Road.
13  Q   All right.
14  A   That's what I can remember.
15  Q   And when did you start working at Farmington Pharmacy?
16  A   I can't remember.  Maybe April, by the end of April.
17  Q   Of 2012?
18  A   Maybe April 2012 or May 2012, until the time I already
19      left them the day before going to -- to be with the
20      Walgreen's.  And I mentioned that to Amy, even.  I told
21      her, "Can you tell me what -- what is the time just to
22      let them know to get another -- another one to -- to
23      work instead of me?"
24  Q   Um-hmm.
25  A   And another thing, small thing there, Farmington --

Page 114

1       Farmington Pharmacy, they have Farmington Pharmacy, and
2       inside that, or related to Farmington Pharmacy, there is
3       something, like, mail-order pharmacy called
4       "Peak Pharmacy," P-E-A-K Pharmacy.
5           Peak Pharmacy is a mail-order pharmacy.  I
6       worked there, like, two days a week.
7   Q   Um-hmm.
8   A   So that owner owned Farmington, and also owned
9       Peak Pharmacy.
10  Q   Um-hmm.
11  A   And he paid me for both of them.
12  Q   Um-hmm.  Okay.  Did you have any performance problems at
13      Farmington Pharmacy?
14  A   Never.
15  Q   All right.  Was your departure from Farmington Pharmacy
16      completely voluntary on your part?
17  A   Yes.
18  Q   Have you worked at any pharmacies in the United States,
19      other than Farmington Pharmacy, Franklin Discount
20      Pharmacy, Target Pharmacy, and Walgreen's Pharmacy?
21  A   And CVS before.
22  Q   Thank you for that correction.
23          And have you worked at any pharmacies, other
24      than the ones we've just identified on the record --
25          MS. LINDERMAN:  Objection to form and

Page 115

1       foundation.
2           MS. HARDY:  -- in -- in the United States?
3           MS. LINDERMAN:  Back while --
4           THE WITNESS:  I was --
5           MS. LINDERMAN:  -- she worked, or --
6           MS. HARDY:  At any point.
7           MS. LINDERMAN:  So even where you're employed
8       now.
9           THE WITNESS:  Now?  Where I -- I'm working
10      right now, or --
11          MS. HARDY:  Well, let -- let's just go back
12      over this.
13  BY MS. HARDY:
14  Q   I just want to identify all pharmacies that you've
15      worked at, and if there's a pharmacy that you've become
16      employed at after leaving Walgreen's, then we'll include
17      that, and we'll -- we'll cover that topic in a moment.
18          But your -- the pharmacies that you've worked
19      at prior to Walgreen were Farmington Pharmacy,
20      Franklin Pharmacy, and Target Pharmacy; correct?
21  A   Yes.
22  Q   All right.  And then you worked at Walgreen -- or in --
23      in CVS, as well -- I'm sorry -- correct?
24  A   Yes.
25  Q   All right.  Then you worked at Walgreen; correct?

Page 116

1   A   Yes.
2   Q   And now you're employed at another pharmacy?
3   A   Yes.
4   Q   Okay.  Since leaving Walgreen, where have you been
5       employed?
6   A   After leaving -- leaving Walgreen's -- I want to tell
7       you something -- I was -- I was something, like, out of
8       function, so -- and I just tried to get myself -- and
9       started working in a pharmacy.  This pharmacy, and -- it
10      is coming, like, private pharmacy.  It's called "Majestic,"
11      M-A-J-E-S-T-I-C.
12  Q   Are you employed there?
13  A   Yes.
14  Q   How -- when did you become employed?
15  A   When?
16  Q   Yes.
17  A   From November 2012 -- '13.  Sorry, sorry, sorry.  2013.
18  Q   Until current?  Through current?
19  A   Yes.
20  Q   Okay.  And are you -- have you been employed full time
21      since November 2013?
22  A   No, it's just part time.
23  Q   What is your rate of pay?
24  A   Is this something that I'm supposed to answer?
25  Q   Yes.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014

117—120

Page 117

1       MS. LINDERMAN:  Yes.  How much do you make?
2    Like your hourly rate, or if you're paid salary.
3       THE WITNESS:  It was for something, like, from
4    -- the last time it was something, like, 40.
5    BY MS. HARDY:
6  Q   $40 an hour?
7  A   Now, I'm doing $45 an hour.
8  Q   Did you start at $40 and then --
9  A   I'm not sure, ma'am.  Um, at this -- at this point, I
10    don't -- I cannot remember.  It is -- it was $40, or I
11    just got that, and it -- it switches to $45.  I'm not
12    sure.  But it -- that -- that amount they already
13    offered me first, it was $40, and I'm not sure -- yeah,
14    I got $40 or $45.
15  Q   How many hours a week have you worked since November of
16    2013?
17  A   It was 20 hours and, now, coming like 30 hours.
18  Q   When did it become 30 hours?
19  A   This year, but I'm not sure -- February, March.  I'm not
20    sure.  Sorry.
21  Q   Okay.  Have you had any employment, since leaving
22    Walgreen, other than Majestic Pharmacy?
23  A   I work with them between -- between the time I already
24    worked with Majestic?
25  Q   After leaving Walgreen's in July 2013, have you been

Page 118

1    employed with anyone other than Majestic --
2  A   No.
3  Q   -- Pharmacy?
4  A   No.
5  Q   Have you had any source of income since leaving
6    Walgreen's, other than the income from Majestic Pharmacy?
7  A   No.
8       MS. LINDERMAN:  I'll just object to form and
9    foundation.
10  BY MS. HARDY:
11  Q   Did you collect unemployment?
12       MS. LINDERMAN:  That would be covered under
13    MCL 421.11, so it's privileged.
14       MS. HARDY:  What?
15       MS. LINDERMAN:  Any determination by the
16    unemployment agency, including giving unemployment, is
17    not allowed in civil action under MCL 421.11.  So I --
18       MS. HARDY:  I don't --
19       MS. LINDERMAN:  -- don't know if --
20       MS. HARDY:  -- think it's privileged in a
21    deposition to ask whether she collected --
22       MS. LINDERMAN:  It's an --
23       MS. HARDY:  -- unemployment.
24       MS. LINDERMAN:  -- absolute privilege.
25       MS. HARDY:  Well -- so you're asserting an

Page 119

1    absolute privilege to that issue?
2       MS. LINDERMAN:  Yes.
3       MS. HARDY:  All right.  We'll worry about that
4    one later.
5    BY MS. HARDY:
6  Q   All right.  Let me ask you a question about practices as
7    a pharmacist.
8       If a patient comes in and has a valid
9    prescription, but the insurance coverage for their
10    prescription has not yet come through, and let's say
11    they've got, like, a heart condition and it's medication
12    that they need to have refilled because it's critical to
13    their daily health, is it proper for a pharmacist to
14    give them pills to tide them through until their
15    insurance coverage comes through if it's, otherwise, a
16    -- a valid prescription for the patient?
17  A   Okay.  This, according to what type of prescription
18    already got.  If it is coming, like, a regular
19    prescription, something like aspirin --
20  Q   Well, you don't get a prescription for aspirin?
21  A   What?
22  Q   Aspirin you can buy over the counter.
23  A   No.
24       MS. LINDERMAN:  It doesn't --
25       THE WITNESS:  This is --

Page 120

1       MS. LINDERMAN:  -- mean you --
2       THE WITNESS:  -- something --
3       MS. LINDERMAN:  -- don't get a prescription.
4       THE WITNESS:  You -- you don't -- you didn't
5    get any kind of prescription for aspirin.  Baby is one.
6    You didn't get that before?
7       Anyway, this is if -- even coming like a
8    prescription for aspirin, this one, under -- under --
9    they say -- I tried to let it go, and they're just
10    coming, like, some -- some issues with the -- with the
11    insurance, itself.  Okay.
12       So what you can do with the aspirin, and when
13    you counted them -- when you count them, and like --
14    like 10 tablets, or even 100 tablets, what you are going
15    to put around the label -- the -- the vial, you're
16    supposed to put, like, a label around the vial, just
17    even to let them know that inside this -- this vial
18    there is aspirin, or this is -- this -- there is water
19    pills, or there is something else.
20       What you are going to put around the vial just
21    to let it go, or let your customer -- just to get it and
22    take it and swallow it.  You're supposed to put
23    something around it.
24       "So there is issue with your -- your -- that
25    -- that insurance.  I will let you know.  You know what,



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
121–124

1 ma'am? Your insurance didn't let me go with that, but
2 you can just get, like, a three-day supply. And if you
3 get, like, a three-day supply, you are going to pay for
4 that. Just to get, like, a label to put it around you
5 -- around the vial to let you know that this -- there
6 is, inside this vial, something. I'm supposed to give
7 it to you right away. If you are going -- it is not
8 this much. It will cost you, like, $0.30 or something."
9 "Great."
10 But what if it is not aspirin? If it's
11 coming, like, something else, jenowitz (ph). It cost
12 me, like, $300.
13 BY MS. HARDY:
14 Q Cost the pharmacy?
15 A Yeah.
16 Q Right. So it's a money issue for the pharmacy; right?
17 A $300.
18 Q All right. So the pharmacy -- if there's a valid
19 prescription, there's nothing wrong with the patient
20 having the pills; correct?
21 MS. LINDERMAN: Hold on. Objection to form
22 and foundation, because she's missing what you're trying
23 to say.
24 MS. HARDY: Well, I'm breaking it down, only
25 'cause I need shorter answers, so I can understand.

1 BY MS. HARDY:
2 Q If -- if a patient comes in, and let's say they have
3 blood pressure medication that they've been taking for a
4 couple years, and they need a prescription refilled and
5 it's essential to their health and well-being that they
6 have their blood pressure medication, but there's a
7 problem with insurance, and so the pharmacy doesn't know
8 whether insurance is going to pay for it, or whether the
9 patient's going to have to pay out of their pocket,
10 wouldn't you agree that there's nothing wrong with the
11 pharmacy giving that patient some blood pressure pills,
12 without charging them, while they're waiting to hear
13 from the insurance company as to whether the company --
14 the insurer will -- will provide coverage?
15 MS. LINDERMAN: Objection to form and
16 foundation.
17 THE WITNESS: Perfect.
18 MS. HARDY: Just -- now answer that question.
19 THE WITNESS: Perfect.
20 You're coming and you said that you are on
21 this medication from, like, two years -- a couple years
22 ago; right?
23 MS. HARDY: Um-hmm.
24 THE WITNESS: With me? With my pharmacy? I
25 want to -- I --

1 MS. HARDY: Yes.
2 THE WITNESS: -- want to --
3 MS. HARDY: Yes.
4 THE WITNESS: -- ask --
5 MS. HARDY: Yes.
6 THE WITNESS: Yes?
7 MS. HARDY: Yes.
8 THE WITNESS: With my pharmacy?
9 At the moment, once you give me the
10 prescription, I'm going to put, like, issue with the
11 insurance, something like private issue. Something like
12 it didn't go through, and do we have to -- to call
13 insurance just to resolve this issue?
14 Something like the insurance terminated, and
15 it will be okay after, like, a couple days or three
16 days.
17 MS. HARDY: Um-hmm.
18 THE WITNESS: You have the right to get, like,
19 a three-day supply. How to -- what I'm going to put
20 around your vial, a three-day supply. Something like go
21 to make three-day supply with my system. It will go
22 through it for no charge. It is coming by itself with
23 new -- with new or X number, with everything with
24 instruction how to use it.
25 And new instruction even if you are already on

1 this blood medication -- blood pressure medication
2 before last month, and you already used it like once a
3 day, and then new prescription coming to me just twice a
4 day, I'm going to put the twice a day, and you have to
5 get it, like, for free. This is a policy with all kind
6 of pharmacists.
7 MS. HARDY: Okay. All right.
8 THE WITNESS: Perfect?
9 MS. HARDY: Yeah.
10 THE WITNESS: You already got it?
11 MS. HARDY: Yeah.
12 THE WITNESS: So you are one of my customers
13 coming to me, and ask to get this prescription, and "my
14 insurance didn't cover. Ma'am, can you help me,
15 please?"
16 "Yes, sure. I can help you. This is my job
17 just to help you. A three-day supply -- you are one of
18 my valued customers -- valuable customers, I am going to
19 pay."
20 But -- but what can I do? What can I do if
21 you are not one of my customers?
22 BY MS. HARDY:
23 Q Let's take that scenario. What if I've never been your
24 customer before at your pharmacy --
25 A Okay.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
125–128

Page 125

1  Q   -- but my physician sends you a prescription so that I
2      can get blood pressure medication --
3  A   Okay.
4  Q   -- but you don't, yet, as the pharmacy, know whether I'm
5      going to have to pay for it myself, or whether my
6      insurance carrier is going to pay for it.  And I go in
7      to pick up my prescription and find out:
8          "Oh, gosh, there's an insurance problem.  They
9      don't have an answer yet from the insurance company.
10     But I have a blood pressure problem, and I need my blood
11     pressure medication right away."
12         It's appropriate, is it not, for the pharmacy
13     to give me a small amount of medication to tide me over
14     until they get an answer from the insurance company;
15     correct?
16 A   According -- according to the policy with that -- with
17     that chain, according to the policy which I already
18     have, according to what I already got from there, I
19     can't do something like this.  Because you are a new
20     customer with me, I don't have your history.  I don't
21     have to -- to put my -- myself at risk, something like
22     -- something like -- like you -- you are a new customer
23     with me.
24         You said that you -- you get, like, blood
25     pressure medication, and you're supposed to get it right

Page 126

1      away.  Take from your pocket for three-day supply until
2      you get the answer from the -- your insurance, or wait
3      and call them and I will call you back.  Or if you are
4      one of the customers with another pharmacy, they will --
5      they will help you a lot more than me.
6  Q   When you were employed at Walgreen --
7  A   Uh-huh.
8  Q   -- is it your testimony that a Walgreen's policy
9      prevented the pharmacy from giving the new customer a
10     small supply of medication to tide them over in that
11     situation?
12 A   You know, maybe, because I -- even I -- I didn't -- I
13     didn't see something like this.  Even I didn't ask.
14     Maybe because even I didn't get something like -- like
15     issue with the -- the insurance -- coming issue with the
16     insurance right away.
17         "Sir, ma'am, I -- I have issue with your
18     insurance."
19         "Yes, I know that," or "I didn't hear about
20     that before.  Can you call them, please, and just let me
21     know what you're -- what you're coming up" --
22         Or even they -- they will leave their
23     prescription just to try to proceed [sic] it, or even
24     they are going to wait.  I cannot -- I cannot do
25     something -- it is not from my pocket.  It is not

Page 127

1      something I can help with, and I am not sure if it is
2      okay or not okay.
3  Q   All right.  You weren't sure whether Walgreen's policies
4      prevented you from giving the customer, or the patient,
5      a -- a -- some free pills to tide them over while they
6      waited for the answer from the insurance company?
7          MS. LINDERMAN:  Objection to form --
8          THE WITNESS:  The free --
9          MS. LINDERMAN:  -- and foundation.
10         THE WITNESS:  The free -- the free
11     prescription?  The free three-day supply?  The free --
12     the free, like, three-day supply, and after that another
13     three-day supply to get the permission to get it?  It is
14     allowed in Walgreen's.  We did it before.  We did it a
15     lot.  And we are -- we do it every time, but it is
16     coming, like, that -- it is coming like something that
17     -- that system will let me go through it.
18         But if the system didn't let me go through it
19     -- this is a question.  This is system.  This is not
20     human being; right?  This is something asking you, how
21     -- the three pills you are going to get, it deserves
22     10 pounds -- $10.  Okay?
23         If you are going to pay me $10, take it.  If
24     you are not going to pay me, you cannot afford it, how
25     -- that -- that -- the leaflet -- that -- that -- that

Page 128

1      -- that -- this kind of label coming with the co-pay.
2      Who going to pay?  You?  Or the insurance?
3  BY MS. HARDY:
4  Q   All right.  So let me just make sure I understand what
5      you're saying.  So are you testifying that if a new
6      customer came in with a valid prescription, but they
7      didn't have insurance coverage, that the Walgreen's
8      system would prevent you from giving them free pills?
9      Is that what you're saying?
10 A   That -- if the patient --
11         MS. LINDERMAN:  It's a "yes" or "no" question.
12         THE WITNESS:  Hmm?
13         MS. LINDERMAN:  She asked a "yes" or "no"
14     question.
15         THE WITNESS:  Yeah.  The system -- system will
16     stop me.
17 BY MS. HARDY:
18 Q   Okay.  Because of an internal Walgreen policy?
19 A   According to the policy, the -- the -- the system --
20     this -- this -- this kind of program, that program is
21     there, according to whatever you are going to put in it,
22     if they give me -- give you that -- that -- that
23     permission to do it, do it.
24         If they -- this system didn't let you go
25     through it, there is no leaflet coming up from there,



Page 129

1    there is no label around the vial, you cannot give it to
2    him.
3  Q   All right.  When you were at Walgreen, did you know of
4    any law or regulation that prevented you, as a
5    pharmacist, from giving a short-term supply of free
6    pills to a patient while they were waiting for insurance
7    coverage, if they had a valid prescription for that
8    medication?
9  A   You --
10        MS. LINDERMAN:  Objection to form and
11    foundation.
12        MS. HARDY:  Go ahead.
13        THE WITNESS:  You can do that as three-day
14    supply.  If the -- system accept it, it will come
15    in.  This answer not coming to me.  The system, itself.
16    How to know this is a policy or not?  How to know that
17    this policy is inside this system or not?
18        MS. LINDERMAN:  Right.
19        THE WITNESS:  How to know that you are okay or
20    not?  If that -- the label coming up.  If the label
21    isn't coming up, you can't get the -- every patient
22    coming to you, like, with three pills in -- in his hand,
23    and you take it like this, and they go outside to
24    swallow it.
25

Page 130

1  BY MS. HARDY:
2  Q   Let's put aside Walgreen's policy that blocked
3    pharmacists from giving free prescriptions under certain
4    circumstances.
5        When you were a Walgreen employee, did you
6    know of any law or regulation that prevented a pharmacist --
7  A   I didn't --
8  Q   -- from giving --
9  A   -- even --
10        MS. LINDERMAN:  Hold on.
11        THE WITNESS:  -- ask.
12        MS. LINDERMAN:  Hold on.
13  BY MS. HARDY:
14  Q   You didn't even ask?
15        MS. LINDERMAN:  I'm sorry.
16        MS. HARDY:  Let me finish.
17        MS. LINDERMAN:  I need to -- she didn't finish
18    her question.
19        MS. HARDY:  All right.
20        MS. LINDERMAN:  I need to object.
21  BY MS. HARDY:
22  Q   Did you -- so -- so you never asked, and that don't have any
23    knowledge of any law or regulation that would prohibit a
24    pharmacist from giving a new customer a short-term
25    supply of medication while they were waiting for

Page 131

1    insurance coverage if they had a valid prescription; is
2    that correct?
3        MS. LINDERMAN:  Objection to form and
4    foundation.
5        THE WITNESS:  Okay.  I didn't -- I didn't get
6    any problem like that before.  This is -- this is --
7    first of all -- I'm sorry.  I didn't get something like
8    that -- that -- that prescription didn't go through it,
9    and how to deal with that.  If the prescription didn't
10    go through it, you have to deal with the system.  You
11    have to do something with the system.
12        If the system stops you to do anything, if it
13    says "done," it's done.  But if there is something can
14    help with that, maybe coming like a very complicated
15    answer, coming like a very complicated question, maybe
16    I'm going to call somebody, like, more experienced than
17    me.
18        Like 10 -- 10 years ago there, he has this
19    kind of experience, maybe I'm going to call and ask,
20    "Hi, Sarah.  This is Mervat from Store Number
21    blah-blah-blah-blah, and I just want to ask you, the
22    patient in front of me, and his insurance didn't cover
23    this kind of insulin.  Can I give him, please, a
24    three-day supply?"
25

Page 132

1  BY MS. HARDY:
2  Q   Are you done?
3  A   According to what the answer come in, I can do it.  But
4    I'm pretty sure that he will say:
5        "Try this stuff.  If it lets you go -- that
6    leaflet coming up from the system, if it didn't let you
7    go, pay it from your pocket.  If it didn't let you go,
8    that's it.  We cannot -- we cannot give every single
9    customer coming to you, ma'am -- I'm -- I'm -- I'm not
10    sure.  Maybe you are -- you are new here in the
11    pharmacy, but you cannot give every single one coming to
12    you insulin with $300."
13        Yes?  Yes?
14  Q   Um-hmm.
15  A   You are going to give him, like, a three-day supply of
16    jenowitz (ph).  You know what, ma'am?  How many -- how
17    many people on jenowitz, and how much it will cost our
18    pharmacy?  This kind of loss -- kind of loss -- kind of
19    loss means that we have to call the loss prevention and
20    tell him that we already lost one pen from insulin.
21  Q   Okay.  Do you -- did you have any basis for believing,
22    when you were at Walmart [sic], that Donna Spencer
23    violated any policy of Walmart, when --
24  A   Walgreen's --
25  Q   -- she --



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
133–136

Page 133

1   A   -- again.

2   Q   When you --

3   A   Sorry.

4   Q   -- were employed at Walgreen, did you have any reason

5       for believing that Donna Spencer violated any Walgreen

6       policy when she dispensed drugs to patients?

7           MS. LINDERMAN:  Objection to form and

8       foundation.  You can answer.

9   BY MS. HARDY:

10  Q   When she or one of her assistants, such as you,

11      dispensed drugs to patients?

12          MS. LINDERMAN:  Same objection.

13          THE WITNESS:  So which one you are talking

14      about right now?  Which point?  Do you want to adjust

15      it?

16  BY MS. HARDY:

17  Q   Let me ask again.

18          When you were employed at Walgreen, did you

19      have any basis for believing that Donna Spencer was

20      violating Walgreen policy when she provided medications

21      -- prescription medications -- to patients of Walgreen's?

22  A   Absolutely, yes.

23  Q   All right.  What policy did she violate?

24  A   DEA law.

25  Q   What's DEA law?  I'm asking about Walgreen policies

Page 134

1       right now.

2           MS. LINDERMAN:  Objection to form and

3       foundation.

4           I would assume Walgreen's has a policy that

5       they have to follow the law.

6   BY MS. HARDY:

7   Q   Okay.  Tell me what your --

8   A   Maybe -- maybe there's something I don't know.  I -- I

9       -- that's what I can figure about [sic].  Independent

10      pharmacy, they follow law.  CVS follow law.  What --

11      Target, I already there, and I follow the law.  And,

12      now, I am -- I'm hearing another [sic] stuff, so I'm --

13      I'm with you until the end.

14  Q   All right.  All right.  Let's not get cute here.  Of

15      course they follow the law.  But they don't have to have

16      a policy that says, "We follow the law."  I mean, you

17      don't write policies to say, "We follow all laws."

18          MS. LINDERMAN:  Well, some of them might.

19  BY MS. HARDY:

20  Q   So I'm talking something unique to Walgreen that's

21      policy.  Is there any particular policy that -- that

22      they had in -- in effect, that you claim she violated

23      when she dispensed prescription medications to patients?

24          MS. LINDERMAN:  Objection to form and

25      foundation.  You can answer.

