UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Mervat Mikhaeil,

       Plaintiff,

v.

Walgreens Inc.,

       Defendant.

_____/

Case No. 13-14107

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [26]**

This employment discrimination and retaliation suit arises out Plaintiff Mervat Mikhaeil's employment as a pharmacist at Defendant Walgreens. Plaintiff was terminated after she failed to submit multiple "STARS" reports, Defendant's in-house system for reporting prescription errors. Before her termination, Plaintiff made a number of complaints to her supervisors about potential regulatory violations that another pharmacist was committing. She also complained that the pharmacist subjected her to a hostile work environment by repeatedly making derogatory remarks about her national origin. Plaintiff claims that her failure to submit STARS reports was merely used by Defendant as a prextext for a retaliatory termination. She filed this suit alleging violations of the Federal False Claims Act, 31 U.S.C. 3730(h), Michigan's Medicaid False Claims Act, Mich. Comp. Laws § 400.610c, Michigan's Whistleblower Protection Act, Mich. Comp. Laws § 15.362, Michigan's public policy, the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, and Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2201 *et seq.*

This matter comes before the Court on Defendant's motion for summary judgment. For the reasons stated below, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## I.    Facts

### A.  Events Prior to June 28th Meeting

Plaintiff was hired as a staff pharmacist at Walgreens in July 2012 and worked there until her termination in July 2013. (Def.'s Mot., Ex. 1 ¶ 3, Tab A.) She was hired by the Pharmacy Supervisor for the Michigan North region—encompassing 41 Walgreens pharmacies—Amy Yadmark. In December 2012, Plaintiff was transferred to a Walgreens located in West Bloomfield, MI. Yadmark was also Pharmacy Supervisor for this store. In January 2013, Donna Spencer became the Pharmacy Manager for the West Bloomfield location. Unlike the Pharmacy Supervisor, the Pharmacy Manager is responsible only for her own store. Spencer's direct supervisor was Yadmark.

Shortly after Spencer started, Plaintiff alleges that she made inappropriate comments concerning Plaintiff's national origin. Plaintiff was born in Egypt and immigrated to the United States in 2007. (Pl.'s Resp., Ex. B at 12:6-9.) According to Plaintiff, the first incident occurred when she was discussing with Spencer and another co-worker a traffic stop she experienced the previous night. After Plaintiff explained the interaction she had with the officer, she claims that Spencer told her, "If you are living in the United States of America, you have to deal with American people like an American, because you are already trying to do the same like Egyptian. This is not okay here. Try to forget everything about Egypt." (*Id.* at 327:13-18.)  Plaintiff also claims that Spencer would tap her on the shoulder when Plaintiff was using the phone because Spencer was annoyed by Plaintiff's voice. Plaintiff

2

testified that, at least on one occasion,  Spencer told a co-worker to tell Plaintiff to not "use this voice like Egyptian people . . . over the phone." (*Id.* at 329:8-14.) This happened around 12 times, and Plaintiff testified that it would "hurt her feelings." (*Id.* at 330:4-8.) Plaintiff claims that Spencer told her several times to "forget about her attitude and Egypt," (*Id.* at 339:22-23), and that Spencer also made fun of Plaintiff's pronunciation of a medication. (*Id.* at 334:11-335:2.) Plaintiff also claims that Spencer would assign her menial tasks, such as vacuuming the store or taking out the garbage. (*Id.* at 351:19-352:3.)

Plaintiff first reported these incidents to her Store Manager, Amanda, and Assistant Manager, Ginger, in March. (*Id.* at 343:14-345:19.)There is no mention of what followed from these discussions in the record. In April, Plaintiff spoke to a Loss Prevention Manager, Jeremy Willis, while he was on a routine visit to the store. (*Id.*, Ex. D at 22-24.) Loss Prevention Managers are tasked with investigating claims of inappropriate conduct at Walgreens locations. After Willis asked Plaintiff how she was doing, Plaintiff told him that "she felt like [he] was sent from God because she's had issues with Donna Spencer." (*Id.* at 22.) Plaintiff then began to cry uncontrollably, and Willis could no longer understand what she was saying. He asked her to write him an email detailing her concerns. After leaving, Willis contacted Yadmark to tell her that there may be an issue at Plaintiff's store. (*Id.*, Ex. G at 7.)

Plaintiff failed to contact Willis for a number of weeks. After some prompting, Plaintiff eventually called Willis in late April. When he received the call, Willis could not make out who was calling him or what was being said. He wrote in a report, "The caller was very emotional and . . . repeated over and over, 'she's killing me, she's killing me.' "(*Id.*) After

determining that the caller was Plaintiff, Willis asked her to calm down, but he could still not understand her. Willis again asked Plaintiff to write her concerns to him in an email.

Plaintiff wrote to Willis on June 4th. (Def.'s Mot., Ex. 4.) In this email, Plaintiff wrote that she "feel[s] some kind of discrimination while I'm working with [Spencer]." (*Id.*) She discusses Spencer's comment that Plaintiff not use her "Egyptian attitude in the United States," and also writes that Spencer told her to "stop being mean to others." (*Id.*) Plaintiff also discusses problems that she has had with Spencer failing to cover her shifts after Plaintiff covers Spencer's. Willis forwarded this email to Yadmark the next day so that she could follow up on Plaintiff's concerns. (*Id.*, Ex. 4.) Plaintiff also sent an email to Yadmark on June 4th requesting a transfer from the West Bloomfield store because she felt that she could no longer work with Spencer. (Pl.'s Resp., Ex. I at 7.)