Page 135

1           THE WITNESS:  Ma'am, I -- again, I want you to

2       be -- just as I -- I will let you listen, again, to a

3       comment coming from technician.  Technician, she is not

4       educated this much.  Technician, is not -- something

5       like high school.  She didn't get -- get anything --

6   BY MS. HARDY:

7   Q   I'm not asking about -- why are you talking about a

8       technician?  I'm asking about --

9   A   I just --

10  Q   -- Donna Spencer --

11  A   -- want you --

12  Q   -- the --

13  A   -- to listen --

14  Q   -- pharmacy manager.

15  A   I -- I just want you to listen to that -- that comment

16      coming from a technician, and she said, "I have seen a

17      lot of this stuff.  I had -- I have been here for this

18      time of years, and what I already practiced with this

19      lady" --

20          I am sorry.  I'm -- I'm not going to say that

21      -- that -- that -- that -- that comment she

22      said.  It is -- was so rude, and I didn't practice this

23      kind of law with anyone.  She give Control 2 medication

24      without the label.  It's okay.  I'm -- I'm sorry.

25  Q   Now -- now, wait a minute.  I -- who are you talking

Page 136

1       about?  What technician?

2   A   Janet.

3   Q   All right.

4   A   The regular --

5   Q   All right.

6   A   The regular technician.

7   Q   And she was referring to Donna Spencer doing something

8       she thought was inappropriate?

9   A   Yes.

10  Q   What -- what comment did she make that you thought was

11      so rude?

12  A   She did -- she said something.

13  Q   I want -- want you to put it on the record.  What was

14      it?

15  A   It was -- I am not sure.  I cannot -- I can't -- I --

16  Q   Well, you just said you weren't going to repeat it

17      'cause it was so rude.

18  A   It was --

19  Q   So --

20  A   -- rude.

21  Q   So, obviously, you know what it is --

22          MS. LINDERMAN:  You can spell it.

23          MS. HARDY:  -- and it's your obligation to

24      repeat it.

25          THE WITNESS:  I -- I'm supposed to say it?



Page 137

1       MS. LINDERMAN:  Yes --
2       MS. HARDY:  Yes.
3       MS. LINDERMAN:  -- you are.
4       THE WITNESS:  Crazy -- crazy lady.  She is
5   totally crazy.
6   BY MS. HARDY:
7   Q   All right.  That's what Janet said about --
8   A   Yes.
9   Q   -- Donna Spencer?
10      When did she make that statement about Donna
11  Spencer?
12  A   No.  I got that for a long time.  It -- once she -- she
13  found something, she commented just to say, "Hey, I
14  found this, this stuff, and I don't know if this goes
15  with the law or not."
16      I -- I already tried to tell her, "You know
17  what?  Tomorrow we are going to ask her, our -- our
18  manager here, what is going on with that."
19      I already tried to -- to transfer all this
20  comment -- not comment -- all those kinds of information
21  to my manager, who was the pharmacy manager, and she
22  didn't listen.  I tried to transfer this to a little bit
23  higher from the -- our manager.
24  Q   I -- I don't want to go into all of that right now.  I
25  just want to know what you're claiming Donna Spencer did

Page 138

1   that violated Walgreen policy.  And your answer is she
2   violated DEA law?
3   A   Yes.
4   Q   All right.  What DEA law are you claiming she violated
5   when you worked at Walgreen?
6   A   First of all, there's nothing like Control 2 in advance.
7   If it is coming, like, emergency -- emergency case in
8   front of you -- and you have to give Adderall medication
9   to the patient, there is something like hospital to --
10  to get this kind of emergency.  If you want to give the
11  -- the patient that -- any kind of medication, supposed
12  to give it in a vial, and there is a label in front of a
13  -- a label around the vial, and you're supposed to give
14  him something to read, something like -- like -- like a
15  leaflet to read.  Something about his medication to read
16  just to make sure that this is the right medication.
17      If you -- if it is coming, like -- you are
18  going to give any kind of medication, it's okay for a
19  three-day supply, if your system allow you to give
20  three-month -- -day supply.  According to the law,
21  Control 2, you cannot postulate.  You cannot
22  postulate like -- like -- you know -- you know what I
23  mean?
24      If your doctor just put you on Adderall 60,
25  and you have, like, six tablet for three-day supply, how

Page 139

1   to postulate this kind of medication to your patient?
2   You can postulate and give him six tablets.  Within
3   72 hours you have to complete the amount you give it to
4   him.
5       So what does this mean?  This means that you
6   already give six tablets, and you have to give, like, 54
7   -- the other 54 within 72 hours.
8   Q   Okay.
9   A   What I --
10  Q   Stop.  Stop.  Stop.
11      I want to know what you're claiming
12  Donna Spencer did.  I don't want you to just recite --
13      MS. LINDERMAN:  I think she's --
14      MS. HARDY:  -- what you --
15      MS. LINDERMAN:  -- telling you that.
16      MS. HARDY:  Well --
17      MS. LINDERMAN:  That's --
18      MS. HARDY:  But that --
19      MS. LINDERMAN:  -- her answer.
20      MS. HARDY:  It's not clear that that's what
21  she's doing.  She's now just going on and on and on
22  about what she believes is the appropriate way to
23  dispense, but she's not tying it back --
24      MS. LINDERMAN:  But then --
25      MS. HARDY:  -- to Donna --

Page 140

1       MS. LINDERMAN:  -- this is --
2       MS. HARDY:  -- Spencer.
3       MS. LINDERMAN:  The next question you ask her
4   is:  Are you saying that's what Donna did?
5       MS. HARDY:  Well, that's not how I'm going to
6   go about it.
7   BY MS. HARDY:
8   Q   I want you to identify each thing she did, and -- and be
9   specific as to what she did, and how many times it
10  happened, that you claim was a violation of DEA law.
11      MS. LINDERMAN:  Objection to form and
12  foundation.
13      MS. HARDY:  Don't -- don't just give me a
14  lecture on what --
15      THE WITNESS:  I'm not --
16      MS. HARDY:  -- what --
17      THE WITNESS:  -- sorry.
18      MS. HARDY:  -- what -- what --
19      MS. LINDERMAN:  She isn't.
20      MS. HARDY:  -- the pharmacy --
21      MS. LINDERMAN:  She's telling you --
22      MS. HARDY:  -- regulations, you know, provide
23  is proper procedure.  Tie it to if Donna Spencer gave a
24  patient something that she shouldn't have done, or she
25  did it in an improper way, and "This is why I believe it



Page 141

1   was a violation of DEA law."
2         THE WITNESS:  Ma'am, I did.
3         MS. LINDERMAN:  Objection to --
4         MS. HARDY:  And it --
5         MS. LINDERMAN:  -- form --
6         MS. HARDY:  -- it --
7         MS. LINDERMAN:  Sorry.
8         MS. HARDY:  It -- it needs to be specific, not
9   just a long dissertation about DEA regulations.
10        THE WITNESS:  I --
11        MS. LINDERMAN:  Objection to form and
12  foundation.  I think she is trying to do it.
13  BY MS. HARDY:
14  Q   So you've got to break it down, and we're going to --
15  we're not going to take a long answer that goes, you
16  know, a page or so.  We want to take -- we want you to
17  list things that you claim she did.
18  A   Can I ask --
19  Q   So let -- let's -- let me approach it this way:
20        When is the first time you claim Donna Spencer
21  did something that was in violation of the law or a
22  regulation?
23        MS. LINDERMAN:  Objection to form and
24  foundation.
25

Page 142

1   BY MS. HARDY:
2   Q   And what was that?
3         MS. LINDERMAN:  Same objection.
4         THE WITNESS:  Ma'am, I didn't -- I didn't
5   answer your question when you said that --
6   BY MS. HARDY:
7   Q   I want you to answer the question I just asked you.
8   A   Ma'am, can -- can -- I just wanted to let you know that
9   you said, "What is a DEA law?"
10        That's what you said.  So I -- I just want --
11  that's what I already --
12  Q   I --
13  A   -- give it to you.
14  Q   Look, I'm not faulting you.  We're just going to move on
15  and try to move on efficiently.  So let's -- let's
16  proceed in this fashion.  Identify the first thing you
17  became aware of that Donna Spencer did that you believed
18  was in violation of the law or a regulation with --
19  A   Maybe --
20  Q   -- in --
21  A   -- it was --
22  Q   -- in connection with her role as a pharmacist.
23  A   It was on June 19th.
24  Q   June 19th of 2013?
25  A   Yes.

Page 143

1   Q   Okay.  What did she do on June 19th?
2   A   She did it on June 18th, not on June -- June 19th.
3         June 18th, she did it.
4   Q   What?
5   A   I discovered it on June 19th.  And -- and when I -- I --
6         I got it, I was --
7   Q   What -- what do you claim she did on June 18, 2013?
8   A   I found a shortage.  I -- I did something like a DEA
9         report.  It's supposed to be annual.  And the annual
10        report, I did it -- it was on June 9th.
11  Q   19th?
12  A   9th.  9th.  6/9.
13  Q   Okay.
14  A   I did the report on June 9th, and supposed to put every
15        single control, like 2, Control 3, Control 4, Control 5,
16        just put it in the report, like inventory, and send it
17        back to DEA -- DEA law.  DEA.
18        And when I already did, there was a bottle of
19        Control 2.  Do you want me to tell you what is that?
20  Q   Well, I'm getting confused, because you told me the
21        first time she did something that you believed was a
22        violation of the law, or a regulation, was on June 18th.
23        Now, you're talking about a report on June 9th.
24        MS. LINDERMAN:  Objection to form and
25        foundation.  She said she found -- realized it on that

Page 144

1   date.
2         MS. HARDY:  No.  She said she realized it on
3   June 19th.  The event occurred on June 18th.  And, now,
4   she's talking about a DEA report that she prepared on
5   June 9th.
6         MS. LINDERMAN:  She -- I don't think she said
7   19th, but I could -- I think it was the 9th --
8         THE WITNESS:  Okay.
9         MS. LINDERMAN:  -- but I'm going to object --
10        MS. HARDY:  Well, how --
11        MS. LINDERMAN:  -- to form --
12        MS. HARDY:  She couldn't --
13        MS. LINDERMAN:  -- and foundation.
14        MS. HARDY:  -- discover on June 9th what
15  happened on June 18th.
16        MS. LINDERMAN:  Something could have happened
17  on June 9th that she knew about, and when she saw
18  something on the 18th, she realized something had
19  happened.
20        MS. HARDY:  Well, that's --
21        MS. LINDERMAN:  That was --
22        MS. HARDY:  -- different --
23        MS. LINDERMAN:  -- the answer --
24        MS. HARDY:  -- but...
25        MS. LINDERMAN:  -- to your question.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
145–148

Page 145

1 BY MS. HARDY:
2 Q   All right. Is -- is the first situation where you claim
3     Donna Spencer did something in violation of a rule or --
4     a rule, regulation, or a legal provision on June 18th?
5         MS. LINDERMAN: Objection to form and --
6         MS. HARDY: Just --
7         MS. LINDERMAN: -- foundation.
8         MS. HARDY: Just answer the question.
9         THE WITNESS: Okay.
10 BY MS. HARDY:
11 Q   Was it June 18th?
12 A   It's -- can -- can I --
13 Q   No. Just answer the question --
14 A   Um-hmm.
15 Q   -- because we -- you're making this enormously
16     confusing, so we have to keep going back over it.
17 A   Personally, what happened, it was on June 19th. I found
18     shortage in one of Control 2 medications. I already --
19     I already have put, like, a sticker that this amount is
20     in the vial. And she -- she put another sticker there,
21     before me, like two days before me. And we reported all
22     those kinds of amounts to DEA.
23         It's supposed to be, like, 39 tablets or
24     capsules inside the vial. I got a prescription from one
25     of my customers, and it's supposed to do, like,

Page 146

1     30 tablets from this kind of control. And I believe in
2     -- I already have enough to do this kind of
3     prescription. And when I went to count them, I found
4     that there is shortage, like, 10 tablets.
5 Q   All right. So you made that discovery on June 19th?
6 A   19th.
7         MS. HARDY: Okay. Marla, are you with her?
8         MS. LINDERMAN: Yeah.
9         MS. HARDY: She said June 19th.
10 BY MS. HARDY:
11 Q   Okay. So you discovered 10 tablets short on a
12     particular prescription on June 19th, and it had --
13 A   Not the prescription, ma'am. It is common, like,
14     medication. This is medication. This is Control 2
15     medicine.
16 Q   Well, what is the difference between controlled medicine
17     and a prescription?
18 A   Prescription is a hard copy you can get from any kind of
19     -- of doctor, but I don't -- I did -- the prescription
20     came to me, and I couldn't do it. I couldn't do that
21     prescription, itself --
22 Q   Um-hmm.
23 A   -- because I don't have enough to do it. When I count
24     them it was 29. I put the label, like -- like -- like a
25     label, there -- there is 39 in the vial. And she

Page 147

1     already put another label before me, like two days
2     before me, there is 39.
3         But when I counted them, I found 29. When I
4     found, like, 10 -- 10 tablets or 10 capsules -- I'm not
5     sure which one -- it -- how -- what was in there. It
6     was, like, 10 tablets shortage. I got -- I got -- you
7     know, one tablet make a lot with the DEA. What then
8     happened is they found, like, 10 tablets shortage there.
9         So I just asked that technician, "Janet, can
10     you come in, please?"
11         And she came.
12         "Ma'am, I'm sorry for that, but this is 29.
13     Maybe because I -- I was working in another store in the
14     morning. I'm so exhausted. So can you just count them
15     for me, please?"
16         She count them and she told me, "There is 29
17     in there."
18         I told her, "Do you see my -- my label there?"
19         She said, "Thirty-nine."
20         "Do you see the label Donna already jotted
21     down?"
22         She said, "Thirty-nine."
23         I asked her, "There is 10 shortage in there."
24         She told me, "This medication is a safe
25     product in a safe. Mervat, don't make it a big issue.

Page 148

1     Your blah-blah-blah-blah manager always gives something
2     in advance. Give what -- give this kind of medication
3     in advance."
4         I asked her how did she do that.
5         She told me something like put in hand and let
6     him go.
7         I told her she can put medication in hand and
8     let him go?
9         She said yes. She do that a lot.
10 Q   What was the medication at issue?
11 A   Adderall.
12 Q   And what kind of medication is that?
13 A   Control 2.
14 Q   Control 2?
15 A   Generic Adderall.
16 Q   Is it a pain medication, or what is it?
17 A   No. Adderall is something like ADHD. Something like --
18         MS. LINDERMAN: It's like --
19         THE WITNESS: -- that.
20         MS. LINDERMAN: -- an amphetamine --
21         MS. HARDY: Pardon me?
22         MS. LINDERMAN: -- for --
23         MS. HARDY: It's an anti-inflammatory?
24         MS. LINDERMAN: No, not --
25         MS. HARDY: Not --



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
149–152

Page 149

1      MS. LINDERMAN: -- anti-inflammatory. It's
2  like an amphetamine for ADHD.
3      THE WITNESS: Amphetamine.
4      MS. HARDY: Oh.
5  BY MS. HARDY:
6  Q   Okay. Did the patient have a prescription for that
7  medication?
8  A   No. Because there is 29, and the prescription for 30
9  tablets.
10 Q   All right. So you're saying the prescription was for
11 29?
12 A   That prescription for 30, and I found that I have 29.
13 So I couldn't fill this -- this prescription.
14 Q   All right. But the patient had a prescription for 30
15 tablets or pills?
16 A   Yes.
17 Q   Okay. Did the patient have insurance coverage as -- as
18 of June 19th?
19 A   Yes. He has a -- has coverage there, yes. And the
20 label is coming up and everything is just fine, but I
21 couldn't find enough for him, so I return it back and
22 reverse the claim.
23 Q   Did the patient have insurance coverage on June 18, 2013,
24 to your knowledge?
25      MS. LINDERMAN: Objection to form and

Page 150

1  foundation. You're talking about two different
2  patients, I think.
3      THE WITNESS: Yeah. For this prescription?
4  Yes. And he didn't get it.
5  BY MS. HARDY:
6  Q   Are we talking about two different patients?
7  A   Yes.
8  Q   What -- what -- what two different patients are we
9  talking about?
10 A   This patient, even I don't know his name. I don't have
11 any --
12 Q   I'm not asking for the name. I'm trying to -- I'm
13 trying to get a date, and the medication at issue, and
14 the circumstances.
15 A   The circumstance around the shortage of 10 tablets in
16 the safe.
17 Q   Did that pertain to one patient or two patients?
18      Are you claiming --
19      MS. LINDERMAN: She's not --
20      MS. HARDY: -- she gave --
21      MS. LINDERMAN: -- understanding you.
22      MS. HARDY: -- she gave the 10 tablets to some
23 other patient, other than the patient who had the
24 prescription?
25      THE WITNESS: Yes.

Page 151

1  BY MS. HARDY:
2  Q   All right. How -- how do you know that?
3  A   This prescription coming to me with my shift.
4  Q   How do you know she gave 10 tablets to somebody who did
5  not have --
6  A   He didn't --
7  Q   -- a prescription?
8  A   Ma'am, I think you are confused for a minute.
9      She didn't -- she didn't even see this
10 patient. He didn't come in before. He came to me to
11 fill his prescription. When I tried to process the
12 prescription, there was shortage 10 tablets, and we
13 couldn't give him the -- this -- this.
14 Q   Okay.
15 A   We couldn't --
16 Q   I got --
17 A   -- give him --
18 Q   -- all that.
19      So --
20 A   Yes.
21 Q   -- where do you think the 10 tablets went, the missing
22 10 tablets?
23 A   According to what I already have seen, and according to
24 what I already heard about, that's -- there are 10
25 tablets went with -- in advance. It went with another

Page 152

1  -- another patient. Even I don't know him.
2  Q   Okay. And -- but that's your speculation; right?
3      MS. LINDERMAN: Objection to form and --
4      MS. HARDY: You --
5      MS. LINDERMAN: -- foundation.
6  BY MS. HARDY:
7  Q   You don't know it went -- you're just assuming it went
8  with another patient?
9  A   After -- after like -- like one day after this, I found
10 a prescription --
11 Q   No, no. Just answer my question.
12      You -- you don't know where those 10 tablets
13 went and who's responsible for the missing 10 tablets,
14 do you?
15      MS. LINDERMAN: Objection to form and
16 foundation.
17      THE WITNESS: I'm -- I'm 100 percent that that
18 -- that -- that shortage coming from her, because --
19 BY MS. HARDY:
20 Q   Because you think that's the kind of thing she does;
21 right?
22      MS. LINDERMAN: Objection to form and
23 foundation. She's trying to --
24      THE WITNESS: Because I --
25      MS. LINDERMAN: -- explain this.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
153–156

Page 153

1  THE WITNESS: -- already got another
2  prescription, that I make it today, it was waiting there
3  in the waiting bin, and there was like a -- like a
4  handwritten there, and it was written on 6/18.
5  And she already jotted down, like, "I gave
6  five tablets from this kind of medication with -- for no
7  charge. This is my initial," and 6/18/2013.
8  This is the first five. This -- this is the
9  first five I already discovered.
10  MS. HARDY: Okay.
11  THE WITNESS: Where is the other five?
12  BY MS. HARDY:
13  Q  You don't know?
14  A  I don't know.
15  Q  All right. So you're claiming there's a document from
16  June 18th, in her handwriting, that confirms that she
17  gave five of the Adderall prescription to a patient
18  other than the person who came in on June 19th with --
19  A  Yes.
20  Q  -- the prescription?
21  A  Exactly.
22  Q  All right. And do you have a copy of that document?
23  A  Yes.
24  Q  All right. Where is it?
25  A  It's with Marla. Ms. -- with my --

Page 154

1  MS. HARDY: Have you --
2  THE WITNESS: -- lawyer.
3  MS. HARDY: -- turned that over?
4  MS. LINDERMAN: We have, but we don't have the
5  protective order. I told them we -- that I can't give
6  it to you until we have the protective order, because
7  we're talking about someone's prescription. We --
8  MS. HARDY: You're giving it back to the place
9  where it should have stayed from the beginning.
10  MS. LINDERMAN: Actually, under the
11  Medicare/Medicaid law, if she gives it directly to me,
12  if she's looking into fraud, that's absolutely okay.
13  And I cannot give it to you until we have the protective
14  order.
15  MS. HARDY: All right. I would submit that
16  she wasn't supposed to take it in the first place --
17  MS. LINDERMAN: No --
18  MS. HARDY: -- from --
19  MS. LINDERMAN: -- there's --
20  MS. HARDY: -- Walgreen's.
21  MS. LINDERMAN: There's actually a law that
22  protects what she did. She's allowed to go in and get
23  it, and give it to an attorney if she's investigating
24  fraud, which is what she was doing. I've had to deal
25  with that issue before.

Page 155

1  MS. HARDY: All right. And --
2  MS. LINDERMAN: So --
3  BY MS. HARDY:
4  Q  -- what -- what fraud do you claim she -- she committed
5  where she -- who -- who was she defrauding, in your
6  view?
7  MS. LINDERMAN: Objection to form and
8  foundation.
9  BY MS. HARDY:
10  Q  Who was she cheating to use another word for fraud?
11  MS. LINDERMAN: Same objection.
12  BY MS. HARDY:
13  Q  What -- what's your --
14  A  She --
15  Q  -- theory?
16  A  -- said -- she -- she's telling who? I'm not sure who
17  -- what -- what happened with everybody, but I can see
18  this is a big violation to the DEA. You know what?
19  Even with the -- with her handwriting there, she put,
20  like, five tablets or five capsules -- I'm sorry -- for
21  no charge.
22  It is DK, which means -- I'm not sure DK, what
23  does it mean, but this is her initials. I'm sorry. I
24  don't know what does DK mean. But she put, like, DK,
25  and after that she put, like, 6/18/2013. And I found

Page 156

1  this kind of five tablets, and after that I found what?
2  I found the patient, after seven days,
3  she called me by mistake, and she called me and was --
4  was screaming over the phone, "Ma'am."
5  "Yes, ma'am. Can you just -- I'm sorry for
6  that, but can -- I -- I want to hear you. I -- I'm --
7  I'm totally for you. What -- what you want me to do,
8  I'm going to do it."
9  She said, "Is there any other pharmacist
10  there?"
11  I told her, "Yes, there is another manager."
12  She said, "Is this the first time she work in
13  a pharmacy or something?"
14  I said, "Ma'am, she is a supervisor, and she's
15  a pharmacy manager here. Can you just let me know
16  what's going on?"
17  She told me, "I need another five tablets from
18  my medication. I'm totally out. Or you know what?
19  Give me back my prescription."
20  "How to give you back your prescription? And
21  even I don't know how many did you get from me? And are
22  you going to -- to -- to give me the tablets you already
23  got from us, and you are going get the prescription from
24  me and go another pharmacy just to -- to fill it out.
25  And what about my pharmacy? This makes me scary [sic]."