On June 10th, Yadmark received a "frantic" phone call from Plaintiff regarding Spencer. Plaintiff was crying and Yadmark had difficulty understanding her. (*Id.* at 1.) Yadmark believed that she should discuss this matter with Plaintiff in person and directed her to contact her assistant to set up a meeting. The next day, June 11th, Plaintiff wrote another email to Yadmark detailing her issues. (Def.'s Mot., Ex. 1, Tab E.) She wrote that Spencer had come into the store, slammed the table, and said something that Plaintiff viewed as an insult (although she is not sure what Spencer said). Plaintiff stated that she could no longer work with Spencer and was having trouble sleeping. She wrote, "I have been enduring her treatment and trying to forget about her, but I can't sustain it anymore and don't know how to deal with her." (*Id.*) Plaintiff also wrote that she had "evidence and documents of all the mistakes that [Spencer] has done in work." (*Id.*)

4

Yadmark discussed these complaints with Spencer after receiving Plaintiff's email. (*Id.*, Ex. 1 ¶ 9.) Spencer told her that she had become frustrated with Plaintiff and hit her hands on the table to get her attention. Spencer denied making any disparaging remarks about Plaintiff's national origin, but stated that they had talked about different driving styles in the United States and Egypt. Spencer also told Yadmark that she had already apologized to Plaintiff for the incident. Yadmark then discussed the complaints with Willis. (*Id.* ¶ 10.) Yadmark told Willis that Spencer admitted to having a conversation about differing driving styles and that she slammed the table, but that she was going to facilitate an apology between the two. Willis did not follow up on the matter. (*Id.*, Ex. 5 at 75:10-16.)

Plaintiff and Yadmark scheduled a meeting for June 28th to discuss Plaintiff's concerns. Prior to this meeting, however, Plaintiff sent another email to Yadmark. (*Id.*, Tab F.) In this email, sent on June 25th, Plaintiff wrote that she was reporting "about a certain situation that occurred in my pharmacy concerning controlled substance II (C2)." (*Id.*) The email discusses two occasions where Plaintiff believed that Spencer violated the law in advancing medication to patients at no charge. The customers had prescriptions, but Defendant was not yet authorized to fill them. Plaintiff attached pictures of the prescriptions that she had taken with her cell phone to the email, which was sent from her personal Yahoo account. The email concludes "Is this legal? What about DEA laws?" (*Id.*) Yadmark called Plaintiff concerned about how she attached pictures of the prescriptions to the email. (Def.'s Mot., Ex. 1 ¶ 12.) She believed that Plaintiff may have violated patient privacy laws and instructed her to delete any copies of the prescriptions.

### B.  June 28th Meeting

Plaintiff eventually met with Yadmark on June 28th at the district office in Southfield. Loss Prevention Supervisor John Calhoun was also present. At the meeting, Plaintiff and Yadmark discussed Plaintiff's concerns about Spencer's national origin comments and actions. (Pl.'s Mot., Ex. I at 2.) They also discussed Plaintiff's problems with not being properly compensated for covering Spencer's shifts. The conversation then turned to the information in Plaintiff's June 25th email. The parties differ in their accounts of this portion of the meeting. According to Defendant, Yadmark and Plaintiff first discussed Spencer's alleged prescription violations. During this discussion, Plaintiff told Yadmark about a time where a customer called the store to complain that he had been given the wrong medication. Yadmark asked Plaintiff if she had reported this incident in the Walgreens STARS system. (*Id.*) STARS is an electronic system for reporting instances where an improperly processed or improperly filled prescription is dispensed to a customer. (Def.'s Mot., Ex. 1 ¶ 4.) Plaintiff explained that she could not enter a STARS report for this event because she did not have enough information at the time. (Pl.'s Resp., Ex B at 256:3-257:5.)[1] Yadmark disagreed and believed that Plaintiff at least should have entered a draft report. Yadmark spent "20-30 minutes" discussing with Plaintiff the employee policy for entering STARS reports and their importance. (Def.'s Mot., Ex. 1 ¶ 16.) Yadmark further told Plaintiff that Spencer had not violated any of Walgreens' policies by advancing medication to customers. (Pl.'s Resp., Ex. I at 2.)

---

[1] In her brief, Plaintiff "denies that Ms. Yadmark spoke to her about STARTS reports prior to July 11, 2012." (Pl.'s Resp. at 10.) Plaintiff's deposition testimony, however, shows that they did have a discussion about it on June 28th. (*Id.*, Ex. B 256:3-257:5.)

Plaintiff presents a different version of this discussion. She claims that when she talked to Yadmark about Spencer's prescription violations, Yadmark brushed off her concerns. She told Plaintiff that Spencer was "perfect" and had done nothing wrong. (Pl.'s Resp., Ex. B at 385:1-5.) Plaintiff also claims she told Yadmark about a potential instance of Medicare fraud not previously mentioned in the June 25th email. (*Id.* at 503:10-18.) She beleived that Spencer had failed to reverse an incorrectly filled prescription, and, as a result, Medicare was billed twice for the same prescription. Plaintiff testified that she told Yadmark, "There is something with . . . the Medicaid or Medicare fraud, ma'am. I can see that here." (*Id.*) Yadmark again brushed off these concerns. Plaintiff also testified that she gave Yadmark the two prescriptions numbers that she was concerned about. (*Id.* at 225:15-23.) As for why she did not submit STARS reports, Plaintiff testified that Spencer ordered her not to submit STARS reports for Spencer's mistakes and threatened dire consequences if she did. (*Id.* at 473:23-474:12.) It is not clear, however, that Plaintiff actually told Yadmark, or anyone else at Walgreens, about these threats prior to her termination.[2]

At a certain point, the conversation turned to Plaintiff's attachment of prescriptions to the June 25th email. Yadmark explained to Plaintiff that attaching the prescriptions to the email was a privacy violation that may warrant discipline. (Def.'s Mot., Ex. 1 ¶ 14.) Plaintiff testified that Yadmark told her that she would be terminated for the violation, but that Yadmark had to double check with the Privacy Office. (Pl.'s Resp., Ex. B at 252:14-19;

---

[2] In her brief, Plaintiff claims that Yadmark also told her to not file STARS reports, but she fails to support this assertion. Plaintiff's deposition testimony is that Spencer told her not to file STARS reports and that she did not tell Yadmark about this out of fear. (Pl.'s Resp., Ex. B at 475:10-480:3.) Plaintiff, however, did make this claim in her post-termination email to Kevin Schmidt. (Def.'s Mot., Ex. 7, Tab E.)