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
157–160

Page 157

1    You know, it is coming like this stuff, I --
2    even I can't -- I couldn't go with that.  So I tried to
3    tell her, "Ma'am, I'm so sorry for -- for your
4    inconvenience, but can you give me just one day just to
5    try to help you?"
6  Q   Okay.  Are you doing a hypothetical here?  Is that what
7    this is all about?  What -- what are you referring to
8    right now?
9        MS. LINDERMAN:  She's asking, was this someone
10   you actually had a conversation with?
11       THE WITNESS:  I'm sorry.
12 BY MS. HARDY:
13 Q   The five --
14 A   I'm sorry.
15 Q   The five pills that you claim Ms. Spencer dispensed to a
16   patient, prior to June 19th, that caused part of the
17   shortage on June 19th, do you know whether or not that
18   person had a prescription for that medication?
19 A   I just left the pharmacy without even getting the
20   answer.
21       MS. HARDY:  All right.  Why don't we take a
22   lunch break?
23       THE VIDEOGRAPHER:  Okay.  This completes disc 2.
24   We're off the record at 12:57 p.m.
25

Page 158

1        (Whereupon a break was taken
2        from 12:57 p.m. to 2:12 p.m.)
3        THE VIDEOGRAPHER:  We are back on the record
4    at 2:12.  This is disc 3 of the deposition of
5    Mervat Mikhaeil.  Please proceed.
6  BY MS. HARDY:
7  Q   I want to start over, again, on the issue I was covering
8    before the lunch break about Donna Spencer.  And I want
9    to give you some instructions, again, about how we'll
10   proceed, and then hope that we can proceed in a more
11   efficient fashion.
12       Now, I'm going to give you a chance to explain
13   whatever it is you want to explain, but instead of
14   trying to do it all upfront, you've got to let me ask my
15   question, respond to my question, and then you'll have a
16   chance -- after I get through my initial questions -- to
17   say whatever you want about the facts and circumstances.
18       But when I ask you a very specific question
19   such as, "Identify what it is Donna Spencer did that you
20   believe was a violation of a rule, regulation, or the
21   law with respect to the dispensing of drugs," I want you
22   to give me a short answer that identifies what she did
23   that you are claiming was a violation of the law or a
24   regulation.
25       Not to give me everything about what happened

Page 159

1    and all the details, but just to give me a description
2    of what the inappropriate conduct was.  Then I'm going
3    to move on, and I'm going to ask you questions, which is
4    "How did you learn about that?"  "When did you learn
5    about that?"  "Why do you believe it was a violation of
6    a regulation or a law?"
7        So there's going to be separate questions, and
8    I just want you to respond to the question I ask.  And
9    then when we get toward the end, if you have anything
10   further to add, I'll ask you that and you'll be able to
11   add whatever you want.  Okay?
12       MS. LINDERMAN:  Can I add one thing?
13       MS. HARDY:  Sure.
14       MS. LINDERMAN:  Also, do not assume that any
15   lawyer knows pharmacy law.  Okay?  So don't make any
16   assumptions if you need to explain it.
17       THE WITNESS:  Okay.
18 BY MS. HARDY:
19 Q   So let's start with a list of what it is you claim
20   Donna Spencer did in connection with dispensing
21   prescription drugs at Walgreen that is either a
22   violation of a law or a -- a regulation.  Give me a list
23   of her improper conduct.
24 A   Okay.  One, Donna give the customer a Control 2
25   substance without giving the patient a label listed on

Page 160

1    the -- on the vial.  So it is one of the violations.
2  Q   Okay.  Just hold on for a moment while I write that
3    down.  And that -- that is a violation, in and of
4    itself, in your view?
5  A   Yes.
6  Q   Okay.  Did she do anything else that you consider to be
7    a violation of the law or a regulation?
8  A   Second, she didn't fill the rest of the prescription,
9    the Control 2 substance, within 72 hours.
10 Q   Okay.  Is there anything else she did --
11 A   She --
12 Q   -- that's responsive to my question?
13 A   I just want to ask one question?  I have to tell
14   everything about a lot of prescription, or just one
15   prescription?
16 Q   Just give me the -- the general descriptions of the
17   violations, and then I'll go back and get the details
18   when -- when we're done with your list.
19 A   Okay.
20       MS. LINDERMAN:  So all the prescriptions.  Not
21   just one.  She wants --
22       THE WITNESS:  Okay.
23       MS. LINDERMAN:  -- to know every --
24       THE WITNESS:  I thought --
25       MS. LINDERMAN:  -- single one.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
161–164

Page 161

1    THE WITNESS:  -- I -- I thought I understood
2  from here.
3         Third, she did Medicare/Medicaid fraud,
4  because -- that's it.
5         MS. HARDY:  Okay.
6         THE WITNESS:  Fourth, she changed an instruction
7  of use of Control 2 medications.
8  BY MS. HARDY:
9  Q    She changed what?
10 A    The instruction of use for Control 2 medications without
11     getting information from the doctor, himself.
12 Q    Okay.  Is there anything else?
13 A    Fifth, she stuck -- she put two labels and just one
14     prescription for Control 2.
15 Q    She put two labels in just one prescription?
16 A    Just one hard copy, and she give the one hard copy two
17     prescription numbers.
18 Q    I don't understand.  Can you -- can you try to explain
19     it, again, please?
20 A    This kind of prescription 2 medication, it's supposed to
21     give you an X number or prescription number 1.  I cannot
22     give you this kind of prescription like number 1 and
23     number 2.  If you need another -- more -- more tablets
24     from this kind of medication, supposed to give me
25     another prescription from your doctor.

Page 162

1  Q    So she filled -- she gave a patient too many pills for
2      one prescription when it should have been separated into
3      two separate?
4  A    It's supposed to be, like, two prescriptions.
5  Q    Um-hmm.
6  A    And she give the patient the medication with two
7      numbers.  This is not allowed with the DEA law.
8  Q    I -- that -- I'm not -- still not tracking.  If she had
9      two prescriptions for one patient, and she gave that
10     patient two different numbers, what's inappropriate
11     about that?
12 A    This -- let -- let me give you an example.
13         If this prescription coming like Adderall,
14     20 milligrams --
15 Q    Um-hmm.
16 A    -- and your doctor give you, like, 60 tablets, and
17     supposed to be twice daily, one in the morning and one
18     before sleeping.  And when I try it with your insurance,
19     your insurance didn't accept it like 60.  They transfer
20     to me that we just accept 30 tablets from this kind of
21     medication.
22         I have to return it to you and tell you what I
23     already got from your insurance.  Your insurance didn't
24     accept this amount from your medication.  Your insurance
25     just accept 30 tablets.

Page 163

1  Q    Um-hmm.
2  A    If you are okay with that, I'm going to give you
3      30 tablets.  If you want the whole amount, 60, you have
4      to pay from your pocket.
5  Q    Um-hmm.
6  A    Maybe you are going to ask me to -- "Can you give me the
7      30 with the insurance, and I can pay the other 30 from
8      my" --
9  Q    Um-hmm.
10 A    -- "pocket?"
11         "I cannot do that, ma'am.  You have to go back
12     to your doctor to give you another prescription with
13     another quantity."
14         This is Control 2.  This is not something
15     flexible.
16 Q    All right.  But -- but the patient in your scenario had
17     a prescription for 60, the patient just didn't have
18     insurance coverage for 60?
19 A    Yes, exactly.  So you can pay it as a cash, but I cannot
20     split it into two halves.  One with a prescription
21     number, and the other one as cash with another
22     prescription number.  This is just one hard copy.  It's
23     supposed to go with one prescription number.
24 Q    So what -- what was the problem with doing what she did?
25     I mean, did it -- the patient got what the patient was

Page 164

1      entitled to get; right?
2  A    Yes.
3  Q    Okay.  But -- so what was the problem?
4         MS. LINDERMAN:  Objection to form and
5      foundation.  You can answer.
6         THE WITNESS:  According to the law, this is
7      not my law.  This is coming, like, DEA law.  It's
8      supposed to give me a hard copy for one prescription
9      number.  If you want more, give me another hard copy to
10     give you more.
11 BY MS. HARDY:
12 Q    But doesn't -- didn't the patient come in with --
13     according to your scenario -- a prescription for 60
14     tablets?
15 A    Exactly.
16 Q    Okay.
17 A    That's what I am trying to tell you.  This is optional
18     for you.  You want to get 30 tablets with your -- your
19     insurance, that's what your insurance can cover and you
20     can lose the other 30, or you want that whole 60, but
21     you have to pay it as a cash.
22 Q    Okay.  Is there any -- anything else that you claim --
23 A    No.
24 Q    All right.  So you -- there's five different categories
25     of misconduct that you are attributing to Donna Spencer



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
165–168

Page 165

1    with respect to how she dispensed prescription medications?
2  A    Exactly.
3  Q    All right. All right. Let's go back to your first
4      point. You -- you keep using the word "Control 2." Do
5      you mean Schedule 2?
6  A    Schedule 2 or Control 2. They're the same.
7  Q    They're the same in your -- in your verbiage?
8  A    This -- with all pharmacists, we call them "Control 2."
9  Q    Okay.
10  A    But maybe, you know, as a schedule -- it is coming like --
11      like a schedule with the law.
12  Q    All right. Well -- and -- and you're positive that the
13      regulations use Control 2 synonymous with Schedule 2?
14  A    Yes. Control 2 or Schedule 2. You can use whatever is
15      easy for you; Control 2 or Schedule 2.
16  Q    All right. Well, for the purposes of this deposition,
17      we'll assume Control 2 and Schedule 2 are the same. I
18      don't know if that's, in fact, the case, but for the
19      purposes of these questions, I'm going to use Control 2,
20      and -- because you're using that, and we're going to
21      assume that that's the same as Schedule 2.
22  A    Yes.
23        MS. LINDERMAN: I don't have a problem with
24      that. I've never heard it referred to as anything but
25      "Control 2" in my depositions that I've done, so...

Page 166

1      I'm okay with it meaning the same thing if you
2      want.
3        MS. HARDY: Tom, you can speak to this. Are
4      you --
5        MR. DAVIS: I've -- I've heard Schedule 2. I
6      believe that's the way it's written in the regulations,
7      but it doesn't matter if that's how we want to -- if
8      it's put on as the same thing, that's fine.
9  BY MS. HARDY:
10  Q    All right. Let's take your -- your first point that she
11      did not properly label on the vial Control 2 medications
12      that she was dispensing.
13        How many times do you claim she committed that
14      alleged misconduct?
15  A    As I know, it is twice. But how many before that, I
16      don't know.
17  Q    Well, let's only deal with what you claim you know.
18        What are the dates when you claim she engaged
19      in that conduct?
20        MS. LINDERMAN: Objection to form and
21      foundation.
22  BY MS. HARDY:
23  Q    When is it, to your knowledge, that she dispensed
24      Control 2 medications without properly labeling the
25      vial?

Page 167

1        MS. LINDERMAN: Same objection.
2        THE WITNESS: The one which I already --
3  BY MS. HARDY:
4  Q    Is -- is the -- is the first one June 18, 2013?
5  A    June 19th, yes.
6  Q    I'm not talking about when you discovered it. I'm --
7      I'm -- I'm referring to when she engaged in the actions
8      that you consider --
9  A    I --
10  Q    -- violative of the law or a regulation?
11  A    Maybe before what I already discovered. I already
12      discovered that on June 19th.
13  Q    All right. So you discovered it on June 19th, and it
14      occurred sometime prior to June 19th?
15  A    I'm not sure if it supposed to be before that she
16      already did --
17  Q    All right.
18  A    -- something like this or not. I'm not sure.
19  Q    All right. Is --
20  A    I'm sorry.
21  Q    -- that -- is that the medication you were testifying
22      about before the lunch break?
23  A    Yes --
24  Q    Okay.
25  A    -- it was --

Page 168

1        Yes. The -- the one who called me? Yes.
2  Q    Okay.
3  A    The one who called me. She already give me the -- the
4      -- the -- she give me that -- this kind of -- of
5      something I can catch. You know, she just asked for
6      something. She already got it before.
7  Q    Okay. Spell the medication.
8  A    I don't have that prescription, even, so I -- what I
9      know is this coming, like, Adderall. That's what I
10      know. It's Adderall.
11        For this patient on 6/19?
12  Q    Um-hmm.
13  A    Adderall.
14  Q    And that's the patient that you were missing 10 tablets
15      that were needed for the full --
16  A    That's what I can --
17  Q    -- prescription?
18  A    You know, the shortage was from Adderall, and the -- the
19      patient was on Adderall. It is the same strength? I'm
20      not sure. Maybe 20, maybe 30. I'm not -- I'm not sure.
21      But the shortage was in 10 tablets here, and she asked
22      for Adderall, like, another five. Did she give her two
23      fives? I'm not sure.
24  Q    All right. But, now, the first violation that you're
25      pointing to is that Ms. Spencer did not properly label



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
169–172

Page 169

1    the vials when she dispensed medication.
2        What did she do in connection with the
3    Adderall that -- prescription that you discovered on
4    June 19th that was a mislabeling of a vial?
5  A  That's what I want just to make it clear a little bit.
6        I discovered, on June 19th, that there is
7    shortage in the Control 2 substance, or Schedule 2
8    substance, whatever you want to call it.  But it is
9    coming, like, 10 tablets from Control 2 substance.
10       It -- that -- that one who already got it, got
11   it on 6/18, according to her handwriting.  It was in
12   front of me, but I didn't discover that.  It was in
13   front of me, the prescription, itself, handwritten,
14   everything, it was in front of me in the -- in the bin,
15   the prescription bin.
16       But I didn't get that -- this prescription,
17   before she called me, something like June -- one week
18   after -- she called me one week after to get more
19   medication.
20  Q  You're talking about the patient?
21  A  This patient, yes.
22  Q  Okay.
23  A  She called me, like, a little bit after.  But I already
24   got the -- there's something wrong here.  When I just
25   touched it there's shortage.  Touched it and there is

Page 170

1    shortage in a Control 2 substance.  The medication in
2    the safe, there is shortage in that.
3  Q  All right.  But this is supposed to be an example of
4    Ms. Spencer improperly labeling the vial when she gave
5    the medication to the patient.
6        MS. LINDERMAN:  I'm --
7  BY MS. HARDY:
8  Q  What -- what did she do, in connection with this
9    incident, that you believe was improperly labeling the
10   vial?
11  A  This --
12       MS. LINDERMAN:  Hold on.  I'm going to object
13   to form and foundation.  I think you're asking the
14   question backwards.  She's not saying there's anything
15   wrong with labels.  It's there wasn't a label.
16  BY MS. HARDY:
17  Q  Or without a label.  Whatever.
18       I mean, something about the labeling of the
19   vial was wrong; right?  That -- that's what --
20  A  There's --
21  Q  -- you're claiming?
22  A  -- no label.  You -- you can --
23  Q  How do you know there was no label on -- on the vial?
24  A  That's what I told you.  When you get that prescription
25   with a label, it's supposed to pay cash or let it go

Page 171

1    with insurance.  There is no label coming up from that
2    -- that -- that printer, without giving cash or giving
3    me the insurance.  If it go through the insurance, by
4    itself it will come up.
5        If the insurance refused to cover it, I am --
6    I have to ask you, "Ma'am, you want me to do it as a
7    cash?"
8        You are going to say "yes" or "no."
9  Q  Okay.  I -- I got all that.  That -- that -- that's not
10   the focus right now.
11       The focus is, who did she give medications to
12   without putting a label on the vial?
13  A  Okay.
14       MS. LINDERMAN:  Objection to form and
15   foundation.  Are you asking her for the name?
16       MS. HARDY:  Well, a -- a date or some
17   identification.  I mean, I don't -- I don't understand
18   since she had nothing -- she doesn't know anything about
19   what happened prior to June 19th, other than the note
20   that she saw that five tablets were dispensed.  How does
21   she know --
22       THE WITNESS:  This is --
23       MS. LINDERMAN:  Wait, hold on.
24       MS. HARDY:  How does she know that there was
25   not a proper label on the vial when the five tablets

Page 172

1    were dispensed?
2        MS. LINDERMAN:  I think this may be a document
3    you actually have.  If -- if -- if you give it to her.
4    If you have the photo --
5        MS. HARDY:  Um-hmm.
6        MS. LINDERMAN:  -- I believe that's the
7    prescription we're talking about today -- that -- in
8    this instance.
9        MS. HARDY:  Yes.
10       THE WITNESS:  Can --
11       MS. LINDERMAN:  And then she'd be able to tell
12   you that information.
13       THE WITNESS:  Can I tell you about the process
14   of the prescription?  When the prescription coming to
15   you, and it went through the insurance, you are going to
16   put the label here, and with our X number, and all kinds
17   of your information that's information --
18       MS. HARDY:  Um-hmm.
19       THE WITNESS:  -- for you and your medication
20   and that's also on the label.
21       MS. HARDY:  Right.
22       THE WITNESS:  If there is no label coming up,
23   I will do something like this.  I give her this stuff in
24   here for what?  I -- she just jotted down there.  I give
25   her this kind of medication and the number.  It was this



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
173–176

Page 173

1    amount, and this is my initial, and this is my date.
2        And on the other side, she put prior
3    authorization required.  You know meaning -- what the
4    meaning of prior authorization?  Prior authorization,
5    this means your doctor, your primary, your physician, is
6    supposed to call that insurance, "I -- I accept to give
7    this medication to my patient because she needs it.  Can
8    you just let her go through it?"
9        So after done with all this kind of
10   medication, they are going to call me as a pharmacist to
11   give me code number.  I have to put it with my system,
12   so the printer will give me the label.  I will put the
13   label around the vial, and put the other label here on
14   the prescription, and after that I file it in the -- in
15   the -- in the drawer, because everything is just fine.
16       The name of that -- that prescription, the
17   number's there, everything goes through it.  The
18   insurance covered and the insurance said --
19   BY MS. HARDY:
20   Q    Well, what -- what if insurance -- what -- what if
21   Ms. Spencer gave five tablets, on June 18, 2013, to a
22   patient who had a valid prescription, who did not have
23   insurance approval, at the time, and she was given five
24   tablets to tide that person through until they could
25   fill the rest of their prescription?

Page 174

1        What are you claiming she had to do, other
2    than what she did, in terms of writing the note down and
3    indicating that she'd given the five tablets?
4    A    I'm --
5        MS. LINDERMAN:  Objection to form and
6    foundation.
7        THE WITNESS:  "I'm sorry, ma'am.  I cannot
8    give you -- I cannot fill this prescription.  It didn't
9    go through it.  Do you want to pay -- to pay from your
10   pocket?"
11   BY MS. HARDY:
12   Q    No, I -- yeah, I don't need to hear that all -- all over
13   again.  I mean, I understand you said if you want to pay
14   from your pocket, or if you want to have insurance.
15       But what if it's a situation where they have a
16   valid prescription, and they're being given pills on a
17   short-term basis to tide them over until they get an
18   answer on insurance?  You've -- you've acknowledged that
19   that's proper to do.  Now, the question is:
20       What -- what is she supposed to do in terms of
21   labeling of a vial when she gives those, you know, five
22   pills to just tide someone through?
23       MS. LINDERMAN:  Objection to form and
24   foundation.
25       THE WITNESS:  What she can do?

Page 175

1        MS. HARDY:  Tom, would you get -- would you
2    get the darn document?
3        MR. DAVIS:  Which one do you want?
4        MS. HARDY:  The -- the -- the one from 6/18.
5        MR. DAVIS:  The email letter?
6        MS. HARDY:  Yeah.  Not the email, but the --
7    the -- the -- the --
8        MR. DAVIS:  The prescription?
9        MS. HARDY:  The prescription, yeah.
10       MR. DAVIS:  Okay.
11       MS. HARDY:  Let's go off the record.
12       THE VIDEOGRAPHER:  Off the record at 2:32.
13       (Whereupon a break was taken
14        from 2:32 p.m. to 2:35 p.m.)
15       THE VIDEOGRAPHER:  Back on the record at 2:35.
16   Go ahead.
17       MS. HARDY:  Let the record reflect that I've
18   marked, as Deposition Exhibit No. 3, a document which
19   has been stamped "Confidential:  Subject to a Protective
20   Order."  It is a redacted prescription dated 5/17/13 and
21   it --
22       MS. LINDERMAN:  5/17 or 6/17?
23       MS. HARDY:  5/17.
24       MR. DAVIS:  There's two different ones here.
25       MS. LINDERMAN:  I don't think we're talking

Page 176

1    about --
2        MR. DAVIS:  There's two different ones --
3        MS. LINDERMAN:  -- the right one.
4        MR. DAVIS:  -- and that's the one we're
5    talking about (counsel indicating).
6        MS. HARDY:  Well -- well, let me finish my --
7        MS. LINDERMAN:  Okay.
8        MS. HARDY:  -- description.
9        It's dated 5/17/13.
10       (Marked for identification:
11        Deposition Exhibit No. 3.)
12       MS. HARDY:  I'm marking, as Deposition Exhibit
13   No. 14 -- or 4, a second redacted prescription, which is
14   stamped "Confidential:  Subject to a Protective Order,"
15   and that one is dated 6/18, and it does not have a year.
16   It just has a "1" and does not have whatever the second
17   number should be on the copy.
18       (Marked for identification:
19        Deposition Exhibit No. 4.)
20       MS. HARDY:  I'm going to show a copy of
21   Exhibit No. 4 to the witness and to counsel.
22   BY MS. HARDY:
23   Q    And I'd like you to identify if this is the prescription
24   that you have been referring to in your testimony.
25   A    Um-hmm.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
177–180

Page 177

1    MS. LINDERMAN:  Well, we will be able to read
2    a better copy, actually.  So I can say, for the record,
3    it is a "3" at the end.
4  BY MS. HARDY:
5  Q   All right.  And it does say in handwriting:
6        PA needed - called 6/18/13.
7        So I think that helps confirm that this is
8    from the year 2013.
9        Now, is this the prescription that you have
10   just been referring to in your testimony that --
11  A   Yes.
12  Q   -- concerns Adderall?
13  A   Um-hmm.
14  Q   And is this the one where --
15       MS. LINDERMAN:  You have to say "yes."
16  BY MS. HARDY:
17  Q   -- there was supposed to be 39 pills dispensed, and
18   there was only 29 available?
19       MS. LINDERMAN:  Objection --
20       MS. HARDY:  Or, actually, it says
21   "Quantity: 30" on -- on this.
22       MS. LINDERMAN:  Objection to form and
23   foundation.  This is the one that gets filled.  There's
24   another one she couldn't fill.  This is the one that
25   gets the five.  It makes it so she can't fill it.