518:3-5.)[3] Plaintiff was suspended following the meeting pending a determination from the Privacy Office. (Def.'s Mot., Ex. 1 ¶ 17.) Eventually, the Privacy Office determined that Plaintiff should not be terminated, but should be given a final written warning and training for the privacy violation. (*Id.*) Yadmark called Plaintiff to tell her this news. The parties dispute when this occurred. Defendant claims that Plaintiff was suspended for only one day, and this is what Plaintiff's time sheet indicates. (*Id.*, Tab J at 17.) Plaintiff claims that Yadmark did not call her until July 8th, (Pl.'s Resp., Ex. B at 281:16), and that Plaintiff did not return to work until July 11th. In any event, Plaintiff and Yadmark set up a meeting for July 11th to discuss Plaintiff's discipline for the privacy violation and her other concerns. In the interim, Yadmark reviewed Plaintiff's and Spencer's STARS reports and determiend that Plaintiff had filed far fewer reports than would be normally be expected. (Def.'s Mot., Ex. 1 ¶ 19.)

### C. July 11th Meeting

Plaintiff met with Yadmark on July 11th. Loss Prevention Manager Willis was also present. (Pl.'s Resp., Ex. G at 5.) Willis first presented a Privacy Office training document to Plaintiff, but Plaintiff refused to read or sign it. (Def.'s Mot., Ex. 5 at 104:17-105:8; Ex. 1, Tab L at 1.) Plaintiff was allowed to take the document home. (*Id.*) Plaintiff then became frustrated and emotional. (*Id.*, Ex. L.) She requested a transfer from the West Bloomfield store because she could no longer work with Spencer. (Pl.'s Resp., Ex. F at 3.) She

---

[3] In her brief, Plaintiff claims that Yadmark told Plaintiff that "the proper discipline for the alleged HIPPA violation was retraining, not suspension or termination." (Pl.'s Resp. at 8-9.) She also claims that Plaintiff had not been given any warning that she might be terminated for the violation. (*Id.* at 9.) These statements directly contradict Plaintiff's deposition testimony that Yadmark told her that she might be terminated for the violation. (*Id.*, Ex. B. at 518:13-17.)

complained that Spencer would not cover her shifts even though Plaintiff had to cover Spencer's shifts. She also claimed that one time Spencer became upset at Plaintiff for not covering her shifts, and hit her on the shoulder. Plaintiff then explained that she felt that she was a good worker, and told a story about a time when she advanced a customer 17 pills after Spencer incorrectly filled the prescription. Yadmark asked Plaintiff if she submitted a STARS report for this error, and Plaintiff replied that she had not. As it turns out, Spencer had already submitted a STARS report for the error, but it does not appear that either Plaintiff or Yadmark knew this at the time. Yadmark told Plaintiff that she would be suspended for failing to submit a report. The meeting then ended.

### D. Plaintiff's Termination

Immediately following the meeting, Yadmark decided to terminate Plaintiff for failing to submit the STARS report. (Def.'s Mot., Ex. 1 ¶ 22.) She wanted to inform Plaintiff in person, and they agreed to meet on July 22nd. (*Id.*, Tab N.) Before that meeting, Plaintiff sent an email to Walgreens Market Vice-President Kevin Schmidt. (*Id.*, Ex. 7, Tab A.) The email seeks help "regarding an increasingly hostile work environment." (*Id.*) It discusses Plaintiff's complaints about Spencer's comments concerning her national origin. It also details Spencer prescription errors, the meetings Plaintiff had with Yadmark, and Plaintiff's pay concerns. Schmidt forwarded this email to Todd Lyle, Market Loss Prevention Director. (*Id.*, Ex. 7 ¶ 4.) It does not appear that Yadmark was aware of the email.

Plaintiff met with Yadmark and Loss Prevention Supervisor Calhoun on July 22nd. Plaintiff first returned the training document she had taken home following the July 11th meeting. (Pl.'s Resp., Ex. B at 459:2-13.) There is some confusion as to what happened next. According to Defendant, Yadmark handed Plaintiff a copy of her final written warning

9

for her privacy violation from June 25th and a termination letter for failing to enter STARS reports. (Def.'s Mot., Ex. 1 ¶ 23; Ex. P & Ex. Q.) Yadmark did not sign either document. Plaintiff testified that she never received the final wirtten warning for her privacy violation. (Pl.'s Resp., Ex. B at 469:20-25.)

After Plaintiff's termination, Defendant investigated Plaintiff's complaints about national origin discrimination from her letter to Schmidt. Schmidt had determined that the earlier efforts by Willis and Yadmark in addressing these complaints were inadequate. (*Id.*, Ex. E.) The investigation was led by Susan Dobrowolski. (Def.'s Mot., Ex. 10 ¶ 4.) On July 26th, Plaintiff sent another email to Schmidt discussing her termination. (*Id.*, Ex. 7, Tab E.) She claimed that Spencer and Yadmark told her not to enter STARS reports for Spencer's errors. Following her investigation, Dobrowolski concluded that Plaintiff's harassment claims were unsubstantiated. (*Id.*, Ex. 10 ¶ 6.)