Page 178

1  BY MS. HARDY:
2  Q   All right.  Was there -- is this the only prescription,
3    or were there others for this particular patient and
4    this particular drug in the time frame of June 2013?
5  A   This -- this prescription may be the only one in our
6    store, in our home store.  She already got this
7    prescription before from another store related to
8    Walgreen's.
9  Q   Let me show you Exhibit No. 3 --
10  A   Um-hmm.
11  Q   -- and your counsel, which is the prescription dated
12   5/17/13.
13  A   Um-hmm.
14       MS. HARDY:  And let me show you an email that
15   you sent to Amy Yadmark on June 25, 2013, and I'm
16   marking this as Deposition Exhibit No. 5, and giving you
17   a copy and a copy for your counsel.
18       (Marked for identification:
19       Deposition Exhibit No. 5.)
20  BY MS. HARDY:
21  Q   Let's go -- let's start with the email.
22       Is this an email that you drafted and sent to
23   Amy Yadmark or Yadmark?
24  A   Yes.
25  Q   All right.  And do Exhibit No. 3 and 4 belong to

Page 179

1    Exhibit No. 5, or are they referenced in Exhibit No. 5?
2  A   There is two prescription numbers there, so these two
3    numbers are here right now in front of you.
4  Q   Let me repeat my question.  It might not have been
5    clear.
6        You refer, in Exhibit No. 5, to two
7    prescriptions; correct?
8  A   Yes.
9  Q   And are those two prescriptions Exhibit No. 3 and
10   Exhibit No. 4?
11  A   Yes.
12  Q   Okay.  All right.  Now, let's go over Exhibit No. 5 and
13   what you report to Amy Yadmark on June 25, 2013 about
14   Exhibits No. 3 and 4.  You -- you tell her that you have
15   a question about whether or not there's any laws that
16   have been violated in connection with these two
17   prescriptions; correct?
18  A   Yes.
19  Q   Okay.  So at the time you contact Amy, on June 25th, you
20   don't know whether Ms. Spencer's actions, in connection
21   with 3 and 4, are improper or illegal or violative of
22   any regulation?
23       MS. LINDERMAN:  Objection --
24  BY MS. HARDY:
25  Q   You're just -- you're asking a question, at that point;

Page 180

1    correct?
2        MS. LINDERMAN:  Objection to form and
3    foundation.
4        THE WITNESS:  For -- as I know, at this time,
5    this one, it is a violation.
6  BY MS. HARDY:
7  Q   Yeah.  I don't want to know at this time.
8        I'm talking about on June 25th when you --
9        MS. LINDERMAN:  That's what --
10       MS. HARDY:  -- write to --
11       MS. LINDERMAN:  -- she's saying.
12       MS. HARDY:  -- Amy --
13       MS. LINDERMAN:  That's what she's answering,
14   "at this time."  She even pointed to it.
15       MS. HARDY:  Well, we just need to be clear,
16   because "at this time" is ambiguous when you're
17   testifying, unless I know precisely what you're
18   referring to.
19  BY MS. HARDY:
20  Q   When you wrote your email on June 25, 2003 [sic], you
21   are asking the question:
22       "I would like to know if this is connected to
23   any laws and how I should deal with it."
24       So isn't it correct that, at that point in
25   time, when you send these on to Amy, you don't know what



Page 181

1 laws or regulations may or may not have been violated;
2 correct?
3          MS. LINDERMAN:  Objection to form and
4 foundation.
5          THE WITNESS:  Okay.
6          MS. HARDY:  Just answer "yes" or "no."
7          THE WITNESS:  I know the answer, this is kind
8 of a regulation, but I tried to get the answer from my
9 supervisor.  If --
10          MS. HARDY:  Well --
11          THE WITNESS:  -- there's -- if -- if -- if
12 there's something supposed to happen even there or not?
13 BY MS. HARDY:
14 Q   If you knew the answer on June 25th, as to whether a
15    rule or regulation had been violated, why didn't you
16    tell Amy as opposed to asking it as if you didn't know?
17 A   This question just to ask her to give me the answer, but
18    I'm surprised when I got the answer on June 28th.
19          She told me -- we were there in her office,
20    and she told me that, "We treat Control 2 substance as
21    aspirin.  We don't care about this -- the Control 2
22    substance as much.  And what I wanted to tell you, right
23    now, it is not a big deal."
24          And she already know how to deal with
25    Control 2.  She was a supervisor for a while.  And I

Page 182

1    think you have to follow the rule she already put.  This
2    -- there is no pharmacist, all over the state, can
3    follow this kind of rule.
4          If the dose like aspirin there, there is no
5    DEA for aspirin.  But pretty sure that there is DEA for
6    Control 2 substance.  It is a very restricted law.
7 Q   When you first started to testify about Exhibit No. 3,
8    and -- or 4, I should say -- following the lunch break,
9    you indicated that it was an example of when
10    Donna Spencer failed to label a vial when she was
11    dispensing medication.  What does that issue have to do
12    with the issues that you raised in connection with
13    Exhibit No. 5?
14 A   Number 5?  Which one?
15 Q   Number 5 is -- is this document in front of you.
16 A   This one?
17 Q   Yes.  That concerns --
18          MS. LINDERMAN:  Hold on.
19          MS. HARDY:  -- Exhibits 3 and 4.
20          MS. LINDERMAN:  Oh, when you're handing her
21    the documents, they aren't labeled.  That's a problem.
22          MS. HARDY:  Yeah.  She -- she needs to label
23    them, herself, because I'm keeping the originals over
24    here for the court reporter just so no one marks on
25    them.  So just have her -- can you write for her --

Page 183

1          MS. LINDERMAN:  Yeah, that's fine.  I just --
2 normally, they --
3          THE WITNESS:  This is --
4          MS. LINDERMAN:  -- would get the one --
5          THE WITNESS:  This is --
6          MS. LINDERMAN:  -- that's actually --
7          THE WITNESS:  This is the label?  Number 5?
8          MS. LINDERMAN:  Let -- let me do it, please.
9 Normally, you give the witness the actual document to
10 make sure that --
11          MS. HARDY:  You know, I -- I stopped doing
12 that, years ago, because they started writing on the
13 originals and then we had to recopy them all.
14          MS. LINDERMAN:  I -- I see that.  I'll just
15 make sure to look at them before we leave, so -- just to
16 make sure.  Exhibit --
17          MS. HARDY:  Exhibit 3 --
18          THE WITNESS:  Five --
19          MS. HARDY:  -- is 5/17/13.
20          MS. LINDERMAN:  Exhibit 4?  This one, which is
21 4, is -- and so Adderall is 4.  Concerta is 3.  This is
22 exhibit -- no, these are mine, Exhibits 1 and 2.
23          Now we're getting things all confused here.
24 Her resume was 1, and her application was 2?
25          MS. HARDY:  Her resume was 1, her application

Page 184

1 is 2, correct.
2          MS. LINDERMAN:  Okay.  Memory did not fail me.
3 Okay.  There.  We're all dealing with the same thing.
4 BY MS. HARDY:
5 Q   Exhibit No. 5 makes no reference, at least to my
6    knowledge, to the failure to properly label the vial in
7    which prescription medications are being dispensed?
8 A   Yes.
9          MS. LINDERMAN:  Wait.
10 BY MS. HARDY:
11 Q   Wait, wait.  Where does it -- where does it --
12          MS. LINDERMAN:  Objection to --
13          MS. HARDY:  -- indicate that?
14          MS. LINDERMAN:  -- form and foundation.
15          THE WITNESS:  Where can I find that --
16          MS. HARDY:  Yeah.
17          THE WITNESS:  -- with the prescription --
18          MS. HARDY:  Yeah.
19          THE WITNESS:  -- itself?
20 BY MS. HARDY:
21 Q   No.  In -- in -- in Exhibit No. 5 --
22 A   Yes.
23 Q   -- which is when you complained to Amy about
24    Ms. Spencer's conduct in connection with Exhibits 3 and 4 --
25 A   You know, I --



Page 185

1  Q   -- you don't make any mention of the fact that this
2      involves a violation concerning how the label is vialed
3      -- or how the vial is labeled.
4          MS. LINDERMAN:  Objection to form and
5      foundation.
6          THE WITNESS:  Okay.  Maybe I didn't mention
7      that in -- in this email.  This is -- for a long time,
8      even, I didn't read it, because even it is not with me
9      right now.  But anyway, when I say that this one didn't
10     go through it, or that one didn't go through it, which
11     means that the two prescriptions don't have our X number
12     at this time.  Because there was one there, it was from
13     me.
14 BY MS. HARDY:
15  Q   That's Exhibit No. 3; correct?
16  A   Yes.  Exhibit No. 3.
17         So I can find that -- I asked the technician
18     to try to find...
19         (Witness reading from document.)
20         Okay.  Okay.  Okay, ma'am.  This one, it was
21     -- it was Exhibit No. 3, it -- it was processed and
22     everything was just fine.
23  Q   All right.  What -- what medication does Exhibit No. 3
24     concern?
25  A   I think Concerta.

Page 186

1  Q   Okay.  And is -- what's the relationship between
2      Concerta and Adderall, if any?
3  A   Concerta or Adderall is Control 2 substance --
4  Q   But --
5  A   -- in the safe.
6  Q   But are they different -- they're --
7  A   They are --
8  Q   -- different medications?
9  A   They are totally different, yes.
10  Q   Okay.  So what's the connection between 3 and 4,
11     Exhibits 3 and 4?
12         MS. LINDERMAN:  Objection to form and
13     foundation.
14 BY MS. HARDY:
15  Q   Exhibit No. 3 has a notation, "Gave four at NC" --
16  A   No charge.
17  Q   Okay.
18         -- "DK"; right?
19  A   Her initial.
20  Q   All right.  So you -- you -- you believe that this was
21     written by Donna Spencer?
22  A   Yes.
23  Q   And you believe it means she gave four Concerta to a
24     patient for no charge?
25  A   Yes.

Page 187

1  Q   All right.  And then she signed it at that -- and
2      initialed it?
3  A   Yes.
4  Q   What's "DK" stand for?
5  A   Donna, the middle name, and after that Spencer.
6  Q   Okay.
7  A   With most of her -- she puts, like, DKS.
8  Q   All right.
9  A   Always puts, like, DKS.  And I can see it there, even.
10     This is coming, like, initial --
11  Q   Oh, okay.
12  A   -- DKS.
13  Q   Do you recognize that as her initials?
14  A   Yes.  She's a -- yeah.
15  Q   All right.
16  A   For Donna, yeah.
17  Q   Okay.  Now, what's the connection between the
18     prescription that's dated 5/17/2013, and has been marked
19     as Exhibit No. 3, and the prescription which is dated
20     6/18/13, and is marked as Exhibit No. 4?  Is there any
21     connection between the two?
22  A   Both of them Control 2 substance.  Both of them for
23     charge in advance.  It's -- no charge means I'm going to
24     give that patient four tablets, or four capsules, in
25     advance.  There is nothing like this happen in the

Page 188

1      pharmacy for Control 2.  In advance -- there's nothing,
2      in advance, you can do it.
3  Q   All right.  So your -- it's your testimony that it is a
4      violation of the law or a regulation to give a Control 2
5      substance in -- in a small dosage, as an interim
6      measure, at any point in time?
7  A   You cannot do that at all.  Whatever -- whatever --
8      whatever happens, you cannot give the patient something
9      in advance, and --
10  Q   Well, what do you mean, "in advance"?  I mean, this
11     person, on 5/17/13, has a prescription for Concerta.
12  A   This prescription already you give it to me.  I already
13     put all your information.  I just -- just put the
14     information, everything in the system, but -- but when I
15     tried to do it, for this patient, it was too soon.
16  Q   How do you know it was too soon?
17  A   If it goes through with -- why I just give him just four
18     tablets?  Why I didn't give him 30 tablets?
19  Q   Well, what -- what -- what about if this particular
20     patient, who came in with -- with the prescription dated
21     5/17/2013, which has been marked as Exhibit No. 3, did
22     not, yet, have response from his insurance company as to
23     whether or not his prescription was going to --
24  A   We have --
25  Q   -- be covered --



MERVAT MIKHAEL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
189–192

Page 189

1  A     -- to wait.

2  Q     -- by insurance?

3  A     We have to wait.

4  Q     You have to what?

5  A     We have to wait.

6         MS. LINDERMAN:  Wait.

7  BY MS. HARDY:

8  Q     Wait?

9  A     Yes.

10 Q     All right.  So is -- is it your testimony that the law
11        prohibits --

12 A     Yes.

13 Q     -- a pharmacy from ever giving a small dosage of a
14        Control 2, or Schedule 2 medication to a patient in
15        advance of insurance coverage being obtained?

16 A     Nothing -- never can -- you cannot do anything with
17        Control 2.  This related to a very conservative law.
18        You cannot do anything with Control 2 prescriptions.  If
19        that -- that -- that system says that it's too soon, you
20        cannot give the patient --

21 Q     What -- what does "too soon" mean?  I'm still not
22        understanding.

23 A     "Too soon" means that you have to wait a little bit,
24        like, four -- four -- almost four days or five days or
25        whatever your insurance -- what your insurance sent to

Page 190

1         you, and they are good to send you, like, a red -- a red
2         screen to assess them, and say just to stop you to
3         process this prescription.

4              Because maybe this patient, he already got it
5         from another pharmacy with his insurance, and this means
6         that he is a drug addict, or even he is a shopper from
7         everywhere, or even like -- like getting a lot of
8         medication from different doctors.  You cannot do
9         something like this.

10             This coming, like, when you trained as a
11        pharmacist to do something with Control 2 -- especially
12        Control 2, the red -- the red colors, green pop --
13        popped in front of you stopping you to do it.

14 Q     Okay.  If we -- let's assume, for the sake of my
15        question, that Donna Spencer gave this particular
16        individual Concerta on 5/17/13, or gave this person four
17        pills.  How do you know that that was too soon?

18 A     I tried it by myself before.  She -- he already called
19        me, like, two days or three days before getting his
20        prescription, and he asked me to process his
21        prescription again, and he told me, "Can you process
22        this prescription for me, please?"

23             I told him, "Do you have a prescription?"

24             He -- he said that it is in the waiting bin.
25        You can find the prescription there.  I tried to find

Page 191

1         it.  Yes, it was in the waiting bin.  When I tried to
2         -- both the first name, last name, date of birth, I
3         found something like "Hold it."

4              "Hold it" means that there is no -- the
5         printer refused to give me a label.  Refused to give me
6         a label.  That means that this prescription didn't go
7         through that -- that -- that insurance.

8  Q     All right.  He called you three days before 5/17/13?

9  A     Not before 5/17.  Before the processing of the
10        prescription.

11 Q     When did he call you?

12 A     It -- I'm not sure when.  I --

13 Q     Do you have any record of --

14 A     Well, for this --

15 Q     -- which you could look to, to refresh --

16             MS. LINDERMAN:  Hold on.

17             MS. HARDY:  -- your memory?

18             MS. LINDERMAN:  Let her finish.

19             THE WITNESS:  Sorry.

20 BY MS. HARDY:

21 Q     Do you have any record you could look to, to refresh
22        your memory, as to when he called you?

23 A     I tried to -- for these prescriptions, especially this
24        prescription, I tried to see when did he call.  When did
25        he get it.  But I believe that it was more than seven

Page 192

1         days until I already did it for him.  He called me
2         asking to do this prescription.

3  Q     When are you claiming that his prescription was able to
4         be filled?

5  A     If the -- that --

6  Q     What date?

7  A     If the screen, itself, would pop up -- it -- with --
8         with the red color, they will say too soon till --

9  Q     Just give me the date when you claim it would have been
10        appropriate, under the law, to fill the prescription for
11        Concerta, which is marked as Exhibit No. 3 and dated
12        5/17/2013.

13 A     I don't have --

14 Q     Okay.

15 A     -- that date.

16 Q     Okay.

17 A     I don't have it.

18 Q     Do you have any records that have that date?

19 A     For this patient, I don't have it.  For this patient, I
20        have everything about it.

21 Q     All right.  Well, just stay with Exhibit No. 3 right
22        now.

23 A     Uh-huh.

24             MS. LINDERMAN:  For the record, she was
25        talking about Exhibit No. 4.  She had the documents.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
193–196

Page 193

1    She lifted it up.

2        MS. HARDY:  No, she -- she's lifting up

3    Exhibit No. 3, and she doesn't -- she doesn't know with

4    respect to 3, and she says she knows with respect to 4.

5        MS. LINDERMAN:  That's what I just said, as to

6    Exhibit 4.

7  BY MS. HARDY:

8  Q  All right.  All right.  So just stay with 3.  All right?

9        So you claim that Donna Spencer filled this

10   prescription, or -- or gave this patient four pills

11   earlier than she was allowed to do so, but you don't

12   know when she gave the pills, or what the date was when

13   she was allowed to do so; is that correct?

14  A  Yes, exactly.

15  Q  Okay.  And you don't have any records that you can look

16   to, to answer either of those questions?

17  A  You know, I can get the whole answer, but I don't want

18   to put anyone at risk with that.  I will not do it.

19  Q  Have you ever reviewed the regulations concerning the

20   partial filling of prescriptions?

21  A  Reviewing the partial --

22  Q  Have you ever read the regulations concerning what's

23   appropriate when a pharmacist is partially filling

24   Schedule 2 prescriptions?

25        MS. LINDERMAN:  Object to form and foundation.

Page 194

1        THE WITNESS:  We already --

2        MS. HARDY:  Answer my question.

3  BY MS. HARDY:

4  Q  Have you ever looked --

5  A  Yes.

6  Q  -- at the --

7  A  Yes.

8  Q  -- regulations?

9  A  Yes.

10  Q  All right.  So you -- do you know what they say?

11  A  Maybe it was from a long time, but anyway --

12  Q  When -- when did you last look at the regulations, the

13   wording of the regulations concerning partially filling

14   the --

15  A  I think --

16  Q  -- prescriptions?

17  A  -- I already got it while I'm taking my -- my -- my

18   practice or my training with Walgreen's, itself.  They

19   are -- if it is something like it's supposed to tell you

20   about the Control 2, itself.  How much you have to be

21   very, very precise.  How much you -- you can't fill

22   something, like, before -- within 72 hours.

23        If you are 100 percent that that -- the

24   medication, in your hand, you can do it.  But if you

25   doubt that the -- the medication --

Page 195

1  Q  All right.  So are -- are you acknowledging, now, that

2   you can partially fill a Schedule 2 prescription under

3   certain circumstances and that's appropriate to do?

4  A  Yes.  There is something you can -- you can do it, like,

5   partial -- partial --

6  Q  Now, why is that completely inconsistent with what you

7   just said --

8        MS. LINDERMAN:  I --

9        MS. HARDY:  -- before?

10       MS. LINDERMAN:  I object to form and

11   foundation.

12       MS. HARDY:  Yeah.

13       MS. LINDERMAN:  I -- I don't --

14       MS. HARDY:  She --

15       MS. LINDERMAN:  -- think --

16       MS. HARDY:  She did say that you are not

17   allowed to partially fill any substance, or -- or

18   Schedule 2 or Control 2.

19       THE WITNESS:  I want to --

20       MS. LINDERMAN:  With insurance.

21       THE WITNESS:  I want to remind you --

22       MS. LINDERMAN:  There's a difference.

23       THE WITNESS:  -- ma'am, what I said.  When you

24   said what I -- you said a lot -- a little bit, DE [sic]

25   law -- DE law is Control 2, can you tell me that?

Page 196

1        I told you, according to the DE law, Control 2

2   is supposed to do it within 72 hours.  That's what I

3   said, and I tried to tell you the part -- the partial,

4   you can do it within 72 hours.

5  BY MS. HARDY:

6  Q  All right.  Just -- just stop.  All right.  Let -- I'm

7   going to read you the regulation in the partially

8   filling of prescriptions.

9  A  Um-hmm.  Okay.

10  Q  All right.

11       MS. LINDERMAN:  You're actually --

12  BY MS. HARDY:

13  Q  And it is 13.06.13 [sic], partially filling of

14   prescriptions.

15       MS. LINDERMAN:  It's 21 CFR - 1306.13.

16       MS. HARDY:  Yes.

17       MS. LINDERMAN:  You used -- you had an extra

18   zero in there.

19       MR. DAVIS:  There's a copy.

20       MS. LINDERMAN:  Okay.  That's a copy.

21  BY MS. HARDY:

22  Q  The partially -- and you have a copy of it in front of

23   you.

24       MS. LINDERMAN:  Right.

25



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
197–200

Page 197

1  BY MS. HARDY:
2  Q   I see your lawyer's giving it to you.
3          The partial filling of a prescription for a
4  controlled substance listed in Schedule 2 --
5          MS. LINDERMAN:  You know what --
6  BY MS. HARDY:
7  Q   -- is permissible if the pharmacist is unable to supply
8  the full quantity called for in a written or emergency
9  oral prescription, and he makes the notation of the
10  quantity supplied on the face of the written prescription.
11          Let's stop right there.  Now, look at
12  Exhibit No. 3.
13  A   Um-hmm.
14  Q   What are you claiming, in light of 21 CFR - 1306.13,
15  that Donna Spencer did, in Exhibit No. 3, that was a
16  violation of the regulation for the partial filling of
17  prescriptions?
18          MS. LINDERMAN:  I'm going to object.  The
19  documents speak for themselves.  It says right there.
20          THE WITNESS:  You can get the answer.
21          MS. HARDY:  That's a prompting answer.
22          THE WITNESS:  You can get that -- the answer
23  there, ma'am, in the -- there with the -- the two lines
24  in the same paragraph there down, you can see it there.
25          If the remaining portion is not, or cannot be

Page 198

1  filled within a 72-hour period, the pharmacist shall
2  notify the practitioner -- the individual
3  practitioner -- which means that -- that the physician,
4  himself, no course or quantity may be supplied beyond
5  72 hours without a new prescription.
6  BY MS. HARDY:
7  Q   All right.  But I'm dealing, first, with Exhibit No. 3.
8  A   Yeah.
9  Q   What about Exhibit No. 3 suggests to you, or suggested
10  to you, back in June 2013, that Donna Spencer had
11  violated the law or a regulation in connection with this
12  particular document?
13          MS. LINDERMAN:  I'm going to just object to
14  form and foundation.  There's another regulation that
15  applies to --
16          MS. HARDY:  You know --
17          MS. LINDERMAN:  -- the situation.
18          MS. HARDY:  -- what?  That's -- that's beyond
19  what's appropriate in terms of an objection.
20          What -- that's totally beyond -- I need to
21  know what it was she thought was violative of the law or
22  regulation.  Not --
23          MS. LINDERMAN:  So you're --
24          MS. HARDY:  Not --
25          MS. LINDERMAN:  -- asking --

Page 199

1          MS. HARDY:  Not what you're telling her.
2          MS. LINDERMAN:  I believe your question is
3  without foundation.
4          MS. HARDY:  All right.  That's fine.  We can
5  stop there.  That's an appropriate legal objection which
6  will preserve the record.
7  BY MS. HARDY:
8  Q   What was inappropriate, in your view, back in June '13
9  -- in June 2013 about Exhibit No. 3?
10  A   Ma'am, I -- that's what I want to tell you.  Because she
11  didn't look -- that maybe -- I -- I'm pretty sure that
12  she already give the four tablets on May 17th.  That's
13  what I'm pretty sure from that, and I got the --
14  Q   Okay.
15  A   -- answer from the patient, himself.
16          But anyway, just -- just let me finish.
17  Q   Well, she gave the full -- she gave -- it says she gave
18  four, no charge.
19  A   Four, no charge.  And the -- the rest of the medication,
20  he already got it more than one week after.
21  Q   How do you know that?
22  A   I -- I am the one who already did this prescription.  I
23  am the one who already called me [sic].  He called me,
24  like, two days before and he asked me to do it.  When I
25  tried to do it for the second time, that -- that -- the

Page 200

1  -- the screen popped -- popped up in front of me.
2          And I told him, "I'm so sorry, sir.  This --
3  there is nothing coming up right now, because it's too
4  soon for another two days.  Can you call me on this day,
5  morning, please, and I can do it for you?"
6          He told me that, "I already got the four
7  prescription for more than seven days, and I'm totally
8  out.  I don't have any kind of medication more -- just
9  to cover myself for the next days."
10          So I told him, "This is the law, sir.  I
11  cannot do anything with the law.  But you can call me at
12  this date, morning, nine o'clock, and I will do it."
13          This was the first call.  I got it this day.
14  And I already processed this prescription and put the
15  whole amount there.  But because he just -- just told me
16  that he already got the four tablets, I don't know what
17  I have to do with that, because according to the
18  partial, it's supposed not even -- not even to do this
19  prescription.  I just put it aside.
20          And when Donna Spencer came, I told her, "You
21  know what, ma'am?  This prescription, I don't know what
22  I have to do with that.  Can you tell me what is going
23  on?"
24          She told me, "I know who is he.  I'm pretty
25  sure that he is honest.  I'm pretty sure I know this



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
201–204

Page 201

1    one, personally."
2         And that's what she told me, even over the
3    phone, and I -- "What you can do right now?  How many
4    did you put in there?"
5         I told her the -- the -- the quantity, which I
6    already have with that -- with that prescription.  She
7    got four tablets on her hand and return it back to the
8    -- the -- the original vial, and close it and put it in
9    the -- in the safe.  This totally -- this totally not
10   something, like, can go with the law.  This totally
11   violation.  She already did that, and I tried to tell
12   everybody how to give, in advance, any kind of Control 2.
13 Q  I'm going to go back to this at a later date --
14 A  Okay.
15 Q  -- the next time around.
16        You -- you identified as the first violation
17   that Ms. Spencer engaged in was not having the proper
18   label, or not having a label on a vial --
19 A  Yeah.
20 Q  -- right?
21 A  Yes.
22 Q  Was that a problem in connection with Exhibit No. 3?
23 A  Yes.  'Cause see there is no label there.  Yes.
24 Q  Are you claiming that if she gives a partial
25   prescription --

Page 202

1  A  With no label.
2  Q  -- that there has to be a label that's on -- on the
3     prescription, itself?
4  A  Yes.
5  Q  Okay.  And that --
6  A  Or -- or we can ask her, "Where is the label for the
7     four tablets?  You already give him four tablets.  And
8     there was a label here supposed to be done with four
9     tablets.  Where is that?"
10 Q  And you're claiming there's a regulation that provides
11    that if you give a partial prescription with four
12    tablets, you need to have a label indicating exactly
13    what's been given?
14 A  Yes.  Supposed to put it here, just to put it -- if you
15    are going to put, like, partial, yes, you can do it, but
16    with the same number.  You know what I mean?  The same
17    number.  If it's coming like RX1, you are going to give
18    the other 26 tablets with RX1, too.  So this coming,
19    like, partial and you can find it with the label there,
20    and this is partial with the second label.
21        So if you couldn't find two labels with one
22    for four, and the other one for 26, there is this kind
23    of total violation against DEA law.
24        MS. HARDY:  Let's go off the record for a few
25    minutes.