## II.   Summary Judgment Standard

Summary judgment is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Moreover, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) (citing and quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

## III.   Analysis

### A. False Claims Act Retaliation

The False Claims Act (FCA), 31 U.S.C. §§ 3729-3730, establishes a scheme that permits either the Attorney General, § 3730(a), or a private party, § 3730(b), to initiate a civil action alleging fraud on the Government. *U.S. ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928, 932 (2009). A private enforcement action under the FCA is called a *qui tam* action. *Id.* "The chief purpose of the FCA is to prevent the commission of fraud against the federal government and to provide for the restitution of money that was taken from the federal government by fraudulent means." *U.S. ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 15 (D.D.C. 2011). To support this purpose, the FCA contains an anti-retaliation provision, § 3730(h), protecting whistleblowers who "pursue or investigate or otherwise contribute to a *qui tam* action, exposing fraud against the government." *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 513 (6th Cir. 2000). Plaintiff alleges that Defendant violated this provision by terminating her for reporting prescription violations and Medicare fraud.

11

Under § 3730(h)(1):

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). FCA retaliation claims are evaluated under the *McDonnell-Douglas* burden-shifting framework. *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007). To establish a prima facie case under § 3730(h), Plaintiff must prove that: (1) she engaged in protected activity; (2) Defendant knew that she engaged in protected activity; and (3) Defendant discharged or otherwise discriminated against her as a result of the protected activity. *U.S. ex. rel. Marlar v. BWXT Y-12*, L.L.C., 525 F.3d 439, 449 (6th Cir. 2008). If Plaintiff succeeds in establishing a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-retaliatory reason for the termination. *Scott*, 234 F. App'x at 346. If Defendant articulates such a reason, the burden shifts back to Plaintiff to show that the proffered reason for her termination was not the true reason, but was pretext for retaliation. *Id.*

### 1. Protected Activity

Before discussing whether Plaintiff's reports of prescription violations and Medicare fraud are protected activity, it is important to note that § 3730(h) was recently amended. Fraud Enforcement and Recovery Act of 2009 (FERA), PL 111-21, May 20, 2009, 123 Stat 1617. Before the amendment, the FCA protected only:

> lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for,

12

> initiation of, testimony for, or assistance in an action filed or to be filed under this section . . . .

As it reads now, the FCA protects:

> lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or *other efforts to stop 1 or more violations of this subchapter*.

31 U.S.C. § 3730(h)(1) (emphasis added). As a result of this amendment, the FCA "now 'protects two categories of conduct.' " *Tibor v. Michigan Orthopaedic Inst.*, No. 14-10920, 2014 WL 6871320, at *2 (E.D. Mich. Dec. 5, 2014) (Cox, J.) (quoting *Halasa v. ITT Educ. Svs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012)). In addition to protecting lawful acts taken in furtherance of an action under the FCA, it now also protects "employees from being fired for undertaking other efforts to stop violations of the Act, such as reporting suspected misconduct to internal supervisors." *Halasa*, 690 F.3d at 847-48; *see also* 155 Cong. Rec. E1295-03, E1300, 2009 WL 1544226 (daily ed. June 3, 2009) (statement of Rep. Berman) ("This language is intended to make clear that [§ 3730(h)] protects not only steps taken in furtherance of a potential or actual qui tam action, but also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department, whether or not such steps are clearly in furtherance of a potential or actual qui tam action.").

Although the Sixth Circuit (and others) have previously recognized that internal reports of fraud, such as Plaintiff's, can qualify as protected activity, *see McKenzie*, 219 F.3d at 516, in protecting "other efforts," the amendment makes clear that this interpretation is correct. An internal report to a supervisor is undoubtably an "effort." *See Webster's Third New International Dictionary* 725 (1986) (defining "effort" as "expenditure of energy toward

13

a particular end.") To be protected, however, the internal report must "specifically allege fraudulent claims for federal funds and not merely address concerns about general misconduct." *Guerrero v. Total Renal Care, Inc.*, No. 11-449, 2012 WL 2237689, at *5 (W.D. Tex. Mar. 12, 2012); *see also U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998) ("Merely grumbling to the employer about job dissatisfaction or regulatory violations does not . . . constitute protected activity . . . .") (interpreting the pre-amendment FCA). This is because the amendment requires a plaintiff to prove that she engaged in "other efforts to stop 1 or more violations of *this subsection.*" 31 U.S.C. § 3730(h)(1) (emphasis added). There still must be some nexus between the report and "exposing fraud." *McKenzie*, 219 F.3d at 517. What the amendment has removed is the requirement that a protected activity be "in furtherance of an action under this section." Therefore, statements from decisions requiring protected conduct to "reasonably lead[] to a viable FCA action," *McKenzie*, 219 F.3d at 517, or to give the employer reason to believe that FCA litigation was a "distinct possibility," *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 188 (3d Cir. 2001), are likely no longer correct. Nevertheless, these decisions generally took a broad view of protected activity and would already find an employee's internal reports to a supervisor protected if they alleged fraud on the government. *See McKenzie*, 219 F.3d at 516 ("Although internal reporting may constitute protected activity, the internal reports must allege fraud on the government.").