Page 203

1         THE VIDEOGRAPHER:  We're off the record at
2    3:08.
3         (Whereupon a break was taken
4          from 3:08 p.m. to 3:15 p.m.)
5         THE VIDEOGRAPHER:  Back on the record at 3:15.
6    Please proceed.
7  BY MS. HARDY:
8  Q  I'd like to return to the list of violations that you
9     claim Donna Spencer committed as a pharmacist.  The
10    first one is failing to put the proper label on a vial,
11    and you've identified Exhibit No. 3 as an example of one
12    such violation.  Are there any other violations of that
13    nature that you claim were committed by Donna Spencer?
14        MS. LINDERMAN:  Objection to form and
15    foundation.
16        THE WITNESS:  Another prescription you mean?
17 BY MS. HARDY:
18 Q  No.  Just stick with the allegation that she dispensed
19    Control 2 substances without a label on the vial.
20 A  Is that --
21 Q  And you've identified Exhibit No. 3 as an example of
22    such a violation.
23        MS. LINDERMAN:  Okay.
24 BY MS. HARDY:
25 Q  Are there any other incidences when you claim she

Page 204

1    committed that particular violation?
2  A  This is --
3         MS. LINDERMAN:  Hold on.  I'm going to object
4    to form and foundation.  She was asking for
5    clarification, which seems reasonable.  She's asking,
6    are you asking if there's another prescription outside
7    of Exhibit No. 3 that she --
8         MS. HARDY:  Sure.  I mean, what -- yes, of
9    course.  Any other --
10        MS. LINDERMAN:  Yeah.  So she's asking about
11   the other -- if there's other prescriptions.
12        THE WITNESS:  This is the other one you
13   already gave us right now, Exhibit No. 4.
14 BY MS. HARDY:
15 Q  Okay.  And Exhibit No. 4 is an example of a prescription
16   being dispensed without a label on a vial?
17 A  This is another one, yes.
18 Q  All right.  Are there any others?
19 A  Sorry?
20 Q  Are there any other prescriptions?
21 A  I -- I don't have any clue about that.
22 Q  All right.  So the only two you have knowledge of are
23   the ones that are -- are documented in Exhibit No. 3 and
24   Exhibit No. 4, and they occurred on 5/17/13 and 6/18/13?
25 A  Yes.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
205–208

Page 205

1       Can I just answer one point, please?
2 Q    Yes.
3 A    For both of them, what you already gave to us right now,
4       No. 3 and No. 4, if you do the right stuff and you --
5       you know how to be -- how to follow the law, I told you
6       now that is supposed to be like one prescription number
7       and you are going to get one prescription partial for
8       four, and the rest -- the old vial, and the rest of them
9       coming like with the same number with the rest of them
10      and they're back home.
11          Sorry.  They're with the state, the Michigan
12      Board of the state -- the Michigan Board of Pharmacy,
13      you have to get the number.  It's supposed to be there,
14      also.  The same number here partial four -- four or
15      five, and there -- with the same number after three days
16      it's supposed to be with the rest of medication.
17          So this board just follow you as a pharmacist
18      to get to see if you followed that rule or not, if you
19      follow the law or not.  If you just said that, "I
20      already give him five tablets for no charge just to --
21      to rescue him, just to give him a life," whatever you
22      are going to say, it's supposed to -- the -- the
23      Michigan Board of Pharmacy is supposed to have a number
24      there with five, and the other number -- the same number
25      was the rest of medication.

Page 206

1           But because we -- I already got that -- that
2       document from Michigan Board of Pharmacy for this
3       prescription that it is filled with the whole amount at
4       the same day, the day after, just one day after I inform
5       my supervisor.  I inform my supervisor about this
6       prescription, and I told her, like, "What you already
7       give it to me, this" --
8 Q    I don't need you to --
9 A    Okay.
10 Q   -- go into all of that.  That's getting way --
11 A   Okay.
12 Q   -- far afield.  I was going to give you the freedom to
13      add a little something, but not to get into five
14      different topics.
15          Let's turn to the second violation you claim
16      Donna Spencer committed, which is not filling the rest
17      of a partially filled prescription within 72 hours.
18          When do you claim she committed that violation?
19 A   What date?
20 Q   What -- in connection with what prescription?  What
21      date?  Give me the details that support that accusation.
22 A   For the first one it was in May, maybe.  The first one,
23      it was this one, it was on June 18th, and she already
24      filled it on June 27th, nine days after.
25 Q   So you're referring to Exhibit No. 4?

Page 207

1 A    Yes.
2 Q    And what documentation supports your accusation that the
3       refill, or the -- the -- not the refill -- the filling
4       of the remaining portion of the prescription did not
5       happen until June --
6 A    27th.
7 Q    -- 27th?
8 A    27th, yes.
9 Q    Do you have any documents to support your -- your
10      representation that the remainder of the prescription
11      was not filled until June 27th?
12 A    Maybe I don't have that -- that -- the document from
13      Walgreen's, itself.  I don't have that label there with
14      Walgreen's, itself.  But I got the label, or I got the
15      number, and the date, itself, on -- on it from the
16      Michigan -- from Michigan Board of Pharmacy.
17 Q    And Exhibit No. 5, do you reference the basis for your
18      charge that the remaining portion of the prescription,
19      reflected in Exhibit 4, was not filled until June 27th?
20          MS. LINDERMAN:  Objection to form and
21      foundation.
22 BY MS. HARDY:
23 Q    Look at Exhibit No. 5.  It's your complaint on June 25th
24      concerning Exhibits No. 3 and 4.
25 A    Yes.

Page 208

1 Q    Do you say in Exhibit No. 5 that you have a basis for
2       knowing that Ms. Sanders [sic] did not fill the
3       remaining portion of the prescription in -- reflected in
4       Exhibit No. 4 until June 27th?
5          MS. LINDERMAN:  I'm going to object.
6          THE WITNESS:  This is --
7          MS. LINDERMAN:  The document speaks for
8       itself.  Form and foundation.
9          THE WITNESS:  This email --
10         MS. HARDY:  I'm sorry.  I misspoke.  It was
11      not -- not Ms. Sanders.  It's --
12         MR. DAVIS:  Spencer.
13         MS. HARDY:  -- Spencer.
14         THE WITNESS:  This email was on June 25th.
15 BY MS. HARDY:
16 Q    Okay.  So you didn't -- you didn't know, at that point
17      in time, when it was filled?
18 A    Yes.
19 Q    Okay.
20 A    Until this time they didn't do it.
21 Q    All right.
22 A    They couldn't do it.
23 Q    Okay.  Do you -- do you -- do you have, in your
24      possession, anything that confirms that the remaining
25      portion of the Adderall prescription, reflected in



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
209–212

Page 209

1  Exhibit No. 4, was not filled until June 27th?
2  A   I have -- that -- that -- that's from -- that's what I
3      said from Michigan Board of Pharmacy that told me, or
4      the document there, it was filled on 6/27.  This is the
5      first point.  The second point, for this patient, she
6      already used that Adderall, but not generic.
7          The only thing that -- that insurance refused
8      to -- failed to let this prescription go through it, the
9      only thing.  Not -- and they ask for prior
10     authorization, because always this patient's on Adderall
11     plain, not Adderall generic.  And she already got it
12     from our pharmacy, but from the other -- the other store
13     from Walgreen's, but from -- in another store.  She
14     already got it, but Adderall brand.
15         And what you are going to do with -- you are
16     -- that -- that -- that -- that insurance will accept it
17     and the -- the printer will give you the label and
18     everything is just fine.  But because of that -- that
19     manager, she didn't practice a lot how to resolve those
20     kind of issues, how to let it go, so she insist to put
21     it as a generic.
22         Generic will not let it -- this one not never
23     going through it, and tried to speak to the patient.
24     And the patient, herself, when she came to me and picked
25     it up, she said that the pharmacy manager called her and

Page 210

1      she said that, "It didn't go through, your insurance,
2      ma'am, so I recommend you with this Trotera (ph), and it
3      says on this kind of medication -- because your
4      insurance will not cover that."
5          So she told me this -- all these issues.  When
6      I tried to get the answer from the Michigan State of
7      Pharmacy, the Board of Pharmacy here in Michigan, they
8      give to me that because she didn't put the proper one.
9      It is generic.  Not that -- the -- it is one generic.
10     She tried to give generic, not the brand one.
11         So that patient, next month, she went to get
12     it from CVS, and there is a document also from Michigan
13     State that she already -- after that, she left
14     Walgreen's at all, and went to get it from CVS.
15         So how did that -- that -- that manager let it
16     go?  Why it is coming, like, prior authorization?  I
17     don't have any clue, because this patient even when she
18     was there, she said, "I don't have any kind of insurance
19     more than Medicaid."
20         But Michigan Board said that Walgreen's tried
21     something else which put, like, question mark, "Which
22     insurance did you try, guys, there?"
23  Q   When did you contact the Michigan Board of Pharmacy --
24  A   It is --
25  Q   -- about --

Page 211

1          Let me finish.
2  A   Sorry.
3  Q   -- about this particular patient and his or her
4      prescription?
5  A   It is not something you have to contact --
6  Q   When did you contact the Michigan Board of Pharmacy
7      about this issue?
8          MS. LINDERMAN:  Objection.  Form and
9      foundation.
10         THE WITNESS:  Last -- last month, maybe.
11  BY MS. HARDY:
12  Q   Last month in 2014?
13  A   Yes.
14  Q   All right.  So after your termination?
15  A   After my termination.
16  Q   All right.  And they're providing information to you
17      about prescriptions?
18  A   Not for me.  Not for Mervat.  To all -- to all
19      pharmacists, they are asking how did they -- it go
20      through it?
21  Q   Well, are you -- you've been asking, since you've been
22      terminated from Walgreen, about prescriptions that were
23      filled at Walgreen when you were employed there?
24         MS. LINDERMAN:  Objection --
25         THE WITNESS:  It is --

Page 212

1          MS. LINDERMAN:  -- to form and foundation.
2          THE WITNESS:  It is coming, like, some -- it's
3      a program there just for pharmacists.  If I wanted to
4      know something, I can get it from there, yes.  They
5      follow every -- they follow every patient.  They follow,
6      also, the pharmacists as -- as well.
7  BY MS. HARDY:
8  Q   But you're allowed, as a non-Walgreen employee, to get
9      information about prescriptions filled at Walgreen?
10  A   If this patient -- if this patient is -- wants something
11      and I wanted to know from where did he get that
12      prescription?  Yes.  For everybody, yes, you can get all
13      information.  If somebody just wants something like
14      Control 2 from you, and you want to -- to map him --
15      that's what we call the Michigan Board of Pharmacy here
16      in Michigan, "map" -- I have to map every single patient
17      getting the -- the prescription.
18  Q   But have you had any contact with this particular
19      patient since you were terminated from Walgreen?
20  A   No.
21  Q   So what right do you have to get information about him
22      now since he's not a patient --
23  A   Because that's --
24  Q   -- you're dealing with, and you're not being asked to
25      fill one of his prescriptions?



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
213–216

Page 213

1 A   Because I have something, like, the law -- according to
2   the law, I -- or according to the -- the -- the
3   situation which I'm already now in, and I wanted to know
4   how did they process this prescription?  This is -- this
5   prescription is one which I was terminated for, so I
6   just wanted to know why and how they fill it.
7 Q   Did the Michigan Board of Pharmacy know, at the time you
8   were getting information from them --
9 A   True.
10 Q   -- that you -- that you were seeking information in --
11   in support of your litigation?
12 A   True.
13       MS. LINDERMAN:  Objection to form --
14       MS. HARDY:  Yes?
15       MS. LINDERMAN:  -- and foundation.
16       THE WITNESS:  True.
17 BY MS. HARDY:
18 Q   The answer is "yes"?
19 A   Yes.
20 Q   You told them that?
21       MS. LINDERMAN:  Objection to form and
22   foundation.
23       THE WITNESS:  Well, told them what?
24 BY MS. HARDY:
25 Q   Told the Michigan Board of Pharmacy that you were doing

Page 214

1   research to support your litigation and seeking
2   information in the course of that about prescriptions
3   given to patients?
4 A   That's what I'm trying to say.  This is a kind of
5   program, it is available for all pharmacists.  Whenever
6   you wanted to follow anyone, you wanted to get any kind
7   of information for one of your -- or your customers --
8 Q   But he's not your customer anymore.  At the time you're
9   seeking --
10       MS. LINDERMAN:  She's trying --
11       MS. HARDY:  -- the information --
12       MS. LINDERMAN:  -- to answer.  You interrupted
13   her.
14       MS. HARDY:  -- about him through this, you
15   know, Web site or whatever -- whatever device you were
16   using -- he wasn't your customer, was he?
17       MS. LINDERMAN:  I'm going to object to form
18   and foundation.
19 BY MS. HARDY:
20 Q   Was he?
21 A   If it is not available to the pharmacist, if the patient
22   is not available for the pharmacist, and if there's
23   something supposed to -- to stop me to do it, the
24   Michigan Board can do that even.
25 Q   All right.  But the Michigan Board didn't know at the

Page 215

1   time you were seeking to get information in the past
2   couple months about this particular customer, that he
3   wasn't a customer of yours when you were seeking the
4   information --
5       MS. LINDERMAN:  Objection --
6       MS. HARDY:  -- did they?  They didn't --
7       MS. LINDERMAN:  Objection --
8       MS. HARDY:  -- know that, did they?
9       THE WITNESS:  Yes.
10       MS. LINDERMAN:  Objection to form --
11       THE WITNESS:  Yes, exactly.
12       MS. LINDERMAN:  -- and foundation.
13       THE WITNESS:  He is not one of my patients
14   right now, but because of she [sic], I already was
15   terminated.  And I am here today for this kind of -- of
16   prescription.
17 BY MS. HARDY:
18 Q   All right.  But when you were using the Michigan Board
19   of Pharmacy to get information about that customer, you
20   didn't tell the board that he was no longer a customer
21   of yours, and your purpose in seeking information was to
22   support your litigation --
23       MS. LINDERMAN:  Objection --
24       MS. HARDY:  -- did you?
25       MS. LINDERMAN:  Objection --

Page 216

1 BY MS. HARDY:
2 Q   You didn't tell them that, did you?
3       MS. LINDERMAN:  Objection to form and
4   foundation.
5       MS. HARDY:  Answer the question.
6       THE WITNESS:  I don't have answer.
7 BY MS. HARDY:
8 Q   Because you didn't tell them what -- what you were
9   really up to, did you?
10       MS. LINDERMAN:  Objection to form and
11   foundation.
12 BY MS. HARDY:
13 Q   That's correct, isn't it?
14 A   Um-hmm.
15 Q   Yes?
16 A   Um-hmm.
17 Q   You've got to verbalize.
18 A   Yes.
19 Q   All right.  Are there any other incidences when you
20   claim Donna Spencer did not fill the remaining portion
21   of a partial prescription within 72 hours?
22       You've identified one instance pertaining to
23   Exhibit No. 4.  Are there any other prescriptions when
24   she committed, in your view, that violation?
25       MS. LINDERMAN:  Objection to form and



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
217–220

Page 217
1    foundation.
2         THE WITNESS:  I'm sorry.  I didn't get that
3    question.
4    BY MS. HARDY:
5    Q    All right.  You're claiming that Donna Spencer failed to
6    fill partial prescriptions -- prescriptions within
7    72 hours.  I asked you when that occurred.  You
8    identified Exhibit No. 4 and the Adderall prescription
9    in connection with that particular document.
10        Are there any other prescriptions where that
11   particular violation occurred?
12        MS. LINDERMAN:  Objection to form and
13   foundation.
14        THE WITNESS:  I -- I just got that on -- on
15   June 26th, maybe, or -- yeah, 26th.  I -- that's what I
16   already discovered when the patient --
17   BY MS. HARDY:
18   Q    All right.  No.  You've testified about Exhibit No. 4
19   and that the refill did not occur until 6/27 --
20   A    Yeah.
21   Q    -- and that was the Adderall prescription.
22   A    Yes.
23   Q    Are there any other prescriptions that --
24   A    No.
25   Q    -- are at issue with respect to Donna Spencer --

Page 218
1    A    I --
2    Q    -- and that alleged violation?
3         MS. LINDERMAN:  Objection to form and
4    foundation.
5         THE WITNESS:  Maybe there is, but I don't -- I
6    don't have any clue about it.  That's all -- that's what
7    I already have right now.
8         MS. HARDY:  You know, I just want to raise a
9    side issue with Ms. Linderman.  While I respect the fact
10   that you're making legal objections, the fact that
11   you're objecting to form and foundation at every single
12   question is a bit suspect.
13        MS. LINDERMAN:  There was a lot of questions
14   where you made an assumption that was incorrect, and
15   there was a problem with the form, too, so --
16        MS. HARDY:  Well --
17        MS. LINDERMAN:  -- there were several
18   recently --
19        MS. HARDY:  They -- they -- they -- well, it's
20   not just several.  It's every single question,
21   virtually, and some judges might conclude that that is
22   intending to be distracting and not appropriate because
23   it's -- it's being overused in circumstances where it's
24   not appropriate.
25        MS. LINDERMAN:  But it was appropriate, and I --

Page 219
1         MS. HARDY:  All right.
2         MS. LINDERMAN:  Later on I --
3         MS. HARDY:  It's up to --
4         MS. LINDERMAN:  -- can tell you --
5         MS. HARDY:  -- you to make --
6         MS. LINDERMAN:  -- what was --
7         MS. HARDY:  -- that --
8         MS. LINDERMAN:  -- wrong with it.
9         MS. HARDY:  -- determination, but, you know,
10   when it comes time if it -- if they ever read this when
11   we have to purge transcripts, the judge will see every
12   single one of those objections --
13        MS. LINDERMAN:  Yeah.
14        MS. HARDY:  -- and we will have to address
15   every single one in a motion to purge.
16        MS. LINDERMAN:  Most of them are just saying
17   that the objection is form of the question.  Perhaps I
18   should have just asked for this whole line.  Can I ask
19   for --
20        MS. HARDY:  Well, you can't ask, in advance,
21   for a form and foundation question until you've heard
22   the -- the question.
23        MS. LINDERMAN:  Well, that's why I did it each
24   time, instead of asking in advance.
25        MS. HARDY:  Well --

Page 220
1         MS. LINDERMAN:  Sometimes --
2         MS. HARDY:  -- that -- you know, I'm just
3    pointing out, for your sake, that, you know, if a judge
4    has to review the transcript, they -- they might find
5    you're abusing that objection.
6         MS. LINDERMAN:  I don't think so when they
7    find out --
8         MS. HARDY:  Okay.
9         MS. LINDERMAN:  -- why.
10   BY MS. HARDY:
11   Q    Let's go to the third instance of alleged improper
12   conduct that you attribute to Ms. Spencer, and that is
13   Medicaid and Medicare fraud.  What are you referring to?
14   A    This prescription with this kind of Medicare and
15   Medicaid fraud.
16   Q    Which -- which prescription are you referring to?
17   A    Maybe I have the numbers, but I don't have it -- this
18   one.  But I -- I was there in the pharmacy, and she
19   filled one prescription wrong, and supposed just to --
20   it was in -- at one day, and saying that it was, like,
21   hundreds of tablets.
22        And the customer, next day, she came because
23   this -- this particular medication for what -- for her
24   husband, and she asked to get the right one, because
25   this medication, he never get it before.  And I -- I



Page 221

1    found that she tried to resolve the issue, and this
2    stuff, and she already resolved the issue, but didn't --
3  Q    Wait.  What's the word you're using?  Reserve?
4         MS. LINDERMAN:  Resolve.
5         MS. HARDY:  Resolve, okay.
6         THE WITNESS:  Resolve the issue means she
7    gives the patient the right one.
8  BY MS. HARDY:
9  Q    So she accidentally gave the patient the wrong one --
10 A    The wrong one.
11 Q    -- and then she corrected it and gave him --
12 A    Corrected --
13 Q    -- the right one?
14 A    Correct it and gave him the right one, but she didn't
15    get the medication back.  Just put it in the destroyed
16    area to destroy this kind of medication, because it is
17    returnable, or she -- she -- because of her fault, it's
18    supposed to accept it, and supposed to put it in the
19    destroyed area.  And after that, you -- she's supposed
20    to destroy it.
21         And even didn't resolve the issue with
22    Medicare.  To reverse a claim happened yesterday, and to
23    -- because there is no hard copy for this wrong
24    medication even, and -- and to give the right one.  She
25    already gave the patient the right one after a lot of

Page 222

1    issues.  But anyway, that wrong one is still there.  The
2    patient --
3  Q    The wrong one is still where?
4  A    With the patient.
5  Q    How -- how do you know?
6  A    She didn't return it.  There is -- there is something
7    like a policy supposed to -- to follow.  If you return
8    me your -- your wrong medication, or whatever happened,
9    you don't want it or whatever, I have to get it and put
10    it in the destroyed area.  Destroyed area means we have
11    to destroy it.  We have to -- don't put it, again, over
12    the counter.
13 Q    Are you referring to one particular prescription or --
14 A    Yeah.
15 Q    -- more than one?
16 A    Yes.
17 Q    Just one?
18 A    I -- one.  And I have two prescriptions -- two -- two
19    prescription numbers under the same -- under the same
20    hard copy, and there was -- there was no refill for this
21    medication, even, just to say, "We did it twice because
22    -- because there is a -- a refill."
23         The doctor just put it every three months,
24    this prescription, so she --
25 Q    Okay.  So just stop for a moment.  I just want to make

Page 223

1    sure I've got the framework here.
2         The allegation of Medicare/Medicaid fraud only
3    is one time?
4         MS. LINDERMAN:  Objection to form --
5  BY MS. HARDY:
6  Q    One -- one instance?
7         MS. LINDERMAN:  -- and foundation.
8         THE WITNESS:  You know what?  I -- I didn't --
9    I just left the pharmacy.  I just left --
10         MS. HARDY:  No, I --
11         THE WITNESS:  -- the pharmacy.
12 BY MS. HARDY:
13 Q    I'm referring to --
14         How many times are you claiming Donna Spencer
15    engaged in Medicare or Medicaid fraud?
16         MS. LINDERMAN:  Objection to form and
17    foundation.
18 BY MS. HARDY:
19 Q    On one occasion or more than one occasion?
20 A    I just have one.
21 Q    Okay.  Fine.  Stop right there.
22         Who is it?  Did she prescribe the medication?
23         Or not -- I'm sorry.  Did she fill the
24    prescription the first time?
25 A    Yes.