Plaintiff has presented sufficient evidence for a jury to believe that she engaged in protected activity. The Court first notes that none of Plaintiff's reports concerning Spencer's potential violations of Schedule II substance regulations, (Pl.'s Resp. at 6-7), constitute protected activity because none of these violations allege fraud on the government. These

14

complaints fall into the category of unprotected "grumbling" about regulatory violations. *McKenzie*, 219 F.3d at 516-17. Plaintiff, however, testified that she complained about more than just these violations. She testified that in addition to her complaints concerning the prescription violations, she also told Yadmark at their June 28th meeting that she was concerned about a potential instance of Medicare fraud. (Pl.'s Resp., Ex. B at 503:10-18.) Plaintiff also testified that she told Yadmark the relevant prescription numbers that she was concerned about. (*Id.* at 225:1-226:24.) Making a report of potential Medicare fraud is not "merely reporting wrongdoing to supervisors." *McKenzie*, 219 F.3d at 516. It is an internal report that alleges fraud on the government. That is protected activity under the FCA. *See Marlar*, 525 F.3d at 450 (holding that an employee adequately plead that she engaged in a protected activity where she "allege[d] that she observed purportedly fraudulent activity and confronted her employer about it").[4]

Defendant argues that Plaintiff's report is not protected activity because Plaintiff lacked proof that Spencer committed fraud. *See Lang v. Northwestern Univ.*, 472 F.3d 493 (7th Cir. 2006). In *Lang*, the court affirmed a finding that an employee failed to engage in protected activity where her report of fraud was "based on nothing more than office gossip."

---

[4] Plaintiff's story does contain a number of inconsistencies. She claims that she told Yadmark her concerns about Medicare fraud on June 28th, but she also testified that she did not learn about the fraud until July 10th or 11th. (Pl.'s Resp., Ex. B at 230:14-231:2.) She later testified that she could not remember the exact date. (*Id.* at 501:2-16; 502:11-23.) There is also no mention of Medicare fraud in any of Plaintiff's emails to Yadmark or Willis prior to their June 28th meeting, (Def.'s Mot., Ex. 1, Tabs E, F), or to Schmidt in July, (*Id.*, Ex. 7, Tabs A, E), even though these emails address every other concern that Plaintiff had. These inconsistencies, however, go to Plaintiff's credibility and are not grounds for granting summary judgment to Defendant. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 419 (6th Cir. 2008)("[I]n a motion for summary judgment, the district court cannot make credibility determinations against the nonmovant . . . .").

*Id.* at 494. The court stated that an employee "who just imagines fraud but lacks proof legitimately may be sacked." *Id.* at 495. Here, Plaintiff testified that she investigated the matter herself and that she presented Yadmark with the prescription numbers she was concerned about. Her report was not based solely on office gossip. Even though Plaintiff's belief that Spencer committed Medicare fraud may have been incorrect, this does not preclude her from presenting a retaliation claim. *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 n.1 (2005) ("[P]roving a violation of [the FCA] is not an element of a § 3730(h) cause of action.").

### 2. Notice

The second element of the prima facie case requires Plaintiff to prove that her "employer knew that [s]he engaged in a protected activity." *Marlar*, 525 F.3d at 449. Because Plaintiff testified that she reported her concerns about a potential instance of Medicare fraud directly to Yadmark, Plaintiff appears to satisfy this element. Relying on *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559 (6th Cir. 2003), Defendant argues that Plaintiff's report failed to provide notice to Defendant because her job duties already required her to alert the company to potential false-claims liability. In *Yuhasz*, the Sixth Circuit affirmed the dismisal of an employee's complaint alleging FCA retaliation because the "concerns about potential liability under the FCA raised by [the employee] in this case were entitrely within the scope of his duties." *Id.* at 567. Reporting potential fraud to his employer, therefore, did not put it on notice that he was engaging in protected activity. *Id.* The Court held that "employees charged with investigating potential fraud . . . must *make clear their intentions of bringing or assisting in an FCA action* in order to overcome the

16

presumption that they are merely acting in accordance with their employment obligations." *Id.* at 568 (internal quotation omitted) (emphasis added).

Even assuming Plaintiff's job requirements are similar to those of the employee in *Yuhasz*, *Yuhasz* no longer appears to be correct in light of the amendment to § 3730(h). As stated previously, the FCA no longer requires that conduct be "in furtherance of an action under this section" to be protected. Rather, the FCA protects any "effort to stop 1 or more violations of this subsection." 31 U.S.C. 3730(h)(1). This includes internal reporting to supervisors "whether or not such steps are clearly in furtherance of a potential or actual qui tam action." 155 Cong Rec. E1295-03, at E1300. If an employee does not need to take steps clearly in furtherance of a potential or actual qui tam action to engage in protected activity, the employee, even if charged with investigating potential fraud, also does not need to "make clear their intentions of bringing or assisting in an FCA action," *Yuhasz*, 341 F.3d at 568, to satisfy the notice requirement. *See Jones-McNamara v. Holzer Health Sys., Inc.*, No. 13-616, 2014 WL 1671495, at *4 (S.D. Ohio Apr. 28, 2014) ("What does not remain correct in regard to the May 2009 version of the statutory scheme is *Yuhasz*'s requirement that the employer knew that the employee was doing more than her job by bringing or furthering an FCA case."); *Manfield v. Alutiiq Int'l Solutions, Inc.*, 851 F. Supp. 2d 196, 204 (D. Me. 2012) ("Since a plaintiff now engages in protected conduct whenever he engages in an effort to stop an FCA violation, the act of internal reporting itself suffices as both the effort to stop the FCA violation and the notice to the employer that the employee is engaging in protected activity."). By reporting her concerns directly to Yadmark, Plaintiff satisfied the notice element of her prima facie case.