Page 224

1  Q    Did you have anything to do with it?
2  A    To do what?
3  Q    With -- with that prescription being filled.
4  A    No.
5  Q    What was the prescription for?
6  A    I think it was for something, like, Control 3 or Control 4.
7  Q    You don't recall?  You don't have those details?
8         MS. LINDERMAN:  Objection to form and
9    foundation.
10         THE WITNESS:  I don't have what?
11 BY MS. HARDY:
12 Q    You don't have the details of what the medication was?
13 A    No.
14 Q    All right.
15 A    I have the prescription numbers.
16 Q    And where -- where did you retain the prescription
17    numbers?  Did you take a copy of them?
18 A    No.  You can get it -- you can get it -- it is with the
19    patient, himself.  The patient got this one and got that
20    one.
21 Q    But did you write them down somewhere and retain them?
22 A    Sorry?
23 Q    Did -- did you keep notes of what the prescription
24    numbers were?
25 A    I think, yes, I already got the notes, and I tried to



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
225–228

Page 225

1    give it to Ms. Amy on June 28th when she called me to be
2    there in her -- in her office. And she even -- I put
3    all the notes there just to give it -- to forward all
4    those stuff for her, and she even didn't listen to
5    anything.
6  Q   All right. Well -- so on June 28th, you -- you had the
7    prescription numbers at issue that you claim constituted
8    a Medicare or Medicaid --
9  A   Yes.
10  Q   -- fraud?
11  A   Yeah.
12  Q   All right.
13  A   I tried to forward it to Ms. Amy. She didn't listen.
14  Q   Did you forward those numbers, via email, to her?
15  A   No. I didn't forward that, because supposed to give her
16    -- after what I already got with the emails, so I was
17    there with her in the -- the same office, so I prefer to
18    give it to her hand by hand, and I -- you know what? I
19    give her the number even while I was there. I already
20    give her the number, like verbal numbers.
21       I told her, "There's something wrong with this
22    number and that number, and it's supposed just to come
23    in to -- to -- to see those kind of issues, but..."
24  Q   What did you write the numbers on? Where did you record
25    those numbers?

Page 226

1  A   Why?
2  Q   No. Where? On what?
3  A   Where?
4  Q   Yes.
5  A   While -- while I was there.
6  Q   No, no, no.
7       MS. LINDERMAN: Not when. Where.
8  BY MS. HARDY:
9  Q   Where? What did you write them on? A piece of paper?
10    A copy of the prescription? I mean, what -- what did
11    you have in front of you to help you recall the numbers?
12  A   When I was there and she call me and she said,
13    "There's supposed to be, like, a meeting together
14    tomorrow. Try to get all the information you want to
15    forward to me. Get all the issues you already faced
16    there."
17       I just put it like one, this second, this --
18    and I just --
19  Q   What did --
20  A   -- put it --
21  Q   -- you write them on? Did you have a notebook? Did you
22    have a scrap of paper? Did you -- what -- what -- where
23    did you write the numbers?
24  A   On a paper.
25  Q   Okay. Do you --

Page 227

1  A   Like --
2  Q   -- have that paper, or did you give that paper to your
3    attorney?
4  A   To -- yes. She -- it is safe, yes, with her.
5  Q   Okay.
6  A   Yes.
7  Q   And it has the number of the two prescriptions that you
8    claim constitute Medicare and Medicaid fraud?
9  A   She already did this prescription, just she -- she
10    submitted twice to Medicare.
11  Q   All right. So is it Medicare or Medicaid?
12  A   Medicare.
13  Q   All right. What was -- and you have no idea what the --
14    the drug was?
15  A   No.
16  Q   All right. And so she submitted it twice because the
17    first time she made a mistake, and --
18  A   Yes.
19  Q   -- it was the wrong medication?
20  A   Yes.
21  Q   And then the second time it was the right medication?
22  A   It was the right one.
23  Q   And why do you claim that was fraud?
24  A   When you -- it is just one hard copy, and you submit it
25    twice. One of them you don't have hard copy for the

Page 228

1    wrong one, but you still got your money back from
2    Medicare, and the other one, it is the right one and you
3    submit it, also, to the Medicare the next day, and you
4    got your money back.
5  Q   How do you know she didn't correct the erroneous
6    submission?
7  A   Till the time I was there, there was no recovery for
8    this kind of --
9  Q   Well --
10  A   -- medication.
11  Q   -- there may not have been a recovery, but how do you
12    know she didn't, within the appropriate time frame,
13    submit the paperwork to notify the government of the
14    error?
15       MS. LINDERMAN: Objection to form and
16    foundation.
17       THE WITNESS: How to know that?
18  BY MS. HARDY:
19  Q   Yeah. How -- how do you know she didn't do that?
20  A   That's what I wanted to tell you. It is still there
21    under the name of the patient. She already got it. The
22    number is still there. If -- if deleted, it -- there is
23    nothing under the patient's profile. But if you already
24    got the number, it is still there with -- that -- that
25    amount of the medication is still there under his name.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
229–232

Page 229

1  Q   All right.  What -- what is the date of the second
2      prescription?
3  A   Second prescription?
4  Q   Yeah.  You said she gave an erroneous prescription to
5      the patient, and then she gave the correct prescription
6      to the patient.
7  A   It was --
8  Q   When -- when did she give the correct prescription?
9  A   It was, like, two days, sequential --
10 Q   Okay.
11 A   -- days.
12 Q   Well, what -- what are the dates?  I --
13 A   The prescription number is there.  You can just try to
14     get, if you want --
15 Q   Well, give --
16 A   -- to get it.
17 Q   -- me a -- where -- when was this in connection with -- in
18     -- to June 28th?  Was it just a couple days before
19     June 28th?
20 A   These kind of prescription?
21 Q   Not this kind.  This particular prescription that you're
22     saying is an instance of Medicare fraud.
23 A   It was -- I think it was, like, maybe three or four
24     months before leaving the pharmacy.
25 Q   It occurred three to four months before you left?

Page 230

1  A   Yes.
2  Q   All right.
3  A   It was -- it happened before leaving the pharmacy, like
4      three or four -- four months before -- before leaving
5      the pharmacy.
6  Q   Well, if it happened, when did you become aware of it?
7  A   I -- you know, I -- accidentally, I already aware about
8      this kind of medication maybe, like, two days or three
9      days before leaving, because the patient already on this
10     medication, and she -- for a long time.  This kind of
11     medication, the doctor just wrote it every three months,
12     so he give him the prescription and he supposed to fill
13     it every three months.
14 Q   When did you become aware of what you --
15 A   Maybe --
16 Q   -- claim is Medicare fraud?
17 A   Maybe two -- two days, or --
18 Q   Before what?
19 A   Before leaving the pharmacy.
20 Q   Before you left?
21 A   Yeah.
22 Q   And you left on July 22, 2013?
23 A   This -- this is a very big question mark.  I don't know
24     when I just got my termination.  I don't know.
25 Q   All right.  Well, you -- sometime in mid-July is when

Page 231

1      you became aware of this alleged Medicare fraud?
2  A   Maybe it was July 10th or July 11th.
3  Q   Okay.
4  A   Something like that.
5  Q   How did you discover this if it was three to four months
6      old at the time of the discovery?
7  A   When you want to -- to put somebody on a prescription,
8      and he coming to you just to do it, you have to open
9      that -- that -- this profile, so everything with a
10     history pops up and you can find everything under his
11     name.  The lady was there, she asked him to -- this time
12     to do the right one.  She was from more than three
13     months and she came just before leaving, or something
14     like this.
15         So when she came to me, she asked it, "Can
16     this time try to do the -- the -- your proper job, guys?
17     Because the last time I already got the -- the wrong
18     medication."
19         I told him [sic], "Give me that -- the
20     prescription, first and last, and the ID for your
21     husband."
22         I just put everything there, and I tried to
23     figure out about the history there.  I found that he was
24     on -- on this kind of medication for more than two years
25     or three years.  But during this kind of medication, I

Page 232

1      found something a little bit different.  I tried to see
2      it, and I found different -- different from that what he
3      already got.
4          I asked the patient, "So did you get this kind
5      of medication?"
6          She said, "Yes."
7          Okay.  But -- but it is still there.  It is
8      still there under that -- that -- that -- that --
9  Q   What do you mean it's "still there"?
10 A   It's still under the patient's name.  It is in the
11     profile.  It is -- that prescription number's still
12     there.  The number, you already got, is still there.
13     The -- the -- I tried to see it, and I found that it is
14     already sent to Medicare and tried to see the -- the
15     right prescription, I found that it was sent to
16     Medicare.  I tried to find a hard copy for the wrong
17     one.  There is nothing.  You know what I mean?
18         When you get a prescription number, it's
19     supposed to have a hard copy before getting the number.
20     I couldn't find the number which already -- that -- that
21     patient on there.  There is a number, but there is no
22     hard copy.
23 Q   What does that suggest if you couldn't find the hard
24     copy?  Why does that indicate to you that --
25 A   It indicates that's --



Page 233

1  Q   -- that's --
2  A   -- the patient.  The patient's already on wrong
3      medication, and we didn't recover this kind of
4      prescription.
5  Q   I'm not tracking you.  All right.  So they -- they got
6      the wrong prescription, but what does the lack of -- at
7      one point in time, and then they got the right one.
8          What does the lack of a hard copy have to do
9      with -- do with your fraud claim?
10 A   If you don't have a prescription, how do you get
11     medication?
12 Q   Well, are you suggesting that she gave a prescription to
13     somebody who didn't have a prescription, or she gave
14     medication to somebody --
15 A   She give --
16 Q   -- when they didn't have a prescription?
17 A   She give the same patient the wrong one, and she gave
18     that same patient the right one.  So the patient has
19     both of them.  And the patient already -- the -- the two
20     -- the two prescriptions submitted to Medicare.
21         If you are going to -- to do a prescription
22     right, you have to reverse the wrong one.  You know what
23     the meaning of reverse?  The claim reverse it.  So there
24     is no -- any other money coming, not more than -- the
25     hard copy already got -- got -- have it.  The hard copy

Page 234

1      you already give to the patient.
2  Q   Okay.  And how do you know she did not take the proper
3      steps to reverse the wrong medication?
4  A   Because the number is still there.  The prescription
5      number is still there.
6  Q   And so that suggests to you that she did not try to
7      reverse it --
8  A   Exactly.
9  Q   -- just simply because the number's there?
10 A   Exactly.  If you delete it -- it's number 1.  You -- you
11     discovered that number 1 is wrong, and you put another
12     number, which coming, like, number 2 right, you have it.
13     Number 1 will not show up with -- with -- other than
14     this name.
15 Q   What if they just made an error and forgot to take the
16     number out of the system?
17 A   When you delete it, it's pretty much out.  When you
18     delete it.
19 Q   Well, I understand when you delete it.  Maybe they
20     forgot to delete it.  Why does that suggest that they
21     engaged in fraud with the federal government just
22     because they didn't delete a number in the system at
23     Walgreen's?
24 A       MS. LINDERMAN:  Objection to form and
25     foundation.

Page 235

1          THE WITNESS:  Okay.  You give a medication
2      regarding two prescription from a doctor; right?
3          MS. HARDY:  Um-hmm.
4          THE WITNESS:  Where is that prescription for
5      this one?
6  BY MS. HARDY:
7  Q   I'm not -- I'm not following you in connection with your
8      fraud allegation.
9  A   That's what I want to try to -- to help a little.  If
10     you have the hard copy you can fill the prescription.
11 Q   Yeah.
12 A   If you don't have hard copy, it is supposed to give you
13     wrong or right, or whatever you say, about -- about the
14     prescription.
15 Q   Well, let's say a mistake is made, and she sees a -- the
16     prescription for one medication, and she fills it with
17     the wrong one and she gives it to the patient.
18 A   Um-hmm.
19 Q   And then she gives them the right prescription when she
20     realizes her error.
21 A   Okay.
22 Q   Okay.  How do you get to Medicaid fraud?
23         MS. LINDERMAN:  Objection to form and
24     foundation.
25         THE WITNESS:  You have --

Page 236

1          MS. LINDERMAN:  She's not a lawyer.
2          THE WITNESS:  You have to reverse it before
3      doing the right one.  Reverse the claim.  Reverse the
4      wrong claim --
5          MS. HARDY:  Um-hmm.
6          THE WITNESS:  -- and put the right one.
7      Reverse it.
8          MS. HARDY:  Yeah.
9          THE WITNESS:  Before doing anything, it's
10     supposed to reverse it.  You can do the right thing.
11     All of us, we -- we do mistakes.  But when I am trying
12     to do the right one, I cannot do mistakes, also, with --
13     with the insurance, or it's just open for everybody just
14     to -- to give a wrong prescription with no hard copy.
15 BY MS. HARDY:
16 Q   Have you described all the facts that support your
17     allegation that Ms. Spencer engaged in Medicare or
18     fraud?
19 A   Did I ask -- did I tell somebody there?
20 Q   No.
21         Have you told me, on this record, every fact
22     you have to support your claim that Ms. Spencer engaged
23     in Medicare fraud?
24 A   Yes.  That's what I already have right now.
25 Q   Let's go to your fourth example of improper conduct by



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
237–240

Page 237

1 Ms. Spencer. That was that she changed the instructions
2 on the use of Control 2 medications without permission
3 from the doctor.
4 A Yes.
5 Q When do you claim she did that?
6 A I don't have the right -- the right date for this
7 prescription. But anyway, it was for Control 2
8 substance, and this prescription supposed to be for
9 90 tablets because the -- the -- the patient already
10 supposed to have it, like, three times daily. Insurance
11 didn't cover more than twice daily.
12 So she change it, the -- the instruction and
13 put BID. BID means twice a day. And changed it TID,
14 which is the doctor already just stopped. And TID means
15 three times.
16 Q Okay. What was the medication involved?
17 A I don't have that prescription right now. Maybe we can
18 ask about the document from --
19 Q What was the date?
20 A It was in February, I think.
21 Q February 2013?
22 A That's what I think. I'm not pretty sure from that.
23 Q All right. How did you come in contact with this
24 situation?
25 A This prescription is just fine, and it was -- there is a

Page 238

1 label there. Everything is just fine with the name of
2 the patient, name of the doctor, everything was fine.
3 And it was filed in there with the prescription.
4 But I got the call at -- so it was -- I think
5 it was in February, and I found one -- I'm not sure of
6 the relation between the -- the patient and this guy who
7 called me. And he was screaming a lot over the phone,
8 and he said, "If you don't know, guys, how to do a
9 prescription, I think you have to close it. You -- you
10 -- you hurt my" -- maybe his wife or some -- I'm not
11 sure.
12 But he -- he was screaming at me, and I told
13 him, "Just one -- one minute, sir. I'm going to get all
14 the information from you. Can you just repeat what you
15 said?"
16 And he said that from, like, a little bit like
17 two weeks or three weeks, he already got a prescription
18 from us, and now he is -- ran out for medication, and --
19 and his wife, or -- or the one related to him, is in --
20 need it, and he couldn't find any. And that's what he
21 told me.
22 "I'm so sorry for that, but I will forward all
23 this stuff to my -- to my manager. Please, sir, I'm so
24 sorry for what happened. Please, just calm down."
25 And he said, "I'll never deal with you again."

Page 239

1 That's what he said, and hanged up on me.
2 That's okay. And after that, I tried to reach
3 my manager -- pharmacy manager -- Donna Spencer, and
4 told her that. So she told me, "So what. What I have
5 to do? His insurance didn't accept more than 60. I
6 changed the instruction to twice daily just to give him
7 the prescription."
8 She was, um-hmm, new in the pharmacy practice
9 at this moment. So I told her, "It's okay, but he's
10 going to call me again. What do you want me to tell
11 him?"
12 She said, "If he calls you, again, just let
13 him call me with my shift."
14 That's okay. After, like, two days I found
15 that his doctor called me, and they're screaming at me,
16 and he -- he told me, "You cost me another prescription
17 to give it to -- to the patient. Another 30 --
18 30 tablets to cover her, and you don't -- you --
19 improper way to get your job, and -- to do your job, and
20 this is -- if I -- if I have time, I will sue you guys.
21 You destroyed the whole family."
22 "I -- you change it -- an instruction from
23 three times to twice without getting permission from me.
24 Do you know anything about -- about the law with
25 Control 2? I think you are totally done. Sorry for

Page 240

1 that."
2 Q All right. How do you know that he was accurate that
3 she changed the prescription from three to two? An
4 irate patient/customer may claim that, but how do you
5 know that they're correct?
6 A The description, itself, say that three times daily and
7 number 90.
8 Q Well, the prescription said three. Did you -- and do
9 you know whether or not the -- the instructions on the
10 label said three or two?
11 A Two.
12 Q And how do you know that?
13 A That is labeled there and it was with the prescription,
14 itself.
15 Q All right. So you're claiming the prescription, itself,
16 on the vial it says three, and the label says two?
17 A And she changed the instruction with her handwriting
18 from TID to --
19 Q Okay.
20 A -- BID.
21 Q How do you know if that, indeed, is accurate what you've
22 just said that she didn't have permission from the
23 doctor?
24 A First of all, because the doctor when changes that --
25 that instruction, he's supposed to give me a new



Page 241

1    prescription for Control 2. There is nothing you can --
2    you can scratch it. You can -- you can cross over and
3    put anything. If he's going to do that, he's supposed
4    to give me a new prescription, or at least he's supposed
5    to sign it and put his DA number.
6        MS. LINDERMAN: DEA?
7        THE WITNESS: Number, right.
8        MS. LINDERMAN: Okay. I thought you said DA.
9    BY MS. HARDY:
10   Q   All right. And you checked the file and you confirmed
11       that there is neither a new prescription nor an initial
12       change to the initial prescription?
13   A   There's nothing there more than her handwriting.
14   Q   Than her what?
15   A   Donna Spencer's handwriting.
16   Q   All right. And that's -- that's all that's in the file
17       that indicates the change?
18   A   Yes.
19   Q   Okay. All right. So was that one instance or more than
20       one instance when you claim she changed the instructions
21       on the use of a -- of a Control 2 medication?
22   A   Can you repeat it, again, please?
23   Q   Is there one instance, or more than once instance, where
24       you claim Donna Spencer changed the instruction on the
25       use of a Control 2 medication?

Page 242

1    A   Control -- I don't have any other -- yeah.
2    Q   All right. Let's go to your last example when you claim
3        that one prescription was split into two. When it was
4        just one prescription, and then the -- it was filled
5        through two prescriptions.
6    A   Yes.
7    Q   Did I describe that correctly?
8    A   Yes, exactly.
9    Q   Okay. On how many occasions do you claim that occurred
10       in connection with Donna Spencer?
11   A   One.
12   Q   When was that?
13   A   One.
14   Q   When?
15   A   When? Sorry. I don't have --
16   Q   Can you give me any time frame at all?
17   A   I'm sorry. I don't have the -- the time for this
18       prescription, but I think it --
19   Q   What can you tell me about it that would help identify
20       it?
21   A   That -- the -- the document will [sic] coming to you.
22       I'm not sure -- it can help you more than me right now,
23       because the document, there -- there was a hard copy
24       like this, and there was, like, two labels there with
25       two prescription numbers, and with her initials on all

Page 243

1    of them, and they're all from the beginning.
2        They're data -- data entry until the time she
3    would file all those stuff, you are going to find her
4    initials everywhere, everywhere, with the two prescriptions.
5    Q   Did you keep a copy?
6    A   It is there with that -- with that document, itself,
7        with the -- the date, yeah.
8    Q   Did you -- did you make a copy of that and give it to
9        your lawyer?
10   A   Yes, it's there. Yes, it is there with them.
11   Q   All right. So we're going to be able to identity that
12       document that supports this allegation?
13   A   Yes. You are going to find it. It is -- this thing
14       like this with two labels there and it's two numbers.
15   Q   All right. Okay. Now, of these various violations that
16       you claim Ms. Spencer committed in connection with the
17       dispensing of Control 2 substances, to whom, if anybody,
18       did you share this information, or with whom did you
19       share this information?
20       MS. LINDERMAN: Objection to form and
21   foundation.
22       THE WITNESS: With who did I --
23   BY MS. HARDY:
24   Q   Who did you talk to about -- about this?
25       MS. LINDERMAN: Outside of me? Her --

Page 244

1        MS. HARDY: Right.
2        MS. LINDERMAN: -- attorney.
3        Okay. I just want to make sure.
4        THE WITNESS: That's what I transferred to
5    Ms. Linderman.
6    BY MS. HARDY:
7    Q   All right. Let me rephrase it.
8        All right. You claim Ms. Spencer committed a
9        number of violations in connection with dispensing
10       Control 2 substances. Other than your attorney, did you
11       tell anybody about these particular violations that
12       you've identified?
13   A   I told my husband.
14   Q   Okay.
15   A   But even -- because he is a genarian (ph) so he didn't
16       get any -- any clue about what I -- I said.
17   Q   Who other than your husband did you tell, if anyone?
18   A   I tried to get advice from one of Walgreen's -- he
19       already left Walgreen's. His name is Anton.
20   Q   Can you spell his name for us?
21   A   A-N-T-O-N.
22   Q   And where does he work within Walgreen's?
23   A   Sorry?
24   Q   Where does he work within Walgreen's?
25   A   You know, I will give it to you. Which -- which -- what



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
245–248

Page 245

1   store you are talking about, I will give it to you right
2   away.  His -- his store number was 4864.
3   Q   What position did he hold?
4   A   Pharmacist.  I'm not sure.  Pharmacist, or -- I think
5   pharmacist for more than four years.  Something like
6   this.  Four years or five --
7   Q   Okay.
8   A   -- years.
9   Q   Did you talk to anybody else about these alleged --
10  A   Um --
11  Q   -- violations?
12  A   What I wanted to tell you about that, even, it is just
13  something, like -- even he didn't, you know, all this
14  kind of -- of -- of particular stuff.  He just heard
15  about something, like, general -- general information.
16       I don't think even he heard about the Medicare
17  -- I -- you know, I found this kind of Medicare -- Medicare
18  fraud.  I just said to Ms. Linderman, I --
19       MS. LINDERMAN:  Don't say anything --
20       MS. HARDY:  Yeah.
21       MS. LINDERMAN:  -- between me and you.
22       THE WITNESS:  Okay.
23  BY MS. HARDY:
24  Q   All right.  You -- you told your husband something about
25  the alleged violations.  You gave a very general