### 3. Causation and Pretext

17

The final element of Plaintiff's prima case requires her to establish a causal connection between her protected activity and her termination. "The FCA's legislative history states that the employee must show that 'the retaliation was motivated at least in part by the employee's engaging in protected activity.' " *McKenzie*, 219 F.3d at 518 (citing S.Rep. No. 99-345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300).[5] Plaintiff has made this showing. Plaintiff testified that she made her report of Medicare fraud to Yadmark on June 28th, and Yadmark made the decision to terminate Plaintiff only two weeks later. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012)("A lapse of two months, as is the case here, is sufficient to show a causal connection, and the district court erred in holding otherwise.").

---

[5] Following the Supreme Court decisions in *University of Texas Southwestern Medical Center. v. Nassar*, 133 S.Ct. 2517 (2013) and *Gross v. FBL Financial Services*, 557 U.S. 167 (2009), the standard of causation required under the FCA is in doubt. *See U.S. ex rel. Schweizer v. Oce N. Am.*, 956 F. Supp. 2d 1, 12 (D.D.C. 2013). *McKenzie* was decided in 2000. In the interim, the Supreme Court's decisions in *Nassar* and *Gross* have stressed that statutes prohibiting employers from taking an adverse action against an employee "because of" that employee's protected activity require the employee to prove that the protected activity was the "but-for cause" of the adverse action, not just a motivation for it. *Nassar*, 133 S.Ct at 2528; *Gross*, 557 U.S. at 177-78. Nevertheless, the Court need not decide this question because it finds that Plaintiff can establish causation under either standard.

Furthermore, Plaintiff has also provided evidence that her work was more heavily scrutinized—particularly her STARS entries—after she made her report. *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009)("The combination of this increased scrutiny with the temporal proximity of his termination occurring less than three months after his [protected activity] is sufficient to establish the causal nexus needed to establish a prima facie case."). Spencer testified that she had known that Plaintiff entered few STARS reports, but did not have any concerns about it. (Pl.'s Resp., Ex. J at 28:19-23.) She further testified that she discussed Plaintiff's lack of STARS reports to Yadmark, but Yadmark did not take any discipline against Plaintiff. (*Id.* at 32:5-7.) It was not until the June 28th meeting, after Plaintiff had made her report of Medicare fraud, that Yadmark disciplined Plaintiff for her failure to enter STARS reports. Coupled with temporal proximity, this evidence of heightened scrutiny is sufficient to establish causation for Plaintiff's prima facie case. *See Hamilton*, 556 F.3d at 436.

For the same reason, Plaintiff can demonstrate pretext. A plaintiff can demonstrate pretext by showing that the defendant's stated reasons: (1) have no basis in fact; (2) were not the actual reason for the termination; or (3) are insufficient to warrant the challenged conduct. *Michael v. Caterpildilar Financial Services Corp.*, 496 F.3d 584, 597 (6th Cir. 2007). But, "[i]f an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (i.e. the adverse action), then the employee will not be able to establish pretext." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530-31 (6th Cir. 2012). "When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is

later shown to be 'mistaken, foolish, trivial, or baseless.' " *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009).

Here, Yadmark's apparent disinterest in Plaintiff's failure to enter STARS reports prior to their June 28th meeting could lead a jury to believe that Plaintiff's failure to enter STARS reports may not have been the actual reason for her termination. A jury might also find the circumstances of Plaintiff's termination to be suspect. Yadmark immediately suspended Plaintiff on July 11th after learning that she failed to enter another STARS report. However, Spencer had already entered a STARS report for this event. (Pl.'s Resp., Ex. C at 11-19.) Yadmark eventually learned that Spencer had already entered a STARS report, (*Id.*) but this did not change her decision to terminate Plaintiff. Viewing the evidence in a light most favorable to Plaintiff, Yadmark decided to suspend and later terminate Plaintiff immediately upon learning, from Plaintiff herself, that she failed to enter a STARS report that had already been entered by Spencer. There is no evidence that Yadmark undertook any investigation into the matter between the July 11th meeting and the decision to terminate Plaintiff. These circumstances do not show that Yadmark made a "reasonably informed and considered decision before taking the complained-of action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998).

**B.   Michigan Medicaid False Claims Act Retaliation**

Plaintiff's second cause of action is for retaliation in violation of Michigan's Medicaid False Claims Act (MMFCA). Mich. Comp. Laws § 400.610c. Similar to § 3730(h) of the FCA, the MMFCA prohibits an employer from retaliating against an employee "because the employee engaged in lawful acts, including initiating, assisting in, or participating in the furtherance of an action under this act or because the employee cooperates with or assists

20

in an investigation under this act." *Id.* The MMFCA, however, does not mirror § 3730(h). Notably, unlike § 3730(h), it does not contain language protecting "other efforts" to stop a violation of the act.

Plaintiff has not cited to any cases interpreting the MMFCA but argues that it should be interpreted in same way as the FCA due to its similar language. Although this argument might be persuasive as it relates to the language that the two statutes have in common, there is no reason to believe that the MMFCA should be interpreted to protect "other efforts" to stop violations of the act as the FCA does. This language was crucial in determining that Plaintiff could establish a prima facie case of retaliation under the FCA. Because the MMFCA does not protect "other efforts," Plaintiff cannot establish a prima facie case of retaliation under the MMFCA.

## C.   Violation of the Michigan Whistleblower Protection Act

Plaintiff's third cause of action is for retaliation in violation of Michigan's Whistleblower Protection Act (WPA). Mich. Comp. Laws § 15.362. Under the WPA:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body . . . .

Mich. Comp. Laws § 15.362.

To establish a WPA claim, Plaintiff must show that: (1) she was engaged in a protected activity; (2) Defendant discharged her; and (3) there is a causal connection between the protected activity and the discharge. *Shallal v. Catholic Soc. Servs. of Wayne Cnty.*, 455 N.W.2d 571, 574 (Mich. 1997). Protected activity is interpreted more narrowly

21

under the WPA than the FCA. It consists of: "(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 212 (Mich. 1998) (citing Mich. Comp. Laws § 15.362).