Page 246

1   description to Anton.
2   A   I --
3   Q   Is there --
4   A   I tried --
5   Q   -- anybody else that you shared this information with?
6   A   The information, I tried to -- to tell him that I -- I
7   found shortage.  This is the only thing.  I already
8   called him, maybe, on June -- June what?
9   Q   Are you referring to Anton right now?
10  A   Sorry?
11  Q   Are you referring to Anton?
12  A   Yeah.  I told him that, "There's a shortage there with
13  one of Control 2 medication.  I discovered that from
14  June 9th -- June 19th, and -- and I don't know, even,
15  what I have to do with that.  That supervisor didn't
16  listen.  That -- that -- that manager didn't listen, and
17  I am in trouble right now.  I don't know who I'm supposed
18  to tell."
19  Q   Okay.
20  A   He told me --
21  Q   I -- I'm just trying to get a list of names right now.
22  A   Okay.
23  Q   Okay.  Is there anybody else you --
24  A   That's what I already got.  Anton just was a shortage
25  of --

Page 247

1   Q   No, I'm not talking about Anton.  I want to know if
2   there's any other people you shared this information
3   with.
4   A   Jeremy Willis, that's what I already told him.
5   Q   Okay.  Anyone else?
6   A   I don't think so.
7   Q   All right.  So the people that -- that you told about
8   Donna Spencer's violations, at least from your point of
9   view, are your husband, Anton, and Jeremy Willis?
10  A   Yes, that's --
11       MS. LINDERMAN:  Objection --
12       THE WITNESS:  -- what I can -- that's what I
13  can remember.
14       MS. HARDY:  Okay.
15       MS. LINDERMAN:  Form and -- object to form --
16       MS. HARDY:  Did you --
17       MS. LINDERMAN:  -- and foundation.
18  BY MS. HARDY:
19  Q   Okay.  What did you tell Jeremy Willis?
20  A   I forwarded him the same -- that same email to both of
21  them at the same time.
22  Q   To -- to who?  To --
23  A   To Ms. Amy --
24  Q   Um-hmm.
25  A   -- and to Mr. Jeremy --

Page 248

1   Q   All right.
2   A   -- Willis.
3   Q   All right.  So when you made your report about
4   Donna Spencer's alleged violations of the rules and
5   regulations concerning the dispensing of Control 2
6   substances, you made that report through an email to
7   Jeremy Willis and Amy Yadmark?
8   A   Yeah.  She knows that, yes.
9   Q   Okay.  And are you referring to --
10       MS. HARDY:  Tom, can you hand me that?
11       MR. DAVIS:  It's Exhibit 5.
12       MS. HARDY:  Exhibit -- oh, is it Exhibit 5?
13       MR. DAVIS:  It's Exhibit 5, I believe.
14  BY MS. HARDY:
15  Q   And can you look at Exhibit 5, please?
16  A   Yes.
17  Q   Is Exhibit 5 the report that you made to Amy and Jeremy
18  about Donna Spencer's alleged violations of the rules
19  and regulations concerning the dispensing of Control 2
20  substances?
21       MS. LINDERMAN:  Object to form and foundation.
22       MS. HARDY:  Or Control 2 medications.
23  Why don't we go off the record for a moment?
24  First, can you --
25       THE VIDEOGRAPHER:  Okay.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
249–252

Page 249

1     MS. HARDY: -- answer the question?
2     First, answer the question, and we'll go off
3   the record.
4     THE WITNESS: Can you repeat the question --
5     MS. HARDY: Yes.
6     THE WITNESS: -- please, again?
7   BY MS. HARDY:
8   Q   Is Exhibit 5 -- the document you have in front of you --
9       the document that you were referring to in your
10      testimony, just moments ago, when you claimed that you
11      reported Donna Spencer's alleged violations?
12  A   Um-hmm.
13  Q   Yes?
14  A   Yes.
15        MS. HARDY: Okay. Now, we can go off the
16  record.
17        THE VIDEOGRAPHER: Okay. This completes disc 3.
18  We're off the record at 4:09.
19        (Whereupon a break was taken
20          from 4:09 p.m. to 4:15 p.m.)
21        THE VIDEOGRAPHER: We are back on the record
22  at 4:15. This is disc 4 of the deposition of
23  Mervat Mikhaeil. Please proceed.
24  BY MS. HARDY:
25  Q   The substance of your report that you made, in

Page 250

1   connection with Exhibit No. 5, speaks for itself because
2   it's in writing, so we don't need to cover that report.
3       But did you have any discussions about this
4   issue with anyone at Walgreen beyond what's indicated in
5   -- in -- in Exhibit 5?
6   A   As I remember, that's -- there's no one, even -- no. I
7       told Ms. Susan Dobrowlsky. She called me on July 15th,
8       I think. And she -- she tried to get all information
9       about that. And this because of recommendation from
10      Mr. Schmidt, the vice president of Walgreen's. I
11      already -- when I got something like suspension on
12      July 11th, I forward to him the whole situation there,
13      because I just wanted to -- to be back with the
14      Walgreen's.
15  Q   Did Susan call you after you wrote to Mr. Schmidt?
16  A   She called me after Mr. Schmidt -- Mr. Schmidt -- I
17      didn't call Mr. Schmidt. I just emailed --
18  Q   No.
19  A   -- him.
20  Q   I know. You sent a letter to Kevin Schmidt; correct?
21  A   Email, yes.
22  Q   All right. And that was on July 18, 2013; correct?
23  A   Yes, maybe.
24  Q   But let me show you a copy of -- of the letter to
25      Mr. Schmidt, so you can confirm the date.

Page 251

1       That's the letter you sent to Mr. Schmidt;
2   correct?
3   A   Yes.
4   Q   And that's dated July 18, 2013 --
5   A   Yes.
6   Q   -- correct?
7   A   Yes.
8   Q   And you talked to Susan after you sent the letter to
9       Mr. Schmidt; correct?
10  A   Yes.
11  Q   Okay. So it was after July 18, 2013; correct?
12  A   Yes. Yes. Yeah, I'm sorry for that. Yes. Because I'm
13      -- I'm a little bit confused between the time I was
14      suspended and the time they told me, "No, you are
15      terminated."
16        So it was on July 11th. And between July 11th
17  to July 22nd, I didn't know that I was terminated. I
18  was there, and in my -- my -- even my profile with
19  Walgreen's open every time. There's nothing wrong with
20  that. So I tried to inform Mr. Schmidt about what
21  happened with me, and he emailed me back that, "I am on
22  vacation out of the state."
23        MS. HARDY: He's got my only copy.
24        MS. LINDERMAN: Sorry.
25

Page 252

1   BY MS. HARDY:
2   Q   Okay. All right. So let me just make sure I understand
3       the sequence of what you reported to Walgreen about
4       Donna Spencer's alleged violations of the laws and
5       regulations controlling the dispensing of Control 2
6       substances.
7         You first notified Amy Yadmark on June 25, 2013,
8       and you put your report in writing, and that's been
9       marked as Exhibit No. 5; correct?
10  A   Yes.
11  Q   All right. And you didn't have any discussions with Amy
12      about this topic? You just communicated with her
13      through email; correct?
14  A   No. She -- that -- yeah. She tried to make me think,
15      on June 28th, just to let me know that this kind of
16      HIPAA violation -- to send it from my personal email.
17      And she told me that this -- this issue will terminate
18      me -- will lead to termination.
19        And she gave me, like, a paper and --
20  Q   This kind of issue meaning the fact that you'd
21      photographed prescriptions?
22  A   Yes.
23  Q   Okay. All right. So she told you on June 28th, after
24      she received your June 25th email, that the fact that
25      you photographed terminations [sic] was a violation of



MERVAT MIKHAEL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
253–256

Page 253

1    HIPAA, and a violation of Walgreen policy, and it could
2    potentially lead to your termination?
3 A   Yes.
4        MS. LINDERMAN:  Object to --
5        MS. HARDY:  Yes.
6        MS. LINDERMAN:  -- form --
7        MS. HARDY:  Okay.
8        MS. LINDERMAN:  -- and foundation.  You said
9    "termination," when you meant "prescription."
10       MS. HARDY:  Thank you for that correction.
11 BY MS. HARDY:
12 Q   And after she told you that you could potentially be
13   terminated for copying on your personal phone, the
14   prescriptions, was that the end of your communications
15   with Amy about the issue of violations of the laws
16   concerning the dispensing of Control 2 substances?
17       MS. LINDERMAN:  Objection to form and
18   foundation.
19       THE WITNESS:  That's what she already told me
20   while I was there in -- in her office.
21 BY MS. HARDY:
22 Q   When were you in her office?
23 A   On June 28th.  It was a Friday, and she asked me to come
24   in there.  I went there and she -- she told me, "Mervat,
25   this is -- this is very big violation against HIPAA.

Page 254

1    Can you just try to tell me why you did that?"
2 Q   Um-hmm.
3 A   I tried to tell her verbal, but she said, "No, sorry.
4    Can you just do that, like -- like handwritten here, and
5    after that sign there?"
6        I tried to read a paper there.  It is coming
7    like a lot of lines there, so I just -- I want to read
8    it.
9        She said, "Mervat, you know, just express
10   yourself, why you did that, just put it there.  I will
11   leave you, like, five minutes to do photocopies for --
12   for some -- some document and coming back right away."
13       And there was a -- a witness there, he is LPS,
14   she told me about him, and she said that the LPS, or
15   loss prevention supervisor, is supposed to be -- he
16   doesn't know anything about the issue.  He doesn't know
17   anything but just as a witness, and is supposed to be.
18       Okay.  And --
19 Q   That was John Calhoun; correct?
20 A   Yes, exactly.
21       And when I tried to jot down why I just
22   photographed that and sent it to her, she left that --
23   that office and went to make photocopies.  Mr. -- the
24   loss prevention supervisor, I don't know what is his
25   name.

Page 255

1 Q   Calhoun?
2 A   Yes.
3        He came to me and he pointed to something
4    there.  It was voluntary, and --
5 Q   What's that word you just used?
6 A   He --
7 Q   Voluntary?
8 A   Yeah.
9 Q   Okay.
10 A  Like this, and he said (witness shakes head).  That's
11   what he already did with his -- with his head, and he
12   said, "No."
13       And I stopped, even, put anything.  I just
14   tried to -- to -- to put my -- to express myself, and
15   even didn't put any letter there.
16       When she came back, she asked me, "Mervat,
17   what is wrong with you?  Why you didn't express
18   yourself, and put your signature there?"
19       I told her, "I'm sorry for that, but can I
20   take it and do it at home, please?"
21       She snatched it --
22 Q   Was that the STARS policy that she wanted you to sign?
23 A   This was a paper.  Even I don't know what was there.
24 Q   Do you recall a discussion with Ms. Yadmark and
25   Mr. Calhoun about a patient whose son had called the

Page 256

1    pharmacy and you said his father had given the wrong --
2    had been given the wrong medication?
3 A   I -- yes.  I thought she -- she asked me, "Do you have
4    another stuff with Ms. -- Mrs. Spencer?"
5        I told her, "Yes.  I have something there."
6        And I -- once I started to tell her about this
7    -- this prescription, she said, "Why you didn't STAR
8    her?"
9        I told her that STAR is something like program
10   with Walgreen's.  It is coming, like, form for
11   everybody.  For every -- for every STAR.  It's supposed
12   to put the name of that -- that -- the wrong -- the name
13   of the medication.  The name of the patient, which I
14   already have the name of the patient, because that
15   patient was in front of me.
16       But I didn't get the medication, which was
17   wrong.  I didn't get that -- that name of that other
18   patient.  They gave it to her by mistake.  They give her
19   another prescription for another patient.  You know what
20   I mean?  She gave him, the patient, all the stuff -- all
21   the stuff for -- totally for another patient.  Something
22   like -- like this, also, coming like a HIPAA violation
23   in a way.
24       But -- but that patient got the wrong one, and
25   when his wife tried to give him the medication, the son



Page 257

1    screamed out, and said, "Don't -- don't give him anything.
2    This is the wrong one."
3         And he read the first name and last name and
4    the -- the medication, and he said, "This is not his."
5         And he took all -- all --
6    Q   Were you the one dealing with him?
7    A   Dealing with the patient?
8    Q   Yes.
9    A   After, like, seven days after.  I tried to get all --
10   any -- any kind of information from the patient, like,
11   for who this -- this -- this medication.  He didn't --
12   he couldn't remember.  What was in the -- in the bottle?
13   He couldn't remember.  What is the day there?  He
14   couldn't remember.  Those are stuff that you -- the form
15   of STAR always asked you.  If you didn't put that --
16   those required data, it will not go through STAR.  It
17   will not go through it.
18        If you wanted to get something to let it go,
19   put every single data you already have, something like
20   your name -- first name, last name, date of birth -- and
21   that patient's first name, the wrong patient -- date of
22   birth, the name of medication, itself, and how many is
23   in there for what this prescription, and for what the
24   other prescription.
25        The patient, himself, is not educated.  He

Page 258

1    couldn't -- couldn't tell anything.  I told her that --
2    I told her, "I couldn't STAR him."
3         But he -- at the -- at the same moment, that
4    -- that -- that son came back and gave it to
5    Mrs. Spencer, and she didn't STAR herself.  It -- there
6    is nothing forwarded to me even to get it.  It is
7    something in your hand right now.  It is not in my hand.
8         This day was my Easter, and I wanted this day
9    off.  I took this day off.  So I wasn't there.  I didn't
10   get any information.
11   Q   What do you mean you weren't there?
12   A   I wasn't -- at this date, I -- I took this date off
13   because it was my Easter.
14   Q   What day are you referring to?
15   A   It was on May 5, 2013.
16   Q   All right.  So you're claiming the -- the -- the son
17   called the pharmacy on what day?
18   A   No.  He came to me the day after, maybe May 5th or
19   May 6th, because I took these two days off.  So maybe
20   May 5th or May 6th.  That patient came on May 13th.
21   Q   May 13th?
22   A   Yes.
23   Q   The patient came into the pharmacy and you talked to the
24   patient?
25   A   Yes.

Page 259

1         MS. LINDERMAN:  Objection.
2    BY MS. HARDY:
3    Q   All right.  And you knew the patient's name?
4    A   Yes.  I know him.
5    Q   And what did the patient tell you?
6    A   The patient told me I got the wrong prescription for
7    another patient.
8    Q   Well, for -- for whom?  For his father?
9    A   For his father.
10   Q   You knew his father's name?
11   A   Yes.
12   Q   Okay.  And did he bring back the wrong prescription?
13   A   No.  He didn't give me anything.  He just told me that
14   story.  That's it.
15   Q   All right.  But you knew when he'd gotten the
16   prescription; right?
17   A   He got it on May 5th or May 6th.
18   Q   Okay.
19   A   Yes.
20   Q   All right.
21   A   Um-hmm.
22   Q   And so you knew the patient's name, the date on which
23   they claim the wrong prescription was given.  The only
24   thing you didn't know was what prescription they got?
25   A   What -- what medication for who?

Page 260

1    Q   Well, you knew who it was for.  You knew it was for the
2    -- for the father of the -- of the person in front of
3    you; correct?
4    A   The wrong -- the wrong patient, they gave it to him.
5    The wrong medication -- the wrong medication was labeled
6    with a wrong -- with the -- the patient.
7    Q   I understand.
8         You knew the patient who'd gotten a wrong
9    medication and the date when they got the wrong
10   medication, you just didn't know what particular
11   medication they received that they should not have
12   received.  That's all correct, is it not?
13        MS. LINDERMAN:  Objection to form and
14   foundation.
15        THE WITNESS:  Okay.
16   BY MS. HARDY:
17   Q   Let's -- let's start over.
18        You knew who was in front of you, the son of
19   the father.  The son of the patient; correct?
20   A   I -- I just concerned about the patient, himself.  The
21   first and last, because even I don't know --
22   Q   Okay.  Just --
23   A   -- the son.
24   Q   -- answer my question.  You knew who the son of the
25   patient was.  He was there in front of you complaining;



MERVAT MIKHAEL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
261–264

Page 261

1 correct?
2 A The son, himself, this -- this was the first time to see
3 him.
4 Q I -- I don't care if it's the first time. You knew who
5 he was. He gave --
6 A He was --
7 Q -- you his name?
8 A Yeah, right. He was in front of me.
9 Q And you knew that he told you that his father had gotten
10 the wrong prescription; right?
11 A His mom got the wrong prescription for his -- his
12 father, yes.
13 Q All right. So you knew the father of the person in
14 front of you had gotten the wrong prescription, and you
15 knew the date on which he'd gotten the wrong prescription --
16 A Exactly.
17 Q -- right?
18 Okay.
19 A Um-hmm.
20 Q And you knew what prescription he should have gotten,
21 because that was in the records; right?
22 A No. It -- there's a lot of records there, so even you
23 don't know which one they give it to.
24 Q Well, on a particular date, you knew what prescription
25 the pharmacy had been asked to give to him; right?

Page 262

1 A Yeah. It is coming, like, a bunch of medication to the
2 patient, a bunch of them. He has a lot of health
3 issues, so he had, like, 12 medications. Which one --
4 Q Twelve medications that he was supposed to get on
5 May 5th or 6th?
6 A Yeah.
7 Q Are you sure?
8 A Something like -- I'm not sure.
9 Q Did you check?
10 A I checked and found a lot of prescriptions, and I asked
11 him, "Do you have any clue which one was wrong?"
12 He said, "No."
13 I told him, "There is a label there. There is
14 first name, last name, with that -- with this
15 medication. Do you know which -- which -- for which
16 patient it was there?"
17 He told me that was -- "Maybe she, maybe he,
18 but I -- I didn't get the first or last name."
19 "Is this -- is this something" --
20 Q But you didn't --
21 A -- "that I have" --
22 Q You said you --
23 A -- "to care" --
24 Q -- you --
25 A -- "about?"

Page 263

1 Q -- you told Ms. Yadmark and Mr. Calhoun that his father
2 was given the wrong medication?
3 A Yes.
4 Q Okay. So you knew it was the father of the person in
5 front of you who got the wrong medication, and you knew
6 the date. You just didn't know what medication they
7 were supposed to get, or what medication they actually
8 got?
9 A Exactly.
10 Q Okay. And you're claiming that you had no obligation,
11 under those circumstances, to prepare a STARS report?
12 A I -- I can't do any kind of a STAR, without getting all
13 the information. You can't -- you can't come in by
14 yourself just to tell me a story, and after that I can
15 put there with a STAR. A STAR means that I have to fill
16 out every single data there. It --
17 Q So you're -- you're telling me that if you happen to be
18 missing one little bit of information, you're not
19 supposed to report anything at all? You either have to
20 report every little bit or nothing?
21 MS. LINDERMAN: Objection to form and
22 foundation.
23 THE WITNESS: Yes, exactly. If you called in
24 to fill out every single -- every -- every single data
25 there, it may be you are trying to cheat me, or you

Page 264

1 don't like that -- this -- this lady --
2 BY MS. HARDY:
3 Q So what does that mean, "trying to cheat me"?
4 A It --
5 Q What does that have to do with it?
6 A Maybe you do it just to -- to hurt her. To tell me to
7 hurt her. You want to STAR her for no reason.
8 Q Who are you referring to?
9 A I'm trying to tell -- this happened for one of the
10 customers. It happened from Ms. Spencer. That's what I
11 already found, that she -- that is supposed to give the
12 right -- the right patient the right medication. She
13 gave the wrong patient the -- the right patient -- wrong
14 medication for wrong patient.
15 Q Well, okay. And -- and you're supposed to report that,
16 so that Walgreen's knows that a mistake has been made?
17 A That's what I did. I reported the issue to Ms.
18 Ms. Amy, and I told her that, "This issue -- I couldn't
19 STAR the -- the issue, because the system didn't let me
20 go through it, because asked me, 'Who is the wrong
21 patient?' I don't have any clue."
22 Q Okay.
23 A "Who is that -- that -- that -- that -- that -- what was
24 the wrong medication? I don't have any clue. How many
25 is -- was in there? I don't have any clue. So I didn't



Page 265

1  do this STAR, because I don't have it."
2       And she asked me, "Why you didn't do it?  This
3  is wrong.  And you're coming to me just to say that
4  there is a STAR?"
5       "Yes, ma'am.  I'm trying to tell you, because
6  the one who handle it -- the -- the -- the -- the wrong
7  prescription is supposed to do it.  It's supposed to --
8  to STAR himself right away.  It's supposed to put
9  that -- that" --
10      Because everything was in the label.  If you
11 got the label out, and you throw it in -- in the
12 garbage, you cannot --
13 Q  Why did --
14 A  -- submit it.
15 Q  -- you wait from May 5th or 6th to June 25th to report
16    the STARS violation?
17 A  No.  I didn't wait this much.  I already report -- maybe
18    I didn't say it clear to my -- to the supervisor, but I
19    told her that, "There is a lot of issues in the
20    pharmacy.  Can I try to set up an appointment with you,
21    please, just for what -- something" --
22 Q  That's --
23 A  -- "happened?"
24 Q  That's not reporting a particular violation by just
25    saying there's a lot of issues in the pharmacy.

Page 266

1       Why didn't you report, prior to June 25th,
2  that a specific patient had been given the wrong
3  medication --
4       MS. LINDERMAN:  Objection to form --
5       MS. HARDY:  -- on May 5th --
6       MS. LINDERMAN:  -- and foundation.
7       MS. HARDY:  -- or 6th?
8       MS. LINDERMAN:  Objection to form and
9  foundation.
10      THE WITNESS:  I --
11 BY MS. HARDY:
12 Q  You waited over a month to give the details, as you knew
13    them, to Walgreen about the wrong medication having been
14    dispensed on May 5th or 6th.
15 A  I --
16      MS. LINDERMAN:  Objection --
17 BY MS. HARDY:
18 Q  Why did you wait so long?
19 A  I didn't --
20      MS. LINDERMAN:  Objection to --
21      THE WITNESS:  I didn't --
22      MS. LINDERMAN:  -- form and --
23      THE WITNESS:  -- wait --
24      MS. LINDERMAN:  -- foundation.
25      THE WITNESS:  I didn't wait this long.  On

Page 267

1  May 23rd, I tried to set up an appointment between me
2  and her just to let her know everything about that, and
3  tried to -- to ask her just to transfer me from there.
4  That's what I tried several times --
5  BY MS. HARDY:
6  Q  You -- you emailed many times to different people at --
7    at Walmart [sic] when you had complaints.  Why didn't
8    you email that information if you're claiming the STARS
9    system would not let you submit a report, because you
10    were missing some details that it needed?
11      MS. LINDERMAN:  Objection as to form and
12    foundation.
13 BY MS. HARDY:
14 Q  Why didn't -- why didn't you notify them by email if you
15    weren't able to sit down and talk with someone, and you
16    weren't able to enter it into the STARS system?
17      MS. LINDERMAN:  Objection to form and
18    foundation.
19      THE WITNESS:  Maybe because I have a document
20    for that, more than what the -- the -- the patient said
21    in front of me.  Maybe because I just wanted to be
22    transferred from this -- this store.  Maybe because I
23    was there for the -- maybe -- I was there for the whole
24    May and the whole -- whole June with a messed up schedule.
25    I couldn't find even time to go to my physician.