> For about-to-report claims, an employee must prove by clear and convincing evidence that he, or a person acting on his behalf, was about to report, verbally or in writing, a violation or a suspected violation of Michigan law to a public body, *see* Mich. Comp. Laws § 15.363(4), and that the person who fired him was objectively aware that he was about to make a report before he was fired. *Kaufman & Payton, P.C. v. Nikkila*, 503 N.W.2d 728, 732 (1993).

*Briggs v. Univ. of Detroit-Mercy*, 22 F. Supp. 3d 798, 805 (E.D. Mich. 2014) (Cleland, J.). Evidence is clear and convincing when it "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Martin*, 538 N.W.2d 399, 410 (Mich. 1995) (quoting *In re Jobes*, 529 A.2d 434, 441 (N.J. 1987)).

Plaintiff did not report any violations to a public body and she was not asked by a public body to participate in an investigation. The only way for Plaintiff to survive summary judgment on her WPA claim is to show that a reasonable jury could find by clear and convincing evidence that she was about to report violations to a public body. She has not done so. The only evidence that Plaintiff provides that she intended to report the alleged violations to a public body is her July 18th email to Schmidt. (Pl.'s Resp., Ex. F.) In that email, Plaintiff wrote that she was being suspended for, among other things, reporting a prescription violation. (*Id.* at 4.) The email states, "I would like to resolve this internally if possible. If that is not possible, please let me know and I will report the matter to the proper

authorities." (*Id.*) There are number of issues with this evidence. First, this email was sent to Schmidt, not Yadmark. Plaintiff has not provided any evidence showing that Yadmark, the person who terminated her, was "objectively aware that [she] was about to make a report before [she] was fired." *Briggs*, 22 F. Supp. 3d at 805. Second, even if Yadmark was aware, this email was written on July 18th, one week after Yadmark had made the decision to terminate Plaintiff. The email could not have motivated Yadmark to make her decison. Finally, the letter states that Plaintiff initially sought to resolve the issue internally. At the time of the this letter, therefore, she was not "on the verge of," *Shallal*, 566 N.W.2d at 575, reporting the violations to a public body. Plaintiff cannot establish a violation of the WPA.

## D.    Termination in Violation of Public Policy

Plaintiff's fourth cause of action is for termination in violation of Michigan's public policy. "A public policy claim is sustainable . . . only where there is also not an applicable statutory prohibition against discharge in retaliation for the conduct at issue. *Dudewicz v. Norris-Schmid, Inc.*, 503 N.W.2d 645, 650 (Mich. 1993) *disapproved of on other grounds by Brown v. Mayor of Detroit*, 734 N.W.2d 514 (Mich. 2007). Here, the facts giving rise to Plaintiff's public policy cause of action are the same as those giving rise to her causes of action under the FCA, MMFCA, and WPA. Plaintiff cannot bring a claim for termination in violation of public policy in this instance. *See Briggs*, 22 F. Supp. 3d at 807 ("Because the WPA specifically prohibits employers from retaliating against employees who report, or were about to report an unlawful practice, Plaintiff cannot bring a claim alleging that [Defendants] retaliated against him in violation of public policy for the identical reason."); *Harris v. River Rouge Housing Com'n*, No. 11-14030, 2013 WL 1314961, at *14 (E.D. Mich. March 29, 2013) (Rosen, J.) ("Because the same facts giving rise to Plaintiff's public policy

23

count also give rise to violations of the Whistleblower Protection Act and the False Claims Act, Plaintiff's Michigan Public Policy Claim is preempted."). To the extent that Plaintiff argues that she has a non-preempted public policy claim for retaliation arising from *internal* reporting of wrongdoing, "Michigan does not recognize a common law cause of action for an employee who has been discharged for reporting violations of law to a superior." *Shaughnessy v. Interpublic Grp. of Cos., Inc.*, 506 F. App'x 369, 377 (6th Cir. 2012).

**E.    Violation of the Fair Labor Standards Act**

Plaintiff's fifth cause of action is for violation of the Fair Labor Standards Act (FLSA). 29 U.S.C. § 201 *et seq.* Plaintiff argues that Defendant failed to properly pay her on two occasions. First, Plaintiff states she was only paid for two hours on July 11th when she was promised a full day's pay. Second, Plaintiff states that she did not receive the proper amount of b-pay after covering shifts in November 2012 and June 2013.

As to the first allegation, Defendant has provided evidence showing that Plaintiff was properly paid on her final day of work. Between July 10 and July 11, Plaintiff worked 18 hours. (Def.'s Mot., Ex. 1, Tab T.) Her pay stub for that period shows that she was paid for those eighteen hours. (*Id.*, Tab U.) Plaintiff has failed to provide any evidence that she was not paid properly on this date. The mere allegation that she was not paid properly is not sufficient to avoid summary judgment.

As to the second allegation, Defendant states it has reviewed Plaintiff's claim and has decided to pay Plaintiff for both of these dates. (*Id.* ¶ 29.) However, Defendant has not yet presented any evidence that it has paid Plaintiff. Until Defendant pays Plaintiff, the Court declines to grant Defendant summary judgment on Plaintiff's FLSA claim.

**F.    National Origin Harassment and Retaliation**

24

Plaintiff's final causes of action allege violations of Michigan's Elliot-Larsen Civil Rights Act (ELCRA). Mich. Comp. Laws § 37.2202. Plaintiff alleges that Defendant violated ELCRA by: (1) subjecting her to a hostile work environment based on her race or national origin; and (2) terminating her in retaliation for complaining about Spencer's harassment.[6] The claims will be addressed separately below.