Page 268

1  BY MS. HARDY:
2  Q  Okay.  So those are the reasons you waited so long to
3    report it?
4  A  Maybe I couldn't find even time to -- to tell the
5    complaint which I already have.  I tried to set up an
6    appointment.  She called me, or she emailed me, and she
7    said, "Can we set up an appointment for you?"
8       She canceled three times.  She cancelled this
9    appointment between me and her, after May 23rd, three
10    times.
11 Q  All right.  In the course of your meeting on June 25th
12    when you reported, for the first time, the STARS
13    violation that had occurred back on May 5th or 6th, you
14    were given a copy of the STARS policy to reread and
15    sign; correct?
16      MS. LINDERMAN:  Objection to foundation.
17      THE WITNESS:  Can -- can -- when was that --
18    this kind of --
19      MS. HARDY:  On June 25, 2013, when you are
20    meeting with Amy and John.
21      MS. LINDERMAN:  Objection to foundation.
22      THE WITNESS:  June 25th, I got the STAR?
23      MR. DAVIS:  June 28th.
24 BY MS. HARDY:
25 Q  Oh, I guess your -- your meeting on June 28th in



Page 269

1    connection with the email that you sent on June 25th.
2  A   She give me a STAR -- a STAR paper just to sign it?
3  Q   Yeah.  Let me -- let me start over with the question and
4    make it clear.
5      You send an email on June 25th to Amy in which
6    you set forth a series of complaints about Donna Spencer.
7    You then meet with her on June 28th.  And in the course
8    of that meeting you raise the fact that there was a
9    wrong prescription given to a patient, back in early
10    May, and you found out about it through the patient's
11    son when he came into the pharmacy and was very upset.
12      And she then proceeds to ask you why you
13    didn't file out a STARS report in connection with that
14    incident.  And then she gives you a copy of the STAR
15    policy, the company policy called -- you know, the --
16    report an external event, which is a STARS report, and
17    she asked you to read it and sign it.
18      Is that all correct?
19      MS. LINDERMAN:  Objection to --
20      THE WITNESS:  No --
21      MS. LINDERMAN:  -- form and --
22      THE WITNESS:  -- it is --
23      MS. LINDERMAN:  -- foundation.
24      THE WITNESS:  It is not true at all.
25

Page 270

1  BY MS. HARDY:
2  Q   What's not true?
3  A   All the -- what you already said, it is not true at all,
4    because -- because you said that they give -- she gave
5    me something like a paper for a STAR just to sign it.
6    This -- if -- if she gave me something like this, it is
7    not something like -- you -- you have to say yes or no.
8    It is supposed to -- to sign it right away.
9      If she gave me something like this, I'm
10    supposed to read it, and to see that, "Yeah, I already
11    did that.  I did that.  I did that."
12      But when she told -- she -- she -- she told
13    me, "Mervat, you have to STAR her."
14      I told her, "No, ma'am.  I'm sorry.  I
15    couldn't STAR her, because I don't have all the
16    information.  But the one who is supposed to ask is --
17    to be asked for that, the one who handles those stuff."
18      And she told me, "Yes, yes, you are right.  I
19    know that this -- this kind of program didn't go
20    through, but you know what?  There -- there is another
21    -- another way you can let it go.  Try to remind your --
22    your pharmacy manager to -- to show you how to -- how to
23    override this kind of -- all this kind of information
24    just to say it as a story."
25      I told her, "Okay.  I will."

Page 271

1      And she said, "But let me go back again.  We
2    are trying to say that you did a HIPAA violation, and I
3    want you to express yourself.  This is the paper.  You
4    can express yourself here.  Sign there."
5      And that's said with a very big thank you.
6    That's what she said.  I got the paper.  I tried to read
7    it.  She told me, "Mervat, this is kind of HIPAA
8    violation.  Just express yourself, again, and sign it."
9      "Okay."
10      I -- I -- I found something like lines there.
11    I tried to jot what happened, and when I started to do
12    that, the other -- the other LPS told me, "No, don't
13    sign."
14  Q   Who do you claim told you not to sign?
15      MS. LINDERMAN:  Asked and answered.
16      THE WITNESS:  LPS, who was the --
17  BY MS. HARDY:
18  Q   John Calhoun?
19  A   Yes.
20  Q   In front of Amy?
21  A   No.  She was outside doing some copies.
22  Q   Okay.  All right.  Let's go back to your email to Amy on
23    June 25th, which is your report on the violations that
24    you attribute to Donna Spencer in connection with
25    dispensing Control 2 substances.

Page 272

1      You set forth your complaint, in Exhibit No. 5,
2    and then you met with Amy and John Calhoun on
3    September 28th; correct?
4  A   June 28th.
5  Q   Or June 28th.  I'm sorry.
6      And in -- in the course of that conversation,
7    you've testified about discussing the dispensing of the
8    wrong medication with the -- for the father of the son
9    who was in front of you.  We've already covered that.
10      Is there anything else that you discussed?
11  A   I tried to go with that -- I tried to -- I just put it
12    like points -- one, two, three, four, five -- just to
13    let her know everything about what happened in the
14    pharmacy.  Once she heard about it -- one -- one --
15    whoever there, and there is something like that she
16    already heard the name, and she said, "No, no, no, no,
17    no.  Why you didn't do that?"
18      I told her the truth.
19      She said, "Yeah, yeah.  I know that -- it is
20    very strict, the form, but you know what?  You can
21    override all information they asked you for.  Ask your
22    -- your pharmacy" --
23  Q   All right.
24  A   -- "manager."
25  Q   This isn't making any sense without being more specific.



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
273–276

Page 273

1    What did you tell her in the June 28th
2  meeting?
3  A  That's what I already told her.  Maybe I tried to tell
4  her about -- about the unfair treatment I got in the
5  pharmacy.
6  Q  Okay.
7  A  And --
8  Q  All right.  So you told her about unfair treatment in
9  the pharmacy, because of the way you felt Ms. Spencer
10  was treating you and not being nice to you?
11    MS. LINDERMAN:  Objection to form and
12  foundation.
13  BY MS. HARDY:
14  Q  Is that what you're referring to?
15  A  I told her the bad treatment I got there --
16  Q  Okay.
17  A  -- yes.
18  Q  Let's approach it this way.
19    Tell me everything you told Ms. Spencer -- or
20  strike that.
21    Tell me everything you told Ms. Amy Yadmark
22  and John Calhoun in the June 28, 2013 meeting.
23  A  Believe me, I cannot remember every single word I said.
24  Q  Tell me the substance that you conveyed.  What were the
25  issues that you brought to their attention in that

Page 274

1  meeting?
2  A  I told her -- she said, "Why you did this prescription
3  and you -- you sent it over your email?"
4    I told her, "Because even I didn't hear about
5  Walgreen's email before, and supposed somebody just to
6  show me how to use it.  I didn't" --
7    "You know what?  More than that, I didn't get
8  a lab coat from Walgreen's, and I was there for more
9  than 11 -- 11 months there.  You know what?  I didn't
10  get the whole information supposed to get, because the
11  whole time just trying to cover somebody there, or here,
12  or here, or doing my best job with Walgreen's."
13    That's what I already told her.
14    I told her, "Ma'am, I did that.  I" --
15    "She's mad that you are helping here and
16  there.  You -- you just -- get you -- a lot of -- of --
17  of pharmacists, they wear coats, but I cannot override
18  it.  You did HIPAA violation.  You are terminated."
19    I -- I told her, "It's okay."
20    And when I tried just to leave, she said,
21  "Mervat, I will" -- she give me the -- the paper just to
22  sign.  I said, "I -- I'm going to sign it there -- in --
23  in -- at home."
24    And she snatched it from me, and she put it
25  from -- just hide it.  And after that, that's what make

Page 275

1  me suspect to even sign any paper she give me -- she
2  give it to me, because she even didn't tell me.
3    And she told me, "I'm going to ask my lawyers
4  there with Walgreen to see if you did this kind of HIPAA
5  violation, what I have to do with you?  If they said
6  that, 'The first option just to terminate her,' I will
7  do it right away."
8    That's what she said.
9  Q  All right.  All right.  What did you tell her in the
10  meeting?
11  A  That -- what -- that that what happened in, like, 15 minutes
12  or 20 minutes while I was there.  That's it.  I already
13  jotted down a lot of the stuff, but she said, "Mervat, I
14  don't have the whole day just to hear you."
15  Q  Okay.  Did you tell her anything else about
16  Donna Spencer and what you believed?
17  A  She --
18  Q  -- was wrongdoing of Donna Spencer?
19  A  She -- she didn't want to listen, and she said like
20  one -- one sentence, like, four times in a row.
21    She said, "Your manager was a supervisor doing
22  the great job, doing the great work.  You don't know how
23  much.  Follow her for whatever she doing.  She is just
24  excellent.  That's what I can say."
25    After a while, she -- she repeated.  This was

Page 276

1  in front of Mr. --
2  Q  Calhoun?
3  A  Yes, Mr. Calhoun.
4  Q  Okay.  Is there anything else that you told Amy Yadmark
5  or John Calhoun in that meeting on June 28th about
6  Donna Spencer?
7  A  I cannot remember, but maybe yes, maybe no.  But I
8  cannot remember right away.
9  Q  Well, take whatever time you need to think back on that
10  meeting.
11  A  Maybe because I just put, like, notes there.  Maybe if I
12  -- if I go there, but even I don't know where is the
13  notes.  I don't know where did I put all this stuff, so
14  even I don't know how -- how to get it.
15  Q  Do you have any notes that you took during the meeting,
16  or after the meeting, to memorialize the content of the
17  meeting?
18  A  No.
19  Q  Okay.  All right.  Did you ever discuss Donna Spencer
20  with Jeremy Willis and anything that you thought she'd
21  done that was improper?
22  A  Yes.  I already discussed those stuff with Jeremy.  It
23  was the first time -- not first time.  The second
24  time I met him on April 22nd.
25  Q  You met Jeremy on April 22nd?



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
277–280

Page 277

1  A   Yes.

2  Q   And what did you tell Jeremy --

3  A   And it was --

4  Q   -- on April 22nd?

5  A   -- around 6:00 p.m., and he was there just trying to

6      figure out about what's going on here and there.  I told

7      that he's coming just for me, because at this day --

8  Q   What did you tell him?

9  A   I wanted to finish this sentence.

10 Q   I know, but -- but you're into all kinds of background.

11     I just want to know what you told Jeremy Willis about

12     Donna Spencer and her wrongdoing from your point of

13     view.

14 A   I told him the -- the bad treatment she gave to me.  All

15     -- all stuff with her bad treatment.  And I showed him

16     by his -- I -- I already give -- told him about that

17     plan she gave me every week, and it is coming like

18     something regarding the garbage, something to -- to the

19     pharmacy.

20         Something like -- like to -- to order --

21     different order to -- to wash up that sink, and -- or --

22     and I told him about the STARS that she put to me, and

23     both of them supposed to go to her.

24         I showed him everything -- single prescription

25     she STAR'd me, and I told him, "Where is me in all this

Page 278

1      stuff?  This is the stuff coming to me.  Can you show me

2      where -- where -- where am I there?  Can you show me my

3      initial here or there?  Can you show me why she put all

4      those stuff on me?"

5          Especially because she -- when she came in

6      January, she didn't know anything, and I tried to tell

7      her, "There's supposed to be confirmation for a

8      particular prescription, because affects the -- the --

9      the -- the life of the patient, and the -- the history

10     of the patient didn't go with that."

11         She told me, "Mervat, you have the right to do

12     the prescription, itself.  This is the only thing you

13     have to go with, and if that patient -- if that

14     prescriber just prescribe it wrong, it is coming to him,

15     not to me.  Just do the prescription."

16         I told him [sic], "Ma'am, I just want to

17     verify it, if it is right or wrong."

18         She said, "No."

19         And when coming back, I already process it,

20     and it was -- this was just one prescription, and it was

21     something wrong, because the doctor already put it

22     there.  Um --

23 Q   Okay.  You're -- you're getting into too much detail.  I

24     just want to know what complaints you conveyed to

25     Jeremy Willis about --

Page 279

1  A   That's what I already told him.

2  Q   All right.  Did you talk to Jeremy Willis on any

3      occasion, other than April 22, 2013, about Donna Spencer

4      and anything that she did that you thought was inappropriate?

5  A   I tried to reach him, maybe, May.

6  Q   But did -- did you -- did you talk to him?

7  A   I called him once, maybe June, maybe May.  I'm not sure.

8  Q   Did you connect with him?

9  A   I called him.

10 Q   Did you talk to him?

11 A   Yes.

12 Q   Okay.  In -- in June or July?

13 A   June or May.

14 Q   May, okay.

15         And what did you tell him during that

16     conversation?

17 A   "Can you help me, please, to -- to be -- I want to be

18     switched from this store to another one?"

19 Q   Anything else?

20 A   That's what I told him.

21 Q   Okay.

22 A   He told me, "Mervat, when I was there on April 22nd, I

23     got all the issues from you.

24 Q   Um-hmm.

25 A   I forward all the issues to Amy.  I think she talked

Page 280

1      with her and you got a little bit --

2          "Yes, I got like five days, or five or six

3      days apiece with her."

4          "But you didn't email me with all the

5      situation which I already asked you for.  I asked you

6      several times just to send email to me.  Mention every

7      single -- as events happened there just to help you,

8      because this is totally a red flag."

9  Q   All right.  Did -- did -- did you do that?  Did you do

10     what he asked you to do?

11 A   No.  I just emailed him in May or June.  I'm not sure,

12     but I already have all emails with me.

13 Q   Um-hmm.

14 A   I will try to find out about that.

15         And I just mentioned a little stuff just to

16     help me to switch from this store.

17 Q   Well, did you tell him all the important things that

18     Donna Spencer had done that you thought were wrong and

19     inappropriate, and that supported your desire to move to

20     another store?

21 A   I -- I told him, like, more than 90 percent from that,

22     which I already discovered at this moment.

23 Q   Did you talk to Amy Yadmark about Donna Spencer on any

24     occasion other than June 28th?

25         MS. LINDERMAN:  Objection to form and



Page 281

1  foundation.
2         THE WITNESS: After all emails which was
3  between me and her, I'm trying to ask for transfer
4  June 28th, and she called me on June -- July 8th --
5  July -- July -- not 7th -- 8th, and -- and she told me
6  with a very happy voice:
7         "Mervat, I want to tell you happy birthday for
8  today. And I wanted to give you good news. My
9  lawyer -- my lawyers didn't allow me to terminate you,
10  because you didn't do something wrong with this kind of
11  HIPAA violation. What you can get is -- will be another
12  training for HIPAA. That's what you -- I can tell you
13  right now."
14  BY MS. HARDY:
15  Q   When do you claim she told you that? July --
16  A   8th.
17         MS. HARDY: Okay. All right. I'm going to
18  show you Exhibit No. 6.
19         (Marked for identification:
20          Deposition Exhibit No. 6.)
21  BY MS. HARDY:
22  Q   Is this the email that you sent to Jeremy Willis, at his
23  request, where he wanted you to put down all the major
24  violations that -- that Donna Spencer had committed?
25  A   Okay.

Page 282

1  Q   And I believe you testified you put 90 percent of them
2  down in the email that you sent to Jeremy?
3  A   It was forwarded from me to Jeremy, yes. Yes.
4  Q   All right. So Exhibit No. 6 is the email that you were
5  referencing, just a few minutes ago, when you said you
6  put down 90 percent of the issues with Donna Spencer
7  that you were upset about and found to be inappropriate?
8  A   Um-hmm, yes.
9  Q   Okay. All right. So you had a conversation with Amy on
10  June 28th and --
11  A   Can I --
12  Q   -- then another one --
13  A   -- say something for that? This one, I think it was on
14  June 5th, and just I mentioned the -- the later evidence
15  happened with me. That's what I can see. It was
16  something I -- he already heard about -- about what
17  happened before April 22nd, but I think --
18         Can I read this, please?
19  Q   Yes, of course.
20         Here's a better copy of Exhibit No. 6.
21  A   Yes, um-hmm. Yes.
22  Q   What are you saying "yes" to?
23  A   This is something like what happened. I already tried
24  to tell him on April 22nd, and when I called him at this
25  day, after done with my work -- not at this day. The

Page 283

1  day before. It was Tuesday.
2         I called him on Tuesday and tried -- I was on
3  front of the store, and I told him a little bit of
4  issues happened with me on this day.
5         And I told -- he told me, "I know what you are
6  talking about without even telling me. I can imagine.
7  But you didn't give me any other -- any kind of email.
8  I cannot speak any one word without giving me email,
9  because this coming like -- like I'm telling something
10  from my -- my imagination."
11         "So can you just give me that -- that -- that
12  stuff which -- like documents that you're already in
13  trouble with her, so I can tell that -- your -- your
14  supervisor?"
15         So I just sent this like a -- stuff, but it is
16  not the whole -- the whole stuff.
17  Q   But Exhibit No. 6 summarizes the important complaints
18  you have about the conduct of Donna Spencer?
19  A   Yes.
20         MS. LINDERMAN: Objection to form --
21         MS. HARDY: All right.
22         MS. LINDERMAN: -- and foundation.
23  BY MS. HARDY:
24  Q   All right. So you had two conversations with Amy, one
25  on June 8th and June -- July 6th, in which you reported

Page 284

1  the wrongdoing of Donna Spencer. Were there any others?
2  A   With Mr. Jeremy?
3  Q   With Amy.
4  A   With Amy?
5  Q   Yes.
6  A   I -- I -- can you say the date again?
7  Q   June 28th and July 6th.
8  A   6th?
9  Q   July 6th.
10  A   No. I didn't just speak with her on July 6th. I
11  already spoke to her. After she -- she --
12  Q   Did she call you on the phone on July 6th?
13  A   July 8th.
14  Q   Okay. Sorry.
15         So you had two conversations with Amy, one on
16  June 28th and the other on July 8th, about your
17  complaints concerning Donna Spencer and the wrongdoing
18  you claim she engaged in?
19  A   I didn't say any -- any -- any words to her on July 8th,
20  because she just -- she just said, "Good news. There's
21  nothing coming up."
22  Q   Okay. All right. So then let me rephrase.
23         You had one conversation with Amy in which you
24  reported wrongdoing of Donna Spencer, and that was on
25  June 28, 2013?



MERVAT MIKHAEIL VOLUME I
MIKHAEIL vs. WALGREEN'S INC.

July 17, 2014
285–288

Page 285

1  A    June 28th.
2  Q    Is that correct?
3  A    Yes.
4  Q    All right.  And you had one conversation with
5       Jeremy Willis on April 22nd, and then you sent him an
6       email on June 25th in which you summarize the important
7       issues concerning Donna Spencer?
8  A    I -- I have this one for June 5th, so I don't -- there
9       is nothing like 25th in front of me even to tell you.
10 Q    Were there any other communications with Jeremy Willis
11      in which you reported the wrongdoing of Donna Spencer?
12 A    Oh, okay.  Yeah, yeah.  I already -- yeah.  That was --
13      this is the two communications between me and him, and
14      the third one was there in the -- in the pharmacy,
15      itself, in the meeting room, or the manager office, on
16      July 11th.
17 Q    Okay.  What did you tell Jeremy Willis about
18      Donna Spencer on July 11th?
19 A    July 11th, Ms. Amy just set up this -- this meeting to
20      tell me, again -- or to Amy, again, about HIPAA
21      violation.  That's it.  But when I was there, she said:
22           "Can you just resolve this issue, please, like
23      right now?  We want to resolve it at 100 percent from
24      the root.  Can you tell me what is wrong with you,
25      because what I can see, even when you came in, in the

Page 286

1       morning, you didn't say 'hi' to Donna Spencer?"
2  Q    Okay.  I want to know what you told Amy, if anything, on
3       July 11th, about the wrongdoing of Donna Spencer.
4  A    I already told her a lot about this.  I told her, "She
5       hates me.  She's trying to make, like, physical
6       harassment.  She -- the last time I already emailed you,
7       and I'm not sure what -- when was it emailed, but it is
8       there with me.  I can find the date."
9            And I -- I told her, "She -- she had the
10      calendar, why I was working, and she screamed at me.  I
11      lost my -- my -- my concentration.  I -- I couldn't do
12      my -- my work good.  She did a lot of this stuff.  I
13      don't know for what."
14           But she told me, "Mervat, I'm 100 percent that
15      she's treating with you very good this week."
16 Q    Is there anything that you haven't testified to that you
17      told Amy, on any occasion, about Donna Spencer in terms
18      -- in -- in connection with wrongdoing that you claim
19      she's engaged in?
20           MS. LINDERMAN:  Objection to form and
21      foundation.
22           THE WITNESS:  Did I tell her that before, or
23      at this day?
24 BY MS. HARDY:
25 Q    Is there anything more that you recorded about

Page 287

1       Donna Spencer, and her alleged wrongdoing, to Amy?
2            MS. LINDERMAN:  Objection to form and
3       foundation.
4            THE WITNESS:  I already told her everything
5       about -- by --
6            MS. HARDY:  Have you --
7            THE WITNESS:  -- the end --
8            MS. HARDY:  -- told --
9            THE WITNESS:  -- of this year.
10 BY MS. HARDY:
11 Q    -- me everything, on this record, that you told Amy?
12 A    No.
13 Q    What else did you tell Amy, if anything?
14 A    I -- you can find it there with the email.  It is
15      coming, like -- she signed me out from the whole system.
16      She -- in front of the customer, she said a lot of
17      times, "Go out.  Go out.  Go home," several times.
18           She try -- there was a technician, and there
19      is a -- a pharmacist.  She asked that -- that -- that
20      technician to ask to the pharmacist.  That's what I
21      already told her.  I think I already told her everything.
22 Q    Have you testified to everything that you told Amy
23      during this deposition today?
24 A    Yes.  Most of them I already did, yes.
25 Q    Okay.  Is there anything you've left out?

Page 288

1  A    I didn't say it, or you didn't read it?
2  Q    No.  Is there anything that you told Amy about
3       Donna Spencer that you have not testified to, today, in
4       this deposition?
5  A    I told her about she -- she hurts me when she -- she
6       hurt me when she said something regarding my Egyptian
7       nationality.  I already told her that before, not on
8       July 11th.  Um-hmm.
9            MS. HARDY:  Okay.  All right.  We've agreed to
10      adjourn today at five, and it's now after five, so we
11      will adjourn, and --
12           MS. LINDERMAN:  We'll have to figure out how
13      much time we'll add.  We're at six and a half hours, but
14      I think that we can agree to a little bit of an
15      extension of the seven hours.  I'm just not saying I'm
16      going to give you another seven.
17           MS. HARDY:  Okay.  All right.  Fair enough.
18           THE VIDEOGRAPHER:  Okay.  We're --
19           MS. HARDY:  I don't think --
20           THE VIDEOGRAPHER:  -- going --
21           MS. HARDY:  -- I could take another seven
22      hours.
23           THE VIDEOGRAPHER:  We're going off the record
24      at 5:05.
25           (The deposition was adjourned at 5:05 p.m.)



Page 289

```
1    STATE OF MICHIGAN )
                       ) SS
2    COUNTY OF MACOMB  )

3              CERTIFICATE OF NOTARY PUBLIC

4         I, Kelli A. Murphy, a Notary Public in and

5    for the above county and state, do hereby certify that

6    this transcript is a complete, true, and correct record

7    of the testimony of the witness held in this case.

8         I also certify that prior to taking this

9    deposition, the witness was duly sworn or affirmed to

10   tell the truth.

11        I further certify that I am not a relative or

12   an employee of or an attorney for a party; and that I am

13   not financially interested, directly or indirectly, in

14   the matter.

15        In witness whereof, I hereby set my

16   hand this day, Saturday, July 26, 2014.

17

18

19

20   _____

21   Kelli A. Murphy, CSR-7768

22   Notary Public, Macomb County, Michigan

23   Signing in Oakland County, Michigan

24   My Commission expires:  January 7, 2018

25
```