### 1. Hostile Work Environment

A plaintiff establishes a prima facie case of hostile work environment based on race or national origin under ELCRA by demonstrating that: (1) the employee belonged to a protected group; (2) the employee was subject to communication or conduct on the basis of her race or national origin; (3) the communication or conduct was unwelcome; (4) the communication or conduct was intended to or in fact did interfere with the employee's

---

[6] Plaintiff also alleges that she was discriminated against because of her race or national origin because she was "improperly subjected to different work conditions based on her race and/or national origin," (Compl. ¶ 80), and because she was "terminated in part because of her race and national origin." (*Id.* ¶ 81.) Plaintiff, however, does not offer any support for these allegations in her brief, which focuses solely on her hostile work environment and retaliation claims. A review of the record also does not reveal any evidence that would allow a reasonable jury to find that Plaintiff was discriminated against because of her race. The "different work conditions" that Plaintiff claims she was subjected to (*e.g.*, being asked to vacuum the pharmacy or take out the garbage) are not materially adverse employment actions. *See Chen v. Wayne State Univ.*, 771 N.W.2d 820, 839 (Mich. Ct. App. 2009)("[I]n order to be actionable, an employment action must be materially adverse to the employee — that is, it must be more than a mere inconvenience or minor alteration of job responsibilities."). And although her termination is materially adverse, Plaintiff has provided no evidence, direct or circumstantial, that would allow a reasonable jury to believe that Yadmark was motivated by Plaintiff's race or national origin in making the decision to terminate her. Furthermore, "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Town v. Michigan Bell Tel. Co.*, 568 N.W.2d 64, 70 (Mich. 1997). Here, Yadmark both hired and terminated Plaintiff within one year. Defendant is entitled to summary judgment on Plaintiff's ELCRA discrimination claim.

25

employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. *Radtke v. Everett*, 501 N.W.2d 155, 163 (Mich. 1993).

> Whether a hostile work environment was created by unwelcome conduct shall be determined by whether a reasonable person, in the totality of the circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment.

> Consequently, to survive summary [judgment], [the] plaintiff ha[s] to present documentary evidence to the trial court that a genuine issue exist[s] regarding whether a reasonable person would find that, in the totality of circumstances, [the defendant's] comments to plaintiff were sufficiently severe or pervasive to create a hostile work environment.

*Quinto v. Cross and Peters Co.*, 547 N.W.2d 314, 320 (Mich. 1996).

In analyzing ELCRA claims, Michigan courts "recognize the persuasive force of federal Title VII precedent." *Beard v. AAA of Michigan*, No. 14-1294, 2014 WL 6480380, at *4 (6th Cir. Nov. 19, 2014). In considering whether discriminatory conduct was severe or pervasive enough to create a hostile work environment, the Court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not create a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). To be actionable, the conduct "must be extreme." *Id.*

Considering the above factors, the Court concludes that the alleged harassment of Plaintiff by Spencer was not severe or pervasive, and therefore failed to create a hostile working environment. Spencer's comments concerning Plaintiff's nationality (*e.g.*, "Try to forget everything about Egypt" and "Forget about your attitude and Egypt"), while perhaps

26

offensive, are not objectively severe. *Cf. Jackson v. Quanex Corp.*, 191 F.3d 647, 654 (6th Cir. 1999). Nor is Plaintiff's allegation that Spencer once made fun of her pronunciation of a medication. Plaintiff also alleges that Spencer would often tap her on the shoulder when she was using the phone and that Spencer shoved her during an argument about covering shifts. Although harassment "involving an 'element of physical invasion' is more severe than harassing comments alone," *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999)), Spencer's conduct was not so physically humiliating as to create a hostile work environment. *Cf. Williams*, 187 F.3d at 559 (holding that a hostile work environment could be established where the "employee's supervisor put his arm around her neck and placed his face against hers, and noticing that she had written 'Hancock Furniture Company' on a piece of paper, said, 'You left the dick out of the hand,' " and where "one day while bending over, he came behind her and said, 'Back up; just back up.' "). Viewed together, Spencer's actions were not severe or pervasive enough to create an objectively hostile work environment.

## 2. Retaliation

To prove a prima facie case of retaliation under ELCRA, "a plaintiff must show (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *DeFlaviis v. Lord & Taylor, Inc.*, 436, 566 N.W.2d 661, 663 (Mich. Ct. App. 1997).

There is no dispute that Plaintiff has established the first three elements of her prima facie case. Defendant argues that Plaintiff cannot established a causal connection between

her complaints about Spencer's harassment and her termination. The Court disagrees. For the same reasons that Plaintiff can establish causation for her FCA retaliation claim, she can establish causation here. Plaintiff can also establish pretext for the reasons discussed in the FCA retaliation section.

## IV.   Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

Defendant's motion is GRANTED as to Plaintiff's claims for violations of the MMFCA (Count II), WPA (Count III), Michigan's public policy (Count IV), hostile work environment under ELCRA (Count VI), and discrimination because of race or national origin under ELCRA (Count VII).

Defendant's motion is DENIED as to Plaintiff's claims of retaliation under the FCA (Count I) and ELCRA (Count VIII).

Defendant's motion is also DENIED WITHOUT PREJUDICE as to Plaintiff's claim for a violation of the FLSA (Count V) until Defendant provides evidence that it has paid Plaintiff the amount promised in Yadmark's declaration. (Def.'s Mot., Ex. 1 ¶ 29.)

SO ORDERED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  February 24, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 24, 2015, by electronic and/or ordinary mail.

s/Carol J. Bethel

28

Case Manager